**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Civil Case No.:**

| | |
|---|---|
| **KATRINA GARCIA and LAURA GABBAMONTE,** individually, and on behalf of all others similarly situated, : | GENERAL JURISDICTION DIVISION |
| : | CLASS ACTION |
| *Plaintiffs,* : | **COMPLAINT FOR** |
| *vs.* : | **EQUITABLE RELIEF AND DAMAGES** |
| : | |
| **KASHI COMPANY,** a California Corporation, and **THE KELLOG COMPANY,** a Michigan Corporation, : | *JURY TRIAL REQUESTED* |
| : | NATIONWIDE CLASS REPRESENTATION |
| *Defendants.* : | |

Plaintiffs, KATRINA GARCIA and LAURA GABBAMONTE ("Plaintiffs") by and through their undersigned counsel, hereby file this Complaint on behalf of themselves and all others similarly situated throughout the United States, and allege against Defendants, KASHI COMPANY and THE KELLOG COMPANY ("Defendants") as follows:

## I. INTRODUCTION

1.      Defendants have represented that the Product is "ALL NATURAL," when in fact, it is not because it contains Genetically Modified Organisms ("GMOs").   Defendants manufacture, market, advertise, distribute and sell various breakfast cereals, energy bars, crackers, frozen entrées including pizza and breakfast foods, as well as snack foods.   At issue here is the cereal product Go Lean Crunch® (the "Product").

2.      Defendants market the Product as "ALL NATURAL."   Specifically on the rear labeling of the Product's packaging.   *See* **Exhibit 1**, attached hereto and incorporated herein, copy of rear label of the Product's packaging.

3.      Contrary to Defendants' representations, however, the Product uses plants grown from GMOs.[1]  *See* **Exhibit 2**, attached hereto and incorporated herein, copy of side label of the Product's packaging showing ingredient list.  Specifically, the Product contains Soy and/or Soy variations, among other ingredients, that are known to be derived from GMOs.     However, Defendants' Product contains no warning or disclaimer that the Product contains GMOs in its advertising and/or labeling for the Product.

4.      GMOs are plants that grow from seeds in which DNA splicing has been used to place genes from another source into a plant.[2]

5.      The Product poses a potential threat to consumers because medical research and scientific studies have yet to determine the long-term health effects of genetically engineered foods.   Recent studies suggest that GMOs may in fact be harmful to a consumer's health.  For example, an insecticidal toxin, known as BT toxin, is often inserted into the genetic code of an array of crops to enable the plant to produce its own insecticide.  This insecticide is released when insects ingest it.[3]  Though BT toxin was supposed to be safe for humans (the digestion system in the human body was supposed to destroy it), more recent studies have shown that the

_____

1.      Dr. Mercola.  "The One and Only Way You Can Tell if a Food is GMO Free."  February 29 2012. Mercola.Com. *See* **Exhibit 3,** *attached hereto and incorporated herein.*

2.      Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.    June 2, 2011. BUSINESS; Business Desk; Part B; Pg. 4. **Exhibit 4,** *attached hereto and incorporated herein.*

3.      Golberg, Max. "For the First Time Ever, Monsanto will be Marketing its Products Directly to Consumers with Sweet Corn-Serious Implications." New York Times, 12 August 2011.  http://livingmaxwell.com/monsanto-gmo-sweet-corn.

human gut is actually not destroying it.[4]   Canadian researchers this year reported that the blood of ninety-three percent (93%) of pregnant women and eighty percent (80%) of their umbilical-cord blood samples contained a pesticide implanted in GMO corn by the biotech company Monsanto, though digestion was supposed to remove it from the body.[5]

6.     The Product also has the potential of harboring allergens not typically associated with the listed ingredients.   A person allergic to Brazil nuts, for example only, would be at risk of suffering an allergic reaction from consuming a product that contained a GMO bioengineered to contain DNA from Brazil nuts.   The consumer would be unaware of the potential allergic reaction because the product containing the GMO would in no way warn of or even indicate its genetically modified condition.

7.      Plaintiffs contend that products containing GMOs are not "all natural" and that Defendants' advertising and labeling is deceptive and likely to mislead the public as a result. Plaintiffs would not have purchased the Product if she had known that the Defendants could not support their claim that the Product is all natural because it contains GMOs.[6]

---

4.     Golberg, Max. "For the First Time Ever, Monsanto will be Marketing its Products Directly to Consumers with Sweet Corn-Serious Implications." New York Times, 12 August 2011.  http://livingmaxwell.com/monsanto-gmo-swet-corn.

5.      Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.   June 2, 2011. BUSINESS; Business Desk; Part B; Pg. 4. *See* **Exhibit 4**; Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.  *See* **Exhibit 5,** *attached hereto and incorporated herein.*

6.      **Plaintiffs do not argue that Defendant was required to state whether its Products were made from genetically modified plaints, as this issue would be pre-empted under the NLEA. Rather Plaintiffs contend that Defendant's affirmative decision to label its Product "ALL NATURAL" is misleading, given that the Products were made from Genetically Modified Organisms.**

## II. PARTIES

8.      Plaintiff, Katrina Garcia is an individual consumer over the age of eighteen.  She resides in Miami-Dade County and is a citizen of Florida.  Plaintiff Garcia has purchased the Product that is the subject of this action, during the Class period, from a Publix Supermarket located at 2270 SW 27th Aveneu, Miami, Florida 33145. Plaintiff Garcia is only making claims for economic damage on behalf of herself and the Class, and respectfully requests a jury trial on damage claims.

9.      Plaintiff, Laura Gabbamonte is an individual consumer over the age of eighteen. She resides in Broward County and is a citizen of Florida.  Plaintiff Gabbamonte has purchased the Product that is the subject of this action from various Publix Supermarkets, during the Class period, including a Publix Supermarket located at 601 S. Andrews Avenue, Fort Lauderdale, Florida 33301.  Plaintiff Gabbamonte is only making claims for economic damage on behalf of herself and the Class, and respectfully requests a jury trial on damage claims.

10.     Defendant Kellogg Company ("Kellogg") is a Delaware corporation with its principal place of business located in the State of Michigan at One Kellogg Square, Battle Creek, Michigan 49017.    Kellogg lists with the Michigan Secretary of State a Registered Agent designated as The Corporation Company located at 30600 Telegraph Road, Suite 2345, Bingham Farms, Michigan 48025.  Therefore, Kellogg is a "citizen" of the State of Michigan.  Defendant Kellogg also promoted and marketed the Product at issue in this jurisdiction and in this judicial district.

11.     Defendant Kashi Company ("Kashi") is a California corporation.   Kashi is a subsidiary of co-Defendant, Kellogg Company and therefore also lists with the California Secretary of State a principal place of business address as One Kellogg Square, Battle Creek,

Michigan 49017.   Kashi lists with the California Secretary of State a Registered Agent designated as C T Corporation System located at 818 W Seventh Street, Los Angeles, California, 90017.   Therefore, Kashi Company is a "citizen" of the State of California.  Defendant Kashi also promoted and marketed the Product at issue in this jurisdiction and in this judicial district.

### III. VENUE AND JURISDICTION

12.     This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under 18 U.S.C. § 1332(d), which, under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the Plaintiffs class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000, exclusive of interest and costs. Plaintiffs allege that the total claims of individual class members in this action are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5).  Plaintiffs are citizens of the State of Florida, as set forth above, and Defendants can be considered a citizen of California (Kashi) and Michigan (Kellogg).  Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).   Furthermore, Plaintiffs alleges that the total number of members of the proposed Plaintiffs Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

13.     Venue in this district is proper pursuant to 28 U.S.C. §1391(b) because Defendants conducts business within, may be found  in, and is subject to personal jurisdiction in this judicial district, and Plaintiffs resides in and purchased the Products that are the subject of this action in this judicial district.

## IV. FACTUAL ALLEGATIONS

14.     Defendants manufacture, market, advertise, distribute and sell various breakfast cereals; energy bars; crackers; frozen entrées including pizza and breakfast foods; as well as snack foods.  At issue here is the cereal Go Lean Crunch® (the "Product").

15.     Defendants market the Product as "ALL NATURAL."  Specifically on the rear labeling of the Product's packaging.  *See* **Exhibit 1**.  Defendants' claim is misleading, however, because Defendants' Product contains GMOs, ingredients that have been modified through biotechnology and are therefore not all natural.[7]

16.     Contrary to Defendants' representations, however, the Product uses plants grown from Genetically Modified Organisms ("GMOs").[8]  *See* **Exhibit 2**, attached hereto and incorporated herein, copy of side label of the Product's packaging showing ingredient list. Specifically, the Product contains Soy and/or Soy variations, among other ingredients, that are known to be derived from GMOs.     However, Defendants' Product contains no warning or disclaimer that the Product contains GMOs in its advertising and/or labeling for the Product.

17.     The GMOs at issue are plants grown from seeds in which DNA splicing has been used to place genes from another source into a plant.  This gene splicing can be used to enable a certain crop to withstand a weed-killing pesticide, for example, or incorporate a bacterial toxin that can repel pests.[9]  This latter practice of incorporating bacterial toxin within a plant's genetic composition has been a particular cause of alarm among conscientious consumers. Canadian

_____

7.     *Id.*

8.     Dr. Mercola.  "The One and Only Way You Can Tell if a Food is GMO Free."  February 29 2012. Mercola.Com. *See* **Exhibit 3,** *attached hereto and incorporated herein.*

9.     Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.  *See* **Exhibit 5**.

researchers this year reported that the blood of ninety-three percent of pregnant women and eighty percent of their umbilical cord blood samples contained a pesticide implanted in GMO corn by the biotech company Monsanto, though manufacturers of GMOs claim that digestion is supposed to remove it from the body. "Given the potential toxicity of these environmental pollutants and the fragility of the fetus, more studies are needed," they wrote in Reproductive Toxicology.[10]

18.     Other concerns that have been raised by environmental groups include the possibility that GMOs contribute to the spread of antibiotic resistance, and could introduce new allergens into foods.[11]   Concern surrounding the latter topic of allergens relates to two factors; the possibility that genes from known allergens may be inserted into crops not typically associated with allergenicity and the possibility of creating new, unknown allergens by either inserting novel genes into crops or changing the expression of endogenous proteins.[12] While the Food and Drug Administration (FDA) has allowed the sale and planting of genetically modified foods for 15 years,  the FDA wrote in a statement to the Tribune that " [u]ltimately, it is the food

---

10.     Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.  *See also*  Golberg, Max. "For the First Time Ever, Monsanto will be Marketing its Products Directly to Consumers with Sweet Corn-Serious Implications." New York Times, 12 August 2011.   http://livingmaxwell.com/monsanto-gmo-sweet-corn.

11.     Bakshi A (2003). "Potential adverse health effects of genetically modified crops". *J Toxicol Environ Health B Crit Rev 6* (3): 211–25.

12.     Key S, Ma JK, Drake PM (June 2008). "Genetically modified plants and human health". *J R Soc Med* 101 (6): 290–8.

producer who is responsible for assuring safety,"  noting also that manufacturers are encouraged to consult with the agency about their products.[13]

19.     The European Union has recognized the potential dangers inherent in consuming genetically modified organisms and has some of the most stringent GMO regulations in the world.  In the European Union all GMOs are considered "new food" and subject to extensive, case-by-case, science based food evaluation by the European Food Safety Authority (EFSA). The EFSA reports to the European Commission who then draft a proposal which if accepted will be adopted by the EC or passed on to the Council of Agricultural Ministers. [14] There is also a safeguard clause that Member States can invoke to restrict or prohibit the use and/or sale of a GMO within their territory if they have a justifiable reason to consider that the approved GMO constitutes a risk to human health or the environment.[15] In February 2008, for example, the French government used the safeguard clause to ban the cultivation of MON810 after Senator Jean-François Le Grand, chairman of a committee set up to evaluate biotechnology, said there were "serious doubts" about the safety of the product.[16]  By 2010, the only GMO food crop with approval for cultivation in Europe is the GM maize MON810, and a second GMO, a potato called Amflora, was approved for cultivation for industrial applications in the EU by the

---

13.     Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.

14.     Davison, J. (February 2010). "GM plants: Science, politics and EC regulations". *Plant Science* 178 (2): 94–98.

15.     European Commission. "Food Safety: From the farm to the fork (What are the National safeguard measures)". Europa.

16.     AFP – Feb 8, 2008 (2008-02-08). "AFP: French GM ban infuriates farmers, delights environmentalists."

European Commission.[17]  Despite the European Union's approval of MON 810, however, it has been banned for cultivation by Germany, Austria, France, Greece, Luxembourg, Poland and Bulgaria.  Meanwhile, Italy does not allow for the cultivation if GMOs.[18]

20.    In addition, independent scientific testing of the effects of GMOs on rats, hamsters, and mice have generated great concern as to the safety of GMOs. The tests have been conducted by: Dr. Irina Ermakova, the Institute of High Neural Activity and Neurophysiology of Russian Academy of Sciences, Moscow; Dr. Alexey Surov and Dr. Alexander Baranov, the Institute of Environmental and Evolution Problems and the Institute of Developmental Biology, Moscow); and Dr. Maria Konovalova, the Saratov Agrarian University. All three of these studies demonstrate significant biological and behavioral changes in the animals when GM soya or GM corn was put into their feed. Some of the biological effects include increased mortality among newborns in the first generation, reduced quantity of offspring, and spike in sterility among second generation animals. On the behavioral front, animals became more aggressive and lost maternal instincts.[19]

21.    Another study conducted by Dr. Arpad Pusztai the potential health risks that GMOs pose to internal organs.  Dr. Arpad Pusztai's research has shown that rats fed with GE potatoes had enlarged pancreases, their brains had shrunk, and their immunity had been damaged. Dr. Eric Seralini's research demonstrated that organ damage can occur.  In addition, the Committee of Independent Research and Information on Genetic Engineering (CRIIGEN)

---

17.    "European Commission approves Amflora starch potato - BASF - The Chemical Company - Corporate Website". BASF. http://www.basf.com/group/pressrelease/P-10-179. Retrieved 2010-09-24.

18.    Barker, Debbie. "Part II: The Emperor has No Clothes." p. 37.

19.    Barker, Debbie. "Part II: The Emperor has No Clothes." P. 39.

and universities at Caen and Rouen were able to get raw data of Monsanto's 2002 feeding trials on rats at the European Council order and made it public in 2005. The researchers found that rats fed with three approved corn varieties of GE corn—Mon 863, insecticide products, Mon 810, and Roundup Ready herbicide —suffered organ damage. The data "clearly underlines adverse impacts on kidneys and liver, the dietary, detoxifying organs as well as different levels of damages to the heart, adrenal glands, spleen and hematopoietic systems," according to Dr. Gilles Eric Seralini, a molecular biologist at the University of Caen.[20]

22.    Additionally, evidence of liver and kidney toxicity appeared when rats were fed an approved GE maize variety (Mon 863) (Seralini GE, Cellier D. & Spironx de Vendomois, J, 2007, "New analysis of rat feeding study with a GM Maize", Archives of Environmental Contamination and Toxicology, 10,1007, S 00244-006-0149-5). Similar effects were observed when Monsanto fed its GT-73 Roundup Ready canola variety to rats. The rats showed a 12 percent to 16 percent increase in liver weight.[21]

23.    Even the World Health Organization (WHO) cautions that "Different GM organisms include different genes inserted in different ways. This means that individual GM

---

20.    Dr. Shiva Vandana, "Introduction: The GMO Emperor has No Clothes." p. 17. "A Comparison of the Effects of Three GM Corn Varieties on Mammalian Health," Joel Spiroux de Veu de Mois, Francois Roullier, Dominique Cellise, Gilles Eric Serelini, *International Journal of Biological Science*s, 2009, 5: 706-726.

21.    Dr. Shiva Vandana, "Introduction: The GMO Emperor has No Clothes." p. 18. *See* Greenpeace (2004) "Greenpeace critique of Monsanto's Roundup Ready Oilseed rape, GT-73",*http://www.greenpeace.at/uploads/media/GT73_Greenpeace_comments_Oct_2004_01.pdf.*

foods and their safety should be assessed on a case-by-case basis and that it is not possible to make general statements on the safety of all GM foods."[22]

24.     More recently, Americans have also expressed a heightened concern about the safety of GMO products, as evinced by the fact that 14 states have currently introduced legislation on GMO labeling. Alaska, with its huge wild salmon industry, has already passed a biotech seafood labeling law.[23]

25.     In addition,  polls taken by the Pew Center, Consumers Union, Harris Interactive and ABC over the last decade that have consistently found that the vast majority of Americans would like to see genetically modified foods better regulated and labeled.[24]

26.     Plaintiffs contend that Defendants' failure to disclose the presence of GMOSs in its Product amounts to a material misrepresentation. Plaintiffs would not have purchased   the Product had she known it contains GMO.s

27.     Furthermore, in *Robert Briseno v. Conagra Foods,* Case No.:  CV 11-05379 MMM(AGRx), United States District Court for the Central District of California, Plaintiffs claimed that Defendant's decision to label its products 100% natural was misleading, given that the products were made from genetically modified plants.  Though the judge acknowledged that requiring an outright labeling of GMO was pre-empted, the judge nonetheless acknowledged that the claim 'All-Natural' could be misleading to a reasonable consumer.  The Court ultimately

22.     Dr. Shiva Vandana, "Introduction: The GMO Emperor has No Clothes." p. 19. *See* "20 Questions  on  Genetically  Modified  Foods."  World  Health  Organization. *http://www.who.int/foodsafety/publications/biotech/20questions/en/*.

23.     Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.
24.     Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.   June 2, 2011. BUSINESS; Business Desk; Part B; p. 4.

concluded that "a reasonable consumer could have been misled by the labeling, marketing, and advertising at issue in this case."[25]

28.    At a minimum, Plaintiffs contends that Defendants should identify that the Product contains genetically modified ingredients.  Failure to is an omission of a material fact and violates a consumer's democratic right to information and choice.   Most people consider the decision of what they put into their bodies to be tremendously important.   People follow restricted diets for religious reasons (some observers of the Jewish faith keep Kosher, some observers of Muslim faith only eat Halal food, and some observers of Hindu faith refuse beef), for moral or personal reasons (many vegetarians and vegans restrict their diets for moral reasons), or because they physically cannot eat certain foods (those with celiac disease cannot eat wheat, those who are lactose intolerant cannot consume dairy products, and those with other food allergies face similar restrictions). In the latter scenario, eating the food in question could cause severe physical harm or death. In the first two scenarios, while the diets may be driven by personal choice rather than physical necessity, the beliefs behind the choices are often deeply held. If a Muslim eats soup that is labeled vegetarian but in fact contains pork, or if a vegetarian eats cereal that contains mouse parts, the mislabeling that led to the inadvertent consumption is likely to be extremely offensive.[26]   Likewise, Defendant's covert inclusion of GMOs in its Product amounts to an unlawful affront to the health conscious consumers and the public at large.

---

25.    *Robert Briseno v. Conagra Foods, Inc*, Case No.:  CV 11-05379 MMM(AGRx), United States District Court for the Central District of California, *Tentative Order Granting Motion to Dismiss*, p. 20 (CD California 2011). *See* **Exhibit 6,** *attached hereto and incorporated herein.*

26.    Valery Federici. "Genetically Modified Food and Informed Consumer Choice: Comparing U.S. and E.U. Labeling Laws*." 35 Brooklyn J. Int'l L. 51 5* at 528.

29.     As Wendell Berry Notes in her *Twelve Paragraphs on Biotechnology*, "[i]n biotechnology, as in any technology affecting living systems, there is nothing perfectly predictable. What we do within living bodies and in the living world is never a simple mechanical procedure such as threading a needle or winding a watch. Mystery exists; unforeseen and unforeseeable consequences are common."[27]   Accordingly, Defendant's failure to disclose the presence of GMOs in its Product violates the consumer's right to know what is being introduced into his or her body/internal system, and right to choose whether he or she wishes to participate in the current experimental stage of genetically modified organisms and their comprehensive effect on human health.

## V. CLASS ALEGATIONS

30.     Plaintiffs re-allege and incorporate by reference the allegations set forth *supra* in paragraphs one (1) through twenty-nine (29) of this Complaint.

31.     Plaintiffs bring this class action pursuant Federal Rule of Civil Procedure 23 and seeks certification of the claims and certain issues in this action pursuant to the applicable provisions of Federal Rule of Civil Procedure 23, on behalf of all persons who, within the four years preceding the filing of this Complaint ("Class Period") purchased the Product for personal use ("Class") throughout the United States.

32.     Defendants' practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All members of the putative Class were and are similarly affected by having purchased and used the Product for its intended and foreseeable purpose, and the relief sought herein is for the benefit of Plaintiffs and members of the putative Class.

---

27.     Wendell Berry, "Twelve Paragraphs on Biotechnology." <u>The GMO Emperor has no Clothes</u>." p.43.

33.     Plaintiffs are informed and believe, and on that basis allege, that the Plaintiff Class is so numerous that joinder of all members would be impractical. Based on the annual sales of the Product and the popularity of the Product, it is apparent that the number of consumers of the Product would at least be in the many thousands, thereby making joinder impossible.

34.     Questions of law and fact common to the Plaintiff Class exist that predominate over questions affecting only individual members, including, *inter alia*:

    a.     Whether Defendants' practices in connection with the design, testing, manufacture, assembly, development, promotion, marketing, advertising and sale of the Product were deceptive or unfair in any respect, thereby violating the Florida Deceptive and Unfair Trade Practices Act, *inter alia*, sections 501.201 to 201.213, *Florida Statutes*;

    b.     Whether Defendants were unjustly enriched through its sale of the Product;

    c.     Whether Defendants negligently misrepresented the true nature of the Product;

    d.     Whether Defendants intentionally misrepresented the true nature of the Product;

    e.     Whether Defendants breached express warranties in its sale of the Product, thereby causing harm to Plaintiffs and members of the Class;

    f.     Whether Defendants violated the Magnuson-Moss Act (15 U.S.C.§§ 2301 *et seq.*);

    g.     Whether Defendants breached implied warranties in its sale of the Product, thereby causing harm to Plaintiffs and members of the Class;

h.     Whether Defendants failed to adequately warn of, and/or concealed the dangers and health risks associated with the Product; and

i.     Whether Defendants' conduct as set forth above injured consumers and if so, the extent of the injury.

35.     The claims asserted by Plaintiffs in this action are typical of the claims of the members of the Plaintiff Class, as the claims arise from the same course of conduct by Defendant, and the relief sought is common.

36.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Plaintiff Class.  Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation.

37.     Certification of this class action is appropriate under Federal Rule of Civil Procedure 23 because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims.

38.     Absent a class action, it would be highly unlikely that the representative Plaintiffs or any other members of the Class would be able to protect its own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

39.     Certification is also appropriate because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.  Further, given the large number of consumers of the Products, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

40.     A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender.

41.     The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

### VI. FIRST CAUSE OF ACTION:
### FOR VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. § 501.201, ET SEQ.

42.     Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through forty-one (41) of this Complaint.

43.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 to 201.213, *Florida Statutes*. The express purpose if the Act is to "protect the consuming public...from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce" Section 501.202(2).

44.     The sale of the Product at issue in this cause was a "consumer transaction" within the scope of the Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 to 201.213, *Florida Statutes*.

45.     Plaintiffs are "consumers" as defined by Section 501.203, *Florida Statutes*. Defendants' Product Go Lean Crunch® is a "good", within the meaning of the Act.  Defendants are engaged in trade or commerce within the meaning of the Act.

46.     Section 501.204(1), *Florida Statutes* declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce".

47.     Section 501.204(2), *Florida Statutes* states that "due consideration be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Trade Commission Act".  Defendants' unfair and deceptive practices are likely to mislead – and have misled – the consumer acting reasonably under the circumstances and, therefore, violate Section 500.04, Florida Statutes and 21 U.S.C. Section 343.

48.     Defendants have violated the Act by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.   Specifically, Defendants have represented that the Product is "ALL NATURAL," when in fact, it is not because it contains GMOs.

49.     Plaintiffs and Class Members have been aggrieved by Defendants' unfair and deceptive practices in that they purchased and consumed Defendants' Product.

50.     The damages suffered by the Plaintiffs and the Class were directly and proximately caused by the deceptive, misleading and unfair practices of Defendants, as described above.

51.     Pursuant to Section 501.211(1), *Florida Statutes*, Plaintiffs and the Class seek a declaratory judgment and court order enjoining the above described wrongful acts and practices of the Defendants and for restitution and disgorgement.

52.     Additionally, pursuant to sections 501.211(2) and 501.2105, *Florida Statutes*, Plaintiffs and the Class make claims for damages, punitive damages, attorney's fees and costs.

## VII. SECOND CAUSE OF ACTION:
## UNJUST ENRICHMENT

53.     Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through forty-one (41) of this Complaint.

54.     Defendants have represented that the Product is "ALL NATURAL," when in fact, it is not because it contains GMOs.

55.     Plaintiffs and Class Members conferred a benefit on Defendants by purchasing its Product Go Lean Crunch®.

56.     Defendants accepted and retained the benefit in the amount of the profits it earned from sales of its Product to Plaintiffs and Class Members.

57.     Defendants have profited from its unlawful, unfair, misleading, and deceptive practices and advertising at the expense of Plaintiffs and Class Members, under circumstances in which it would be unjust for Defendants to be permitted to retain the benefit.

58.     Plaintiffs and Class Members do not have an adequate remedy at law against Defendants (in the alternative to other claims pleaded herein).

59.     Plaintiffs and Class Members are entitled to restitution of the excess amount paid for the Product, over and above what they would have paid if the dangers and health risks associated with the Product had been adequately disclosed.   Accordingly, the Product was valueless such that Plaintiffs and Class Members are entitled to restitution in an amount not less than the purchase price of the Product.

60.     Plaintiffs and Class Members are also entitled to disgorgement of the profits Defendant derived from the sales of its Product.

## VIII. THIRD CAUSE OF ACTION:
### NEGLIGENT MISREPRESENTATION

61.     Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through forty-one (41) of this Complaint.

62.     Defendants have negligently represented that the Product is "ALL NATURAL," when in fact, it is not because it contains GMOs.

63.     Defendants have omitted a material fact to the public, including Plaintiffs and Class Members, about its Product.  Through packaging, labeling and other means, Defendants have failed to disclose that the Product contains Genetically Modified Organisms.  Defendants knew or should have known that these omissions would materially affect Plaintiffs' and Class Members' decisions to purchase the Product.

64.     Plaintiffs and other reasonable consumers, including the Class members, reasonably relied on Defendants' representations set forth herein, and, in reliance thereon, purchased the Product.

65.     The reliance by Plaintiffs and Class members was reasonable and justified in that Defendants appeared to be, and represented itself to be, a reputable business, and it distributed the Product through reputable companies.

66.     Plaintiffs would not have been willing to pay for Defendants' Product if she knew that it contained genetically modified organisms, which have yet to be scientifically proven to be safe for human consumption. In fact, as discussed in greater detail above, several recent studies have indicated the contrary.

67.      As a direct and proximate result of these misrepresentations, Plaintiffs and Members of the Class were induced to purchase and consume Defendants' Product, and have suffered damages to be determined at trial in that, among other things, they have been deprived

of the benefit of their bargain in that they bought Products that were not what they were represented to be, and they have spent money on Products that had less value than was reflected in the premium purchase price they paid for the Product.

## XI. FOURTH CAUSE OF ACTION:
## INTENTIONAL MISREPRESENTATION

68.     Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through forty-one (41) of this Complaint.

69.     Defendants have intentionally represented that the Product is "ALL NATURAL," when in fact, it is not because it contains GMOs.

70.      Defendants have knowingly and intentionally omitted a material fact about the Product it has represented to the public, including Plaintiffs, by packaging, labeling and other means.   Defendant has intentionally failed to disclose that the Product contain Genetically Modified Organisms.  Defendants knew that these omissions would materially affect Plaintiffs and Class Members' decisions to purchase the Product.

71.     Defendants failed to disclose the genetically engineered components of its Product with the intention of inducing consumers to purchase its Product.

72.     Plaintiffs and other reasonable consumers, including the Class members, relied on Defendants' representations set forth herein, and, in reliance thereon, purchased the Product.

73.     The reliance by Plaintiffs and Class members was reasonable and justified in that Defendants appeared to be, and represented themselves  to be, reputable businesses, and they distributed the Product through reputable companies.

74.     Plaintiffs would not have been willing to purchase Defendants' Product if she knew that it contained Genetically Modified Organisms, which have not been scientifically proven to be safe for human consumption.  Moreover, as noted above, recent scientific studies

have actually indicated the contrary, i.e. that genetically modified organisms are not safe for human consumption.

75.    As a direct and proximate result of the intentional misrepresentation alleged herein, Plaintiffs and Class members were induced to purchase the Product, and have suffered damages to be determined at trial in that, among other things, they have been deprived of the benefit of their bargain in that they bought Products that were not what they were represented to be, and have spent money on Products that had less value than was reflected in the purchase price they paid for the Product.

76.    Plaintiffs and other members of the general public, in purchasing and using the Product as herein alleged, did rely on Defendant's above representations, all to their damage as alleged.   In doing these things, Defendants were guilty of malice, oppression and fraud, and Plaintiffs and Members of the Class are, therefore, entitled to recover damages.

## X. FIFTH CAUSE OF ACTION:<br>FRAUDULENT CONCEALMENT

77.    Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through forty-one (41) of this Complaint.

78.    Defendants have represented that the Product is "ALL NATURAL," when in fact, it is not because it contains GMOs; therefore, fraudulently concealing the fact that the Product either is not "ALL NATURAL" and/or contains GMOs.

79.    Plaintiffs allege on information and belief that Defendants suppressed facts regarding the dangers and health risks associated with use of the Product for the purpose of selling its Product in such manner as set forth in detail above.

80.    Defendants were bound to disclose all material facts concerning the contents of its Product, but Defendants intentionally failed to disclose the existence of GMOs in its Product and

the truth about the dangers and health risks associated with use of the Product as set forth in detail above.  Defendants knew that these omissions would materially affect Plaintiffs and Class members decisions to purchase the Product.

81.    Plaintiffs allege on information and belief that Defendants concealed these facts when it knew the true and correct facts regarding the Product, and that Defendants took steps to prevent these facts from becoming known to the general public in the marketing, promotion and sale of the Product.

82.    The concealment of the true facts from Plaintiffs and members of the Class was done with the intent to induce Plaintiffs and members of the Class to purchase the Product.

83.    The reliance by Plaintiffs and members of the Class was reasonable and justified in that Defendants appeared to be, and represented themselves to be, reputable businesses.

84.    Plaintiffs and members of the Class would not have purchased the Product and used them had they known the true facts about the Product.

85.     As a direct and proximate result of the fraud and deceit alleged, Plaintiffs and members of the Class have suffered actual damages in an amount to be determined at trial in that they were induced to purchase products they would not have purchased had they known the true facts about, and have spent money on Products that were not what they were represented to be, and that lack the value Defendants represented the Product to have.

86.    Plaintiffs are informed and believe, and thereon allege, that Defendants knew of the dangers and health risks associated with use of the Product set forth in detail above, and that Defendants intended that customers and the unknowing public should rely on Defendants' representations that the Product is safe and conventional consumer products, as well as Defendants' suppression of the true facts about the Product.

87.     Plaintiffs and other members of the general public, in purchasing and using the Product as herein alleged, did rely on Defendants' above representations and suppression of facts, all to their damage as hereinabove alleged. In doing these things, Defendants are guilty of malice, oppression and fraud, and Plaintiffs and Members of the Class are, therefore, entitled to recover punitive damages.

## XI. SIXTH CAUSE OF ACTION:
## FOR BREACH OF IMPLIED WARRANTY OF FITNESS FOR PURPOSE

88.     Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through forty-one (41) of this Complaint.

89.     Defendants have represented that the Product is "ALL NATURAL," when in fact, it is not because it contains GMOs.  Therefore, Defendant impliedly warranted that the Product does not contain GMOs.

90.     Plaintiffs and other Members of the Class sought a conventional, safe and healthy salad dressing. In doing so, Plaintiffs and other Members of the Class relied on Defendants' skill and judgment to select and furnish suitable goods for that purpose, and on or about that time, Defendants sold the Product to Plaintiffs and other Members of the Class.

91.     By their representations regarding the reputable nature of its companies and related entities, and by their promotion and marketing of their Product, Defendants warranted that the Product was a safe, healthy, and natural cereal for use by consumers. Plaintiffs and Members of the Class bought the Product from Defendant, relying on Defendants' skill and judgment.  However, Defendants' Product was not safe and conventional products because they contained genetically modified organisms as set forth in detail above.

92.     At the time of sale, Defendants had reason to know the particular purpose for which the goods were required, and that Plaintiffs and Members of the Class were relying on

Defendants' skill and judgment to select and furnish safe and conventional goods, so that there was an implied warranty that the goods (the Product), were fit for this purpose.

93.     However, Defendants breached the warranty implied at the time of sale because Plaintiffs and Members of the Class did not receive suitable goods in as much as the goods contained GMOs.  Because the Product has not been scientifically proven to be safe and healthy for consumption through any long-term studies, the Product was not fit for the particular purpose for which it was marketed.

94.      As a proximate result of this breach of warranty by Defendants, Plaintiffs and Members of the Class have suffered actual damages in an amount to be determined at trial in that they were induced to purchase products they would not have purchased had they known the true facts about, and have spent money on products that were not what they were represented to be, and that lack the value Defendants represented the Product to have.

## XII. SEVENTH CAUSE OF ACTION:
## BREACH OF EXPRESS WARRANTY

95.     Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through forty-one (41) of this Complaint.

96.     Defendants have expressly represented that the Product is "ALL NATURAL," when in fact, it is not because it contains GMOs.

97.      Plaintiffs are informed and believes and thereon alleges that Defendants made different express warranties, including, but not limited to, that the Product was a safe, healthy, and natural cereal and would not be harmful to the consumer using it.

98.     As stated hereinabove, there is no scientific evidence to support Defendants' contention that the Product is natural and safe for human consumption, and Defendants withheld

the existence of the genetically modified organisms in its Product and failed to warn of the dangers and health risks associated with use of the Product as more fully described above.

99.     The failure to produce any scientific evidence ensuring the long-term safety associated with use of the Product constitutes breaches of all applicable express and implied warranties as alleged in this complaint, based on all laws that support the breach of express warranty claims by Plaintiffs and other members of the Class regarding the true nature of the Product; these laws include but are not limited to the Common Law and Florida's Consumer Protection Act.

100.    As a proximate result of the failure of the Product to perform as expressly warranted by Defendants, Plaintiffs and members of the Class have suffered actual damages in an amount to be determined at trial in that they were induced to purchase products they would not have purchased had they known the true facts about, and have spent money on products that were not what they were represented to be, and that lack the value Defendants represented the Product to have.

101.    Plaintiffs and Class members gave timely notice to Defendants of this breach on behalf of themselves and all members of the Plaintiff Class directly through a Notice letter sent to Defendants on April 13, 2012, attached hereto and incorporated herein as **Exhibit** 7.

102.    Furthermore, Defendants continue to market the Product without extensive scientific evidence to support the claim that the Product is safe for human consumption in the long-run.

### XIII. EIGHTH CAUSE OF ACTION:
### VIOLATION OF THE MAGNUSON-MOSS ACT (15 U.S.C.§§ 2301 *et seq.*).

103.    Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through forty-one (41) of this Complaint.

104.    Defendants have expressly and impliedly represented that the Product is "ALL NATURAL," when in fact, it is not because it contains GMOs.

105.    Plaintiffs and the Class are consumers as defined in 15 U.S.C. § 2301 (3).

106.    Defendants are suppliers and warrantors as defined in 15 U.S.C. § 2301(4)(5).

107.    Go Lean Crunch® is a consumer products as defined in 15 U.S.C. § 2301(6).

108.    By reason of Defendant's breach of its implied warranties and express written warranties stating that Go Lean Crunch® is an all-natural cereal, when in fact it is composed of GMOs and its ingredients are not as they are found in nature, Defendants have violated the statutory rights due to Plaintiffs and the Class pursuant to the Magnuson-Moss Warranty Act, 15 U.S.C.§§ 2301 *et seq.*, thereby damaging Plaintiffs and the Class.

109.    Plaintiffs and the Class seek all available remedies, damages, and awards under the Magnuson-Moss Warranty act.

## XIV. <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, prays for relief, jointly and severally pursuant to each cause of action set forth in this Complaint as follows:

1.    For an order certifying that the action may be maintained as a class action and Plaintiffs' counsel be appointed as Class Counsel;

2.    For an award of equitable relief as follows:

    a.    Enjoining Defendants from continuing to engage, use, or employ any unfair and/or deceptive business acts or practices related to the design, testing, manufacture, assembly, development, marketing and advertising of the

Product for the purpose of selling the Product in such manner as set forth in detail above;

b.    Restoring all monies that may have been acquired by Defendants as a result of such unfair and/or deceptive act or practices; and

3.    For actual damages in an amount to be determined at trial;

4.    For punitive damages in an amount to be determined at trial;

5.    For an award of attorney's fees;

6.    For an award of costs;

7.    For pre- and post-judgment interest on any amounts awarded; and

8.    For any other award the Court might deem just, appropriate, or proper.

## XV. DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

**Respectfully Submitted,**

**Dated: _____**

By: _____
**Howard W. Rubinstein, Esq.**
Fla. SBN:  0104108
*howardr@pdq.net*
**THE LAW OFFICES OF HOWARD W. RUBINSTEIN, P.A.**
1615 Forum Place, Suite 4C
West Palm Beach, FL 33401
(800) 436-6437 (o)
(415) 692-6607 (f)

**Angela Arango-Chaffin, Esq.**
Fla. Bar No: 87919
*angela@chaffinlawfirm.com*
**THE FLORIDA CHAFFIN LAW FIRM**
1455 Ocean Drive, Suite 811
Miami Beach, FL 33139
(713) 818-2515 (o); (713) 952-5972 (f)

Attorneys for Plaintiffs