# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Civil Case No.: 12-21678-CIV-Lenard/O'Sullivan

| | |
|---|---|
| **KATRINA GARCIA, LAURA EGGNATZ, and JULIE MARTIN:** individually, and on behalf of all others similarly situated, | **:** **:** **:** **:** |
| *Plaintiffs,* | **:** |
| *vs.* | **:** **:** |
| **KASHI COMPANY,** a California Corporation, and **THE KELLOG COMPANY,** a Michigan Corporation, | **:** **:** **:** |
| *Defendants.* | **:** **:** |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, KATRINA GARCIA, LAURA EGGNATZ, and JULIE MARTIN ("Plaintiffs") by and through their undersigned counsel, pursuant to all applicable *Federal Rules of Civil Procedure*, and pursuant to this Honorable Court's January 11, 2013 Order [DE 30], hereby file this Amended Consolidated Class Action Complaint, on behalf of themselves and all others similarly situated throughout the United States, and allege against Defendants, KASHI COMPANY and THE KELLOG COMPANY ("Defendants") as follows:

## I. INTRODUCTION

1.      Defendants have represented that its products are "ALL NATURAL," when in fact, they are not, because they contain Genetically Modified Organisms ("GMOs").

2.      The terms GM foods or GMOs (genetically-modified organisms) commonly refer to crop plants created for human or animal consumption using the latest molecular biology techniques. These plants have been modified in the laboratory through a process whereby the

genes of one species are inserted into another species.   The purported purpose of genetic engineering plants is to enhance certain traits, such as, for example, increased resistance to herbicides.

3.     Genetic engineering can create plants with exact desired traits very rapidly and with great accuracy. For example, plant geneticists can isolate a gene responsible for drought tolerance and insert that gene into a different plan. The new GMO plant will also gain that modified trait.

4.     Genetic engineering is different from natural/conventional plant breeding and poses distinct risks. Specifically, the genetic engineering and associated tissue culture processes are highly mutagenic, leading to unpredictable changes in the DNA and proteins of the resulting GMO that can lead to unexpected toxic or allergenic effects. [1]

5.     Genes can be transferred from one plant to another and genes from non-plant organisms can be transferred into a plant. One common example is the use of *Bacillus thuringiensis,* (B.t.) genes into corn. B.t. is a naturally occurring bacterium that produces crystal proteins that are lethal to insect larvae. Using B.t. crystal protein genes in corn enable the corn to produce its own pesticides against insects.

6.     The Products pose a potential threat to consumers because medical research and scientific studies have yet to determine the long-term health effects of genetically engineered foods.   Recent studies suggest that GMOs may in fact be harmful to a consumer's health.   For example, an insecticidal toxin, known as BT toxin, is often inserted into the genetic code of an array of crops to enable the plant to produce its own insecticide.   This insecticide is released

---

1.   Michael Antoniou, Claire Robinson, and John Fagan. GMO MYTHS AND TRUTHS: AN EVIDENCE-BASED EXAMINATION OF THE CLAIMS MADE FOR THE SAFETY AND EFFICACY OF GENETICALLY MODIFIED CROPS. Earth Open Source. June 2012 at 21.

when insects ingest it.[2]  Though BT toxin was supposed to be safe for humans (the digestion system in the human body was supposed to destroy it), more recent studies have shown that the human gut is actually not destroying it.[3]  Canadian researchers this year reported that the blood of ninety-three percent (93%) of pregnant women and eighty percent (80%) of their umbilical-cord blood samples contained a pesticide implanted in GMO corn by the biotech company Monsanto, though digestion was supposed to remove it from the body.[4]

7.    Federal regulations define an all-natural product as one containing no artificial or synthetic ingredient, nor any ingredient that has been more than 'minimally processed." Clearly, an organism that has undergone sophisticated bioengineering can no longer be described as minimally processed.  7 C.F.R. § 205.2.

8.    Defendants manufacture, market, advertise, distribute and sell various breakfast cereals, cereal bars, energy bars, crackers, frozen entrées including pizza and breakfast foods, as well as snack foods.  Since at least 1999, Defendants have represented themselves as reputable makers of all-natural foods.

9.    At issue here is their cereal product, Go Lean Crunch®, and the snack bars Kashi Go Lean® Crunchy! All Natural Protein and Fiber Bars, and Kashi Go Lean® Roll! All Natural

---

2.    Goldberg, Max. "For the First Time Ever, Monsanto will be Marketing its Products Directly to Consumers with Sweet Corn-Serious Implications." New York Times, 12 August 2011.  http://livingmaxwell.com/monsanto-gmo-sweet-corn.

3.    Goldberg, Max. "For the First Time Ever, Monsanto will be Marketing its Products Directly to Consumers with Sweet Corn-Serious Implications." New York Times, 12 August 2011.  http://livingmaxwell.com/monsanto-gmo-swet-corn.

4.    Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.  June 2, 2011.  BUSINESS; Business Desk; Part B; Pg. 4; Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.

Protein and Fiber Bars,  Go Lean Crunch® Kashi Chewy Granola Bars Trail Mix, Kashi Chewy Granola Bars Honey Almond Flax, Kashi Chewy Granola Bars Peanut Butter, Kashi Chewy Granola Bars Cherry Dark Chocolate, and Kashi Crunchy Granola Bars Pumpkin Spice Flax **(collectively, the "Products").**

10.     Defendants market the Products as "ALL NATURAL" and having "nothing artificial" on the labeling of the Products' packaging as its related advertising, including but not limited to, the Kashi website (www.kashi.com).  *See* **Exhibit 1**, attached hereto and incorporated herein, true and correct copy of label of the Go Lean Crunch® rear packaging, which depicts some of the Products.   These claims are false, however, because the Products contain GMOs, plants whose genetic makeup has been altered through biotechnology to exhibit characteristics that would not otherwise occur in nature.[5]

11.     On its website, Kashi describes 'minimal processing" as involving kitchen chemistry processes that can be done in a family kitchen.  It goes without saying that the average consumer cannot create a genetically modified organism in their family kitchen.  Therefore, a reasonable consumer would want to know if GMOs are in a product that is labeled or advertised as "All Natural," as that is a material fact in their decision making process.

12.     Accordingly, Defendants have falsely and deceptively represented that their Products are natural, when they are not, because they contain GMOs, specifically soy and or soy variations.[6]  *See* **Exhibit 2**, attached hereto and incorporated herein, copy of side label of the Go

---

5.     Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.  June 2, 2011. BUSINESS; Business Desk; Part B; Pg. 4.

6.     Dr. Mercola.  "The One and Only Way You Can Tell if a Food is GMO Free."  February 29 2012. Mercola.Com.

Lean Crunch® product's side packaging, showing the ingredient list. Defendants' Products contains no warning or disclaimer that the Products contain GMOs in its advertising for the Products (this is explicitly not in relation to the Products' labeling).

13.    Plaintiffs were induced to buy the Products, specifically by the words 'all natural' on the packaging and Defendants' representations that the Products had 'nothing artificial.' Plaintiffs expected to purchase a cereal with wholesome ingredients untouched by scientific modifications—only to learn that they were in fact consuming bioengineered ingredients—the safety of which has yet to be proven for long-term human consumption.

14.    Defendant's false and misleading representations and omissions violate state and federal law, detailed more fully below, including Florida and California law.

## II. JURISDICTION AND VENUE

15.    This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under 18 U.S.C. § 1332(d), which, under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the Plaintiffs class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000, exclusive of interest and costs.

16.    Plaintiffs allege that the total claims of individual class members in this action are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5). Plaintiffs are citizens of the States of Florida and California, as set forth below, and Defendants can be considered a citizen of California (Kashi) or Michigan (Kellogg). Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).

17.     Furthermore, Plaintiffs alleges that the total number of members of the proposed Plaintiffs Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

18.     Venue in this district is proper pursuant to 28 U.S.C. §1391(b) because Defendants conduct business within, may be found  in, and is subject to personal jurisdiction in this judicial district, and Plaintiffs, Garcia and Eggnatz, reside in and purchased the Products that is the subject of this action in this judicial district.

### III. <u>PARTIES</u>

19.     Plaintiff, Katrina Garcia is an individual consumer over the age of eighteen.  She resides in Miami-Dade County and is a citizen of Florida.  Plaintiff Garcia is only making claims for economic damage on behalf of herself and the Class, and respectfully requests a jury trial on damage claims.

20.     Plaintiff, Laura Eggnatz (formerly Laura Gabbamonte), is an individual consumer over the age of eighteen.  She resides in Broward County and is a citizen of Florida.  Plaintiff Eggnatz is only making claims for economic damage on behalf of herself and the Class, and respectfully requests a jury trial on damage claims.

21.     Plaintiff, Julie Martin, is an individual more than 18 years old, and is a citizen of California, who resides in the city and County of San Francisco. Plaintiff Martin is only making claims for economic damage on behalf of herself and the Class, and respectfully requests a jury trial on damage claims

22.     Defendant Kellogg Company ("Kellogg") is a Delaware corporation with its principal place of business located in the State of Michigan at One Kellogg Square, Battle Creek, Michigan 49017.   Kellogg lists with the Michigan Secretary of State a Registered Agent designated as The Corporation Company located at 30600 Telegraph Road, Suite 2345, Bingham

Farms, Michigan 48025.  Therefore, Kellogg is a "citizen" of the State of Michigan.  Defendant Kellogg also promoted and marketed the Products at issue in this jurisdiction and in this judicial district.

23.     Defendant Kashi Company ("Kashi") is a California corporation.  Kashi is a subsidiary of co-Defendant, Kellogg Company and therefore also lists with the California Secretary of State a principal place of business address as One Kellogg Square, Battle Creek, Michigan 49017.   Kashi lists with the California Secretary of State a Registered Agent designated as CT Corporation System located at 818 W Seventh Street, Los Angeles, California, 90017.  Therefore, Kashi Company is a "citizen" of the State of California.  Defendant Kashi also promoted and marketed the Products at issue in this jurisdiction and in this judicial district.

## IV. <u>FACTUAL ALLEGATIONS COMMON TO ALL COUNTS</u>

### <u>Plaintiffs' Purchases of the Products</u>

24.     Plaintiff Garcia has purchased Go Lean Crunch®, and the snack bars Kashi Go Lean® Crunchy! All Natural Protein and Fiber Bars (chocolate peanut butter), and Kashi Go Lean® Roll! All Natural Protein and Fiber Bars (chocolate peanut butter) during the Class period, from a Publix Supermarket located at 2270 SW 27th Avenue, Miami, Florida 33145 as well as the Whole Foods located at 10th and Alton in Miami Beach, Florida, 33139.

25.     Plaintiff Eggnatz has purchased the Go Lean Crunch® Kashi Chewy Granola Bars Trail Mix, Kashi Chewy Granola Bars Honey Almond Flax, Kashi Chewy Granola Bars Peanut Butter, Kashi Chewy Granola Bars Cherry Dark Chocolate, and Kashi Crunchy Granola Bars Pumpkin Spice Flax, during 2011, from various Publix Supermarkets, including a Publix Supermarket located at 601 S. Andrews Avenue, Fort Lauderdale, Florida 33301.

26.     Plaintiff Martin purchased Go Lean Crunch® cereal, Kashi Chewy Granola Bars Cherry Dark Chocolate, and Kashi Crunchy Granola Bars Pumpkin Spice Flax, during the Class Period, and specifically during 2012, from a Trader Joes Market, located in San Francisco, California.

27.     Plaintiffs believed the material All-Natural representation in regards to the Products meant that the Products did not contain, nor were they made with, any genetically modified ingredients.  If Plaintiffs had known the Products contained GMOs and thus were not all-natural, they would not have purchased them. Likewise, Plaintiffs contend that the Products containing GMOs are not "all natural" and that Defendants' advertising and labeling is deceptive and likely to mislead the public as a result.  Simply put, Plaintiffs would not have purchased the Products if they had known that the Defendants could not support their claim that the Products are all natural, because they contain GMOs.[7]

28.     In purchasing the Products, Plaintiffs saw, read, and relied on the labeling, packaging, and advertising for the Products claiming to be all natural and/or natural.  Plaintiffs have been damaged by their purchase of the Products because the labeling and advertising for the Products was and is deceptive and misleading; therefore, the Products are worth less than what Plaintiffs paid for them, and Plaintiffs did not receive what they reasonably intended to receive, which was a product that was GMO-free, or in other words, "All Natural" and contained "nothing artificial."

---

7.     Plaintiffs explicitly do not argue that Defendant was required to state whether its Products were made from genetically modified plaints on the labeling for the Products.  Rather, Plaintiffs contend that Defendants' affirmative decision to label its product "ALL NATURAL" is deceptive and misleading, given the fact that the Products contained, or omitted that they contained in advertising not related to the label, Genetically Modified Organisms.

29.     Plaintiffs purchased the Products because they believed that the Products had nothing artificial and were "All Natural," which they interpreted to mean that the Products do not contain any GMOs.

30.     Defendant's statement that the Products had nothing artificial and were "All Natural," was material to Plaintiffs' decision to purchase and consume the Products because they would not have purchased and consumed the Products had they not been advertised and labeled as "All Natural," or if the Products had clearly disclosed that they contain GMOs in advertising for the Products not related to the labeling.  Plaintiffs were reasonable to rely on Defendant's representations given Defendant's reputation in the marketplace for providing natural food products with nothing artificial.  In addition, Plaintiffs paid a price premium for the Products over similar products in the marketplace because they believed the Products were GMO-free, or in other words, "All Natural."

<u>**Defendants' Advertising and Labeling of its All Natural Products**</u>

31.     Defendants manufacture, market, advertise, distribute and sell various breakfast cereals; energy bars; crackers; frozen entrées including pizza and breakfast foods; as well as snack foods.  Defendants have displayed the promises "all-natural" and "nothing artificial" for over twelve years in association with the Kashi name.

32.     At issue here are the following Products:

    a.   Kashi's cereal product, Go Lean Crunch®;

        i.   GMO Ingredient:  Soy.

    b.   Kashi Go Lean® Crunchy! All Natural Protein and Fiber Bars;

        i.   GMO Ingredients:  Corn and Soy.

    c.   Kashi Go Lean® Roll! All Natural Protein and Fiber Bars;

         i.  GMO Ingredient:  Soy.

    d.  Go Lean Crunch® Kashi Chewy Granola Bars Trail Mix;

         i.  GMO Ingredients:  Corn and Soy.

    e.  Kashi Chewy Granola Bars Honey Almond Flax;

         i.  GMO Ingredients:  Corn and Soy.

    f.  Kashi Chewy Granola Bars Peanut Butter;

         i.  GMO Ingredients:  Corn and Soy.

    g.  Kashi Chewy Granola Bars Cherry Dark Chocolate;

         i.  GMO Ingredients:  Corn and Soy.

    h.  Kashi Crunchy Granola Bars Pumpkin Spice Flax;

         i.  GMO Ingredient:  Soy

(the "Products").

## **Genetically Modified Ingredients Are Not "All Natural"**

33.    Defendants label, market, and/or advertise the Products as "ALL NATURAL." Defendants' claim is misleading, however, because Defendants' Products contain GMOs, ingredients that have been modified through biotechnology and are therefore not all natural.

34.    GMOs are not expected to be in foods labeled "All Natural." Recently, Americans have expressed a heightened concern about the safety of GMO Products, as evinced by the fact that legislation requiring labeling GMOs have been proposed in more than a dozen states since 2011.[8]  In addition,  polls taken by the Pew Center, Consumers Union, Harris Interactive and

---

8.    *See    http://www.nytimes.com/2012/05/25/science/dispute-over-labeling-of-genetically-modified-food.html?_r=0* (last visited January 15, 2013).

ABC over the last decade that have consistently found that the vast majority of Americans would like to see genetically modified foods better regulated and labeled.[9]

35.     Concerns about GMOs fall into three categories: environmental hazards, human health risks and economic concerns.

36.     Concerns for human health risks associated with GMOs include the possibility that introducing a new gene into a plant may create a new allergen, cause an allergic reaction in susceptible individuals or have an unexpected and negative impact on overall human health

37.     Furthermore, the FDA has loosely defined the term "natural" as a product that contains no synthetic or artificial ingredients.[10] According to federal regulations, an ingredient is synthetic if it is:

> [a] substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes." 7 C.F.R. §205.2.

38.     Similarly, the USDA's Food Safety and Inspection Service ("FSIS") defines a "natural" product as a product that does not contain any artificial or synthetic ingredient and does not contain any ingredient that is more than "minimally processed," defined as:

> (a) those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.

---

9.     Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.   June 2, 2011. BUSINESS; Business Desk; Part B; p. 4.

10.     FDA Consumer Health Information, Food Label Helps Consumers Make Healthier Choices, available at www.fda.gov/downloads/ForConsumers/ConsumerUpdates!UCM199361.pdf.

> Relatively severe processes, e.g., solvent extraction, acid
> hydrolysis, and chemical bleaching would clearly be considered
> more than minimal processing....

USDA FSIS, Food Standards and Labeling Policy Book, available at
*www.fsis.usda.gov/OPPDE/larc/Policies/Labeling_Policy_Book_082005.pdf31.*

39.    Kashi has since embraced these federal explanations and posted the following

definition of "natural" on its website:

> ***At Kashi, we define natural*** *as:*

> Natural Food is made without artificial ingredients, colors or
> preservatives and is minimally processed.  A natural ingredient is
> one that is made from a renewable source found in nature.
> Minimal Processing involves only kitchen chemistry processes that
> can be done in a family kitchen and does not negatively impact the
> purity of the natural ingredients.[11]

40.    The scientific description of how GMOs are produced refutes any attempt to

categorize them as 'minimally processed,' "all-natural" or substantially similar to something

naturally occurring. Contemporary research on GMOs has made clear that genetic engineering is

completely different from natural breeding and entails different risks because the genetic

engineering and associated tissue culture processes are imprecise and highly mutagenic, leading

to unpredictable changes in the DNA, proteins, and biochemical composition of the resulting

GMO that can lead to unexpected toxic or allergenic effects and nutritional disturbances:

> [T]he process of inserting a genetically modified gene into the
> DNA of a plant cell is crude, uncontrolled, and imprecise, and
> causes mutations – heritable changes – in the plant's DNA
> blueprint. These mutations can alter the functioning of the natural
> genes of the plant in unpredictable and potentially harmful ways.

> Because of these diverse interactions, and because even the
> simplest organism is extremely complex, it is impossible to predict
> the impacts of even a single GM gene on the organism. It is even

---

11.    Kashi Yearbook, www.kashi.com/meet_us/yearbook

more impossible to predict the impact of the GMO on its environment – the complexity of living systems is too great. In short, unintended, uncontrolled mutations occur during the GM process and complex interactions occur at multiple levels within the organism as a result of the insertion of even a single new gene. For these reasons, a seemingly simple genetic modification can give rise to many unexpected changes in the resulting crop and the foods produced from it. The unintended changes could include alterations in the nutritional content of the food, toxic and allergenic effects, poor crop performance, and generation of characteristics that harm the environment.[12]

41.     At a minimum a reasonable consumer would expect a company's representation of 'all-natural' to conform to the company's own published definition, as well as the federal regulation.   However, the process of manufacturing a GMO is clearly beyond "minimal processing;" one would certainly not expect a consumer to bioengineer an ingredient in their kitchen.

42.     Despite this, Defendants' have falsely represented their Products are all natural even though they contain GMOs, namely Corn, Soy, Corn variations, and/or Soy variations. Corn, Soy, Corn variations, and/or Soy variations, among other ingredients, are known to be derived from GMOs and serve as part of the main ingredients in the Products.   However, Defendants' Products contain no warning or disclaimer that the Products contain GMOs in its advertising for the Products (not related to the label).

**Genetically Modified Ingredients are Hazardous to Consume**

43.     To this day, no scientific studies have guaranteed that GMOs are safe for human consumption in the long-term. In fact, many indicate the contrary. More than one hundred peer-

---

12.     Michael Antoniou, Claire Robinson, and John Fagan. GMO MYTHS AND TRUTHS: AN EVIDENCE-BASED EXAMINATION OF THE CLAIMS MADE FOR THE SAFETY AND EFFICACY OF GENETICALLY MODIFIED CROPS. Earth Open Source. June 2012 at 11.

review studies have shown that GMOs damage the vital organs, immune systems and reproductive functions of animals.  Conscientious consumers have been particularly alarmed by the use of gene splicing to incorporate a bacterial toxin in plants that can repel pests.[13]  Canadian researchers reported that the blood of ninety-three percent of pregnant women and eighty percent of their umbilical cord blood samples contained a pesticide implanted in GMO corn by the biotech company Monsanto, though manufacturers of GMOs claim that digestion is supposed to remove it from the body.  "Given the potential toxicity of these environmental pollutants and the fragility of the fetus, more studies are needed," they wrote in Reproductive Toxicology.[14]

44.    Other concerns that have been raised by environmental groups include the possibility that GMOs contribute to the spread of antibiotic resistance, and could introduce new allergens into foods.[15]  Concern surrounding the latter topic of allergens relates to two factors; the possibility that genes from known allergens may be inserted into crops not typically associated with allergenicity and the possibility of creating new, unknown allergens by either inserting novel genes into crops or changing the expression of endogenous proteins.[16] A person allergic to Brazil nuts, for example only, would be at risk of suffering an allergic reaction from

---

13.    Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.

14.    Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.  *See also*  Goldberg, Max. "For the First Time Ever, Monsanto will be Marketing its Products Directly to Consumers with Sweet Corn-Serious Implications." New York Times, 12 August 2011.   http://livingmaxwell.com/monsanto-gmo-sweet-corn.

15.    Bakshi A (2003). "Potential adverse health effects of genetically modified crops". *J Toxicol Environ Health B Crit Rev 6* (3): 211–25.

16.    Key S, Ma JK, Drake PM (June 2008). "Genetically modified plants and human health". *J R Soc Med* 101 (6): 290–8.

consuming a product that contained a GMO bioengineered to contain DNA from Brazil nuts. The consumer would be unaware of the potential allergic reaction because the product containing the GMO would in no way warn of or even indicate its genetically modified condition.

45.     While the Food and Drug Administration (FDA) has allowed the sale and planting of genetically modified foods for 15 years,  the FDA wrote in a statement to the Tribune that " [u]ltimately, it is the food producer who is responsible for assuring safety,"  noting also that manufacturers are encouraged to consult with the agency about their products.[17] The European Union has recognized the potential dangers inherent in consuming genetically modified organisms and has some of the most stringent GMO regulations in the world.  In the European Union all GMOs are considered "new food" and subject to extensive, case-by-case, science based food evaluation by the European Food Safety Authority (EFSA). The EFSA reports to the European Commission who then draft a proposal which if accepted will be adopted by the EC or passed on to the Council of Agricultural Ministers. [18] There is also a safeguard clause that Member States can invoke to restrict or prohibit the use and/or sale of a GMO within their territory if they have a justifiable reason to consider that the approved GMO constitutes a risk to human health or the environment.[19] In February 2008, for example, the French government used the safeguard clause to ban the cultivation of MON810 after Senator Jean-François Le Grand, chairman of a committee set up to evaluate biotechnology, said there were "serious doubts"

---

17.     Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.

18.     Davison, J. (February 2010). "GM plants: Science, politics and EC regulations". *Plant Science* 178 (2): 94–98.

19.     European Commission. "Food Safety: From the farm to the fork (What are the National safeguard measures)". Europa.

about the safety of the product.[20]   By 2010, the only GMO food crop with approval for cultivation in Europe is the GM maize MON810, and a second GMO, a potato called Amflora, was approved for cultivation for industrial applications in the EU by the European Commission.[21]   Despite the European Union's approval of MON 810, however, it has been banned for cultivation by Germany, Austria, France, Greece, Luxembourg, Poland and Bulgaria. Meanwhile, Italy does not allow for the cultivation if GMOs.[22]

46.   In addition, independent scientific testing of the effects of GMOs on rats, hamsters, and mice have generated great concern as to the safety of GMOs. The tests have been conducted by: Dr. Irina Ermakova, the Institute of High Neural Activity and Neurophysiology of Russian Academy of Sciences, Moscow; Dr. Alexey Surov and Dr. Alexander Baranov, the Institute of Environmental and Evolution Problems and the Institute of Developmental Biology, Moscow); and Dr. Maria Konovalova, the Saratov Agrarian University. All three of these studies demonstrate significant biological and behavioral changes in the animals when GM soy or GM corn was put into their feed. Some of the biological effects include increased mortality among newborns in the first generation, reduced quantity of offspring, and spike in sterility among second generation animals. On the behavioral front, animals became more aggressive and lost maternal instincts.[23]

---

20.   AFP – Feb 8, 2008 (2008-02-08). "AFP: French GM ban infuriates farmers, delights environmentalists."

21.   "European Commission approves Amflora starch potato - BASF - The Chemical Company - Corporate Website". BASF. http://www.basf.com/group/pressrelease/P-10-179. Retrieved 2010-09-24.

22.   Barker, Debbie. "Part II: The Emperor has No Clothes." p. 37.

23.   Barker, Debbie. "Part II: The Emperor has No Clothes." P. 39.

47.     Another study conducted by Dr. Arpad Pusztai the potential health risks that GMOs pose to internal organs.  Dr. Arpad Pusztai's research has shown that rats fed with GE potatoes had enlarged pancreases, their brains had shrunk, and their immunity had been damaged. Dr. Eric Seralini's research demonstrated that organ damage can occur.  In addition, the Committee of Independent Research and Information on Genetic Engineering (CRIIGEN) and universities at Caen and Rouen were able to get raw data of Monsanto's 2002 feeding trials on rats at the European Council order and made it public in 2005. The researchers found that rats fed with three approved corn varieties of GE corn—Mon 863, insecticide products, Mon 810, and Roundup Ready herbicide —suffered organ damage. The data "clearly underlines adverse impacts on kidneys and liver, the dietary, detoxifying organs as well as different levels of damages to the heart, adrenal glands, spleen and hematopoietic systems," according to Dr. Gilles Eric Seralini, a molecular biologist at the University of Caen.[24]

48.     Additionally, evidence of liver and kidney toxicity appeared when rats were fed an approved GE maize variety (Mon 863) (Seralini GE, Cellier D. & Spironx de Vendomois, J, 2007, "New analysis of rat feeding study with a GM Maize", Archives of Environmental Contamination and Toxicology, 10,1007, S 00244-006-0149-5). Similar effects were observed when Monsanto fed its GT-73 Roundup Ready canola variety to rats. The rats showed a 12 percent to 16 percent increase in liver weight.[25]

---

24.     Dr. Shiva Vandana, "Introduction: The GMO Emperor has No Clothes." p. 17. "A Comparison of the Effects of Three GM Corn Varieties on Mammalian Health," Joel Spiroux de Veu de Mois, Francois Roullier, Dominique Cellise, Gilles Eric Serelini, *International Journal of Biological Science*s, 2009, 5: 706-726.

25.     Dr. Shiva Vandana, "Introduction: The GMO Emperor has No Clothes." p. 18. *See* Greenpeace (2004) "Greenpeace critique of Monsanto's Roundup Ready Oilseed rape, GT-73," *http://www.greenpeace.at/uploads/media/GT73_Greenpeace_comments_Oct_2004_01.pdf*.

49.     Even the World Health Organization (WHO) cautions that "Different GM organisms include different genes inserted in different ways. This means that individual GM foods and their safety should be assessed on a case-by-case basis and that it is not possible to make general statements on the safety of all GM foods."[26]  More recently, Americans have also expressed a heightened concern about the safety of GMO products, as evinced by the fact that 14 states have currently introduced legislation on GMO labeling. Alaska, with its huge wild salmon industry, has already passed a biotech seafood labeling law.[27]  In addition,  polls taken by the Pew Center, Consumers Union, Harris Interactive and ABC over the last decade that have consistently found that the vast majority of Americans would like to see genetically modified foods better regulated and labeled.[28]  Plaintiffs contend that Defendants' failure to disclose in its advertising for the Products, not related to the labeling for the Products, the presence of GMOs in its Products, amounts to a material misrepresentation. Plaintiffs would not have purchased the Products had she known they contain GMOs.

50.     At a minimum, Plaintiffs contend that Defendant should cease labeling the Products "All Natural" and/or that Defendants should identify that the Products contain genetically modified ingredients in its advertising not related to the labeling.  Failure to is an omission of a material fact and violates a consumer's democratic right to information and choice.

---

26.     Dr. Shiva Vandana, "Introduction: The GMO Emperor has No Clothes." p. 19. *See* "20 Questions on Genetically Modified Foods." World Health Organization. *http://www.who.int/foodsafety/publications/biotech/20questions/en/*.

27.     Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.

28.     Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.  June 2, 2011. BUSINESS; Business Desk; Part B; p. 4.

Most people consider the decision of what they put into their bodies to be tremendously important.  People follow restricted diets for religious reasons (some observers of the Jewish faith keep Kosher, some observers of Muslim faith only eat Halal food, and some observers of Hindu faith refuse beef), for moral or personal reasons (many vegetarians and vegans restrict their diets for moral reasons), or because they physically cannot eat certain foods (those with celiac disease cannot eat wheat, those who are lactose intolerant cannot consume dairy products, and those with other food allergies face similar restrictions). In the latter scenario, eating the food in question could cause severe physical harm or death. In the first two scenarios, while the diets may be driven by personal choice rather than physical necessity, the beliefs behind the choices are often deeply held. If a Muslim eats soup that is labeled vegetarian but in fact contains pork, or if a vegetarian eats cereal that contains mouse parts, the mislabeling that led to the inadvertent consumption is likely to be extremely offensive.[29]  Likewise, Defendant's covert inclusion of GMOs in its Products, amounts to an unlawful affront to the health conscious consumers and the public at large.  As Wendell Berry Notes in her *Twelve Paragraphs on Biotechnology*, "[i]n biotechnology, as in any technology affecting living systems, there is nothing perfectly predictable. What we do within living bodies and in the living world is never a simple mechanical procedure such as threading a needle or winding a watch. Mystery exists; unforeseen and unforeseeable consequences are common."[30]  Accordingly, Defendant's failure to disclose the presence of GMOs in its Products, in advertising not related to the labeling for the Products, violates the consumer's right to know what is being introduced into his or her

---

29.    Valery Federici. "Genetically Modified Food and Informed Consumer Choice: Comparing U.S. and E.U. Labeling Laws*." 35 Brooklyn J. Int'l L. 51 5* at 528.

30.    Wendell Berry, "Twelve Paragraphs on Biotechnology." <u>The GMO Emperor has no Clothes</u>." p.43.

body/internal system, and right to choose whether he or she wishes to participate in the current experimental stage of genetically modified organisms and their comprehensive effect on human health.

## V. CLASS ALEGATIONS

51.     Plaintiffs re-allege and incorporate by reference all allegations set forth above.

52.     Plaintiffs bring this class action pursuant Federal Rule of Civil Procedure 23 and seeks certification of the claims and certain issues in this action pursuant to the applicable provisions of Federal Rule of Civil Procedure 23, on behalf of all persons who, within the four years preceding the filing of this pleading ("Class Period") purchased the Products for personal use ("Class") throughout the United States.  Plaintiffs reserve the right to amend the Class definition if further investigation and discovery indicates that the Class definition should be narrowed, expanded, or otherwise modified.  Excluded from the Class are governmental entities, Defendant, any entity in which Defendant has a controlling interest, and Defendant's officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns.  Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.

Plaintiff also seeks to certify a sub-class of Florida purchasers based on Florida law, and a sub-class of California purchasers based on California law, who purchased the Products during the Class Period.

53.     Defendants' practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All members of the putative Class were and are similarly affected by having purchased and used the

Products for their intended and foreseeable purpose, and the relief sought herein is for the benefit of Plaintiffs and members of the putative Class.

54.     Plaintiffs are informed and believe, and on that basis allege, that the Plaintiff Class is so numerous that joinder of all members would be impractical. Based on the annual sales of the Products and the popularity of the Products, it is apparent that the number of consumers of the Products would at least be in the many thousands, thereby making joinder impossible.

55.     Questions of law and fact common to the Plaintiff Class exist that predominate over questions affecting only individual members, including, *inter alia*:

a.     Whether Defendants' practices in connection with the design, testing, manufacture, assembly, development, promotion, marketing, advertising and sale of the Products were deceptive or unfair in any respect, thereby violating the Florida Deceptive and Unfair Trade Practices Act, *inter alia*, sections 501.201 to 201.213, *Florida Statutes*;

b.     Whether Defendants negligently misrepresented the true nature of the Products;

c.     Whether Defendants breached express warranties in its sale of the Products, thereby causing harm to Plaintiffs and members of the Class;

d.     Whether Defendants breached implied warranties in its sale of the Products, thereby causing harm to Plaintiffs and members of the Class;

e.     Whether Defendants failed to adequately warn of, and/or concealed the dangers and health risks associated with the Products;

f.     Whether the Products are "All Natural;"

g.     Whether the ingredients contained within the Products are "All Natural;"

h.      Whether Defendants' conduct as set forth above injured consumers and if so, the extent of the injury.

i.      Whether Defendant's practices and representations related to the marketing, labeling and sales of the Products in California were unfair, deceptive and/or unlawful in any respect, thereby violating Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

j.      Whether Defendant's practices and representations related to the marketing, labeling and sales of the Products in California were unfair, deceptive and/or unlawful in any respect, thereby violating Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

k.      Whether Defendant violated Cal. Civ. Code §§ 1750 *et seq.* with its practices and representations related to the marketing, labeling and sales of the Products within California;

l.      Whether Plaintiffs are entitled to a Declaratory Judgment as a result of Defendant's practices and representations related to the marketing, labeling and sales of the Products; and

m.      Whether Defendant's practices and representations related to the marketing, labeling and sales of the Products amounts to violation of Money Had and Received.

56.    The claims asserted by Plaintiffs in this action are typical of the claims of the members of the Plaintiff Class, as the claims arise from the same course of conduct by Defendants, and the relief sought is common.

57.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Plaintiff Class.  Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation.

58.     Certification of this class action is appropriate under Federal Rule of Civil Procedure 23 because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims.

59.     Absent a class action, it would be highly unlikely that the representative Plaintiffs or any other members of the Class would be able to protect its own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

60.     Certification is also appropriate because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

61.     Further, given the large number of consumers of the Products, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

62.     A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender.

63.     The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

## VI.  FLORIDA CAUSES OF ACTION ON BEHALF OF PLAINTIFFS GARCIA & EGGNATZ, AND ALL OTHERS SIMILARLY SITUATED

### A. FIRST CAUSE OF ACTION: FOR VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. §§ 501.201, *ET SEQ.*

64.     Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through sixty (60) above.

65.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 to 201.213, *Florida Statutes*. The express purpose of the Act is to "protect the consuming public...from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce" Section 501.202(2).

66.      The sale of the Products at issue in this cause was a "consumer transaction" within the scope of the Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 to 201.213, *Florida Statutes*.

67.     Plaintiffs are "consumers" as defined by Section 501.203, *Florida Statutes*.  Each of Defendants' Products is a "good" within the meaning of the Act.  Defendants are engaged in trade or commerce within the meaning of the Act.

68.     Section 501.204(1), *Florida Statutes* declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce".

69.     Section 501.204(2), *Florida Statutes* states that "due consideration be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Trade Commission Act".  Defendants' unfair and deceptive practices are likely to mislead – and have misled – the consumer acting reasonably under the circumstances and, therefore, violate Section 500.04, Florida Statutes and 21 U.S.C. Section 343.

70.     Defendants have violated the Act by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.  Specifically, Defendants have represented that their Products are "ALL NATURAL" and contain nothing artificial, when in fact the Products contain GMOs.

71.     Plaintiffs and Class Members have been aggrieved by Defendants' unfair and deceptive practices in that they purchased and consumed Defendants' Products.

72.     The Reasonable Consumer necessarily relies on the food companies to honestly represent the true nature of their ingredients.

73.     As described in detail above, Kashi has represented that its products are 'all-natural' and contain nothing artificial when in reality they contain GMOs.  Moreover, Kashi specifically described 'natural' products as those having undergone only 'minimal processing,' or simple kitchen chemistry.  Clearly an ingredient that has been bioengineered has undergone far more severe processing than family-style kitchen chemistry.

74.     Kashi has deceived reasonable consumers, like Plaintiff and the Class, into believing its Products were something they were not—"All Natural."

75.     The knowledge required to discern the true nature of Defendants' Products is beyond that of the reasonable consumer—namely that the Products contain GMOs.

76.    Federal and State Courts decide omission and misrepresentation matters regularly, including those involving a reasonable consumer's understanding of the meaning of 'all-natural.' Accordingly, the issue of whether the all-natural label is misleading to a reasonable consumer is well within the jurisdiction of the Court.

77.    The damages suffered by the Plaintiffs and the Class were directly and proximately caused by the deceptive, misleading and unfair practices of Defendants, as described above.

78.    Pursuant to Section 501.211(1), *Florida Statutes*, Plaintiffs and the Class seek a declaratory judgment and court order enjoining the above described wrongful acts and practices of the Defendants and for restitution and disgorgement.

79.    Additionally, pursuant to sections 501.211(2) and 501.2105, *Florida Statutes*, Plaintiffs and the Class make claims for damages, attorney's fees and costs.

### B. SECOND CAUSE OF ACTION:
### <u>NEGLIGENT MISREPRESENTATION</u>

80.    Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through sixty (60) above.

81.    Defendants have negligently represented that the Products have nothing artificial and are all "ALL NATURAL," when in fact, they are not because it contains GMOs.

82.    Defendants have omitted a material fact to the public, including Plaintiffs and Class Members, about its Products.  Through advertising not related to the label, Defendants have failed to disclose that the Products contain Genetically Modified Organisms.  Defendants knew or should have known that these omissions would materially affect Plaintiffs' and Class Members' decisions to purchase the Products.

83.     Plaintiffs and other reasonable consumers, including the Class members, reasonably relied on Defendants' representations set forth herein, and, in reliance thereon, purchased the Products.

84.     The reliance by Plaintiffs and Class members was reasonable and justified in that Defendants appeared to be, and represented itself to be, a reputable business, and it distributed the Products through reputable companies.

85.     Plaintiffs would not have been willing to pay for Defendants' Products if they knew that they contained genetically modified organisms, which have yet to be scientifically proven to be safe for human consumption. In fact, as discussed in greater detail above, several recent studies have indicated the contrary.

86.     As a direct and proximate result of these misrepresentations, Plaintiffs and Members of the Class were induced to purchase and consume Defendants' Products, and have suffered damages to be determined at trial in that, among other things, they have been deprived of the benefit of their bargain in that they bought Products that were not what they were represented to be, and they have spent money on Products that had less value than was reflected in the premium purchase price they paid for the Products.

### C. THIRD CAUSE OF ACTION:
### FOR BREACH OF IMPLIED WARRANTY OF FITNESS FOR PURPOSE

87.     Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through sixty (60) above.

88.     Defendants have represented that the Products are "ALL NATURAL" and contain nothing artificial when in fact, they contain GMOs.  Therefore, Defendant impliedly warranted that the Products do not contain GMOs.

89. Plaintiffs and other Members of the Class sought a conventional, safe and healthy salad dressing. In doing so, Plaintiffs and other Members of the Class relied on Defendants' skill and judgment to select and furnish suitable goods for that purpose, and on or about that time, Defendants sold the Products to Plaintiffs and other Members of the Class.

90. By their representations regarding the reputable nature of its companies and related entities, and by their promotion and marketing of their Products, Defendants warranted that the Products were safe, healthy, and natural foods for use by consumers. Plaintiffs and Members of the Class bought the Products from Defendant, relying on Defendants' skill and judgment. However, Defendants' Products were not safe and conventional products because they contained genetically modified organisms as set forth in detail above.

91. At the time of sale, Defendants had reason to know the particular purpose for which the goods were required, and that Plaintiffs and Members of the Class were relying on Defendants' skill and judgment to select and furnish safe and conventional goods, so that there was an implied warranty that the goods (the Products), were fit for this purpose.

92. However, Defendants breached the warranty implied at the time of sale because Plaintiffs and Members of the Class did not receive suitable goods in as much as the goods contained GMOs. Because the Products have not been scientifically proven to be safe and healthy for consumption through any long-term studies, the Products were not fit for the particular purpose for which it was marketed.

93. As a proximate result of this breach of warranty by Defendants, Plaintiffs and Members of the Class have suffered actual damages in an amount to be determined at trial in that they were induced to purchase products they would not have purchased had they known the true

facts about, and have spent money on products that were not what they were represented to be, and that lack the value Defendants represented the Products to have.

## D. FOURTH CAUSE OF ACTION:
## BREACH OF EXPRESS WARRANTY

94.     Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through sixty (60) above.

95.     Defendants have expressly represented that the Products have nothing artificial and are "ALL NATURAL," when in fact, they are not because they contain GMOs.

96.     Plaintiffs are informed and believe, and thereon allege, that Defendants made different express warranties, including, but not limited to, that the Products were safe, healthy, and natural foods and would not be harmful to the consumer using them.

97.     As stated hereinabove, there is no scientific evidence to support Defendants' contention that the Products are natural and safe for human consumption, and Defendants withheld the existence of the genetically modified organisms in its Products and failed to warn of the dangers and health risks associated with use of the Products as more fully described above.

98.     The failure to produce any scientific evidence ensuring the long-term safety associated with use of the Products constitutes breaches of all applicable express and implied warranties as alleged in this complaint, based on all laws that support the breach of express warranty claims by Plaintiffs and other members of the Class regarding the true nature of the Products; these laws include but are not limited to the Common Law and Florida's Consumer Protection Act.

99.     As a proximate result of the failure of the Products to perform as expressly warranted by Defendants, Plaintiffs and members of the Class have suffered actual damages in an amount to be determined at trial in that they were induced to purchase products they would

not have purchased had they known the true facts about, and have spent money on products that were not what they were represented to be, and that lack the value Defendants represented the Products to have.

100. Plaintiffs and Class members gave timely notice to Defendants of this breach on behalf of themselves and all members of the Plaintiff Class directly through a Notice letter sent to Defendants on April 13, 2012.

101. Furthermore, Defendants continue to market the Products without extensive scientific evidence to support the claim that the Products are safe for human consumption in the long-run.

## VII.  CALIFORNIA CAUSES OF ACTION ON BEHALF OF PLAINTIFF MARTIN AND ALL OTHERS SIMILARLY SITUATED

### A. FIFTH CAUSE OF ACTION:
### VIOLATIONS OF CAL. BUS & PROF. CODE §§ 17200 *ET SEQ.*

102. Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through sixty (60) above.

103. This cause of action is brought on behalf of Plaintiff, Martin, and members of the general public in California, pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq*., which provides that "unfair competition shall mean and include any unlawful, unfair or deceptive business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter I (commencing with Section 17500) as Part 3 of Division 7 of the Business and Professions Code."

104. Defendant has violated the Act by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.  Specifically, Defendant has represented that the Products are "All NATURAL."  Plaintiff contends that Defendant should cease labeling and advertising

the Product as "All NATURAL," because the presence of GMOs in the Products renders them not "All NATURAL."

105.    Plaintiff alleges that Defendant committed unfair business acts and/or practices, as set forth in detail above. The utility of Defendant's practices related to the deceptive labeling and advertising of the Products is negligible, if any, when weighed against the harm to the general public.

106.    The harmful impact upon members of the general public that purchased and used the Products outweighs any reasons or justifications by Defendant for the deceptive labeling and advertising practices employed to sell the Products that misleadingly claim to be "All NATURAL."

107.    Defendant had an improper motive (profit before accurate marketing) in its practices related to the deceptive labeling and advertising of the Products, as set forth above.

108.    The use of such unfair business acts and practices was and is under the sole control of Defendant, and was deceptively hidden from members of the general public in Defendant's marketing, advertising and labeling of the Products.

109.    Defendant committed a deceptive act or practice by making the labeling and advertising representations set forth in detail above. These deceptive acts and practices had a capacity, tendency, and/or were likely to deceive or confuse reasonable consumers.

110.    Defendant also committed an unlawful business practice by violating the FAL and CLRA as set forth in detail below. These violations serve as predicate violations of this prong of the UCL.

111.     As a purchaser and consumer of Defendant's Products, and as a member of the general public in California who purchased and used the Products, Plaintiff is entitled to and does bring this class action seeking all available remedies under the UCL.

112.     Defendant's labeling and advertising practices, as set forth above, were intended to promote the sale of the Products and constitute unfair, deceptive and/or unlawful business practices within the meaning of California Bus. & Prof. Code § 17200 *et seq.*

113.     Pursuant to California Bus. & Prof. Code § 17203, Plaintiff, on behalf of herself and members of the general public, seeks an order of this Court requiring Defendant to restore to Plaintiff and other California purchasers of the Products all monies that may have been acquired by Defendant as a result of such unfair, deceptive and/or unlawful business acts or practices.

114.     Plaintiff and California purchasers of the Products will be denied an effective and complete remedy in the absence of such an order.

115.     As a result of Defendant's violations of the UCL, Plaintiff and California purchasers of the Products are entitled to restitution for out-of-pocket expenses and economic harm. Pursuant to Civil Code § 3287(a), Plaintiff and California purchasers of the Products are further entitled to pre-judgment interest as a direct and proximate result of Defendant's wrongful conduct.

116.     The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff and California purchasers of the Products are entitled to interest in an amount according to proof.

### B.  SIXTH CAUSE OF ACTION:
### VIOLATIONS OF CAL. BUS. & PROF. CODE §§ 17500 *ET SEQ.*

117.     Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through sixty (60) above.

118.    In violation of California Bus. & Prof. Code § 17500, Defendant disseminated, or caused to be disseminated, the deceptive Products' labeling and advertising representations that misleadingly claim that the Products are "All NATURAL."

119.    Plaintiff, Martin contends that Defendant should cease labeling and advertising the Products as "All NATURAL," because the presence of GMOs in the Products, renders them not "All NATURAL."

120.    Defendant's Products' labeling and advertising representations are misleading because it cannot support its claim that the Products are "All NATURAL."

121.    Defendant's labeling and advertising representations for the Products are by their very nature unfair, deceptive and/or unlawful within the meaning of California Bus. & Prof. Code § 17500 et seq. The representations were likely to deceive reasonable consumers.

122.    In making and disseminating the deceptive representations alleged herein, Defendant knew or should have known that the representations were misleading, and acted in violation of California's Bus. & Prof. Code §§17500 *et seq.*

123.    As a direct and proximate result of Defendant's wrongful conduct, Plaintiff and California purchasers of the Products have suffered substantial monetary and non-monetary damage.

124.    Pursuant to Bus. & Prof. Code § 17535, Plaintiff, Martin, on behalf of herself and other California purchasers of the Products, seek an order of this Court requiring Defendant to restore to California purchasers of the Products, all monies that may have been acquired by Defendant as a result of such unfair, deceptive and/or unlawful acts or practices.

125.    As a result of Defendant's violations of the FAL, Plaintiff, Martin and California purchasers of the Products are entitled to restitution for out-of-pocket expenses and economic harm.

126.    Pursuant to Civil Code § 3287(a), Plaintiff, Martin and California purchasers of the Products are further entitled to pre-judgment interest as a direct and proximate result of Defendant's wrongful conduct.

127.    The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiff, Martin and California purchasers of the Products are entitled to interest in an amount according to proof.

### C.  SEVENTH CAUSE OF ACTION:
### FOR VIOLATIONS OF CAL. CIV. CODE §§ 1750 *ET SEQ.*

128.    Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through sixty (60) above.

129.    This cause of action is brought by Plaintiff, Martin pursuant to Cal. Civ. Code §§ 1750 *et seq.*

130.    Plaintiff and each California purchaser of the Products are "consumers" within the meaning of Civil Code §1761(d).

131.    The purchases of the Products by Plaintiff, martin and California purchasers of the Products were and are "transactions" within the meaning of Civil Code §1761(e).

132.    Defendant has represented that the Products are "All NATURAL."  Plaintiff contends that Defendant labeled and advertised the Products as "All NATURAL," when they are not because of the presence of GMOs in the Products, which also renders them not "All NATURAL," and which violated the CLRA in at least the following respect:

a.   In violation of Civil Code §1770(a)(5), Defendants represented that the Products have characteristics, ingredients, uses, and benefits which they do not have; and

b.   In violation of Civil Code §1770(a)(7), Defendants represented that the Products are of a particular standard, quality, or grade, which they are not.

c.   In violation of Civil Code §1770(a)(9), Defendants advertised the Products with an intent not to sell the Products as advertised;

d.   In violation of Civil Code §1770(a)(14), Defendants represented that the purchase of the Products confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

e.   In violation of Civil Code §1770(a)(16), Defendants represented that the subject of the sale of the Products has been supplied in accordance with a previous representation when it has not.

133.   Plaintiff, Martin seeks and is entitled to injunctive, equitable relief in the form of an order requiring Defendant to make full restitution to California purchasers of the Products of all monies wrongfully obtained as a result of the conduct described above.

134.   Plaintiff, by and through counsel, has notified Defendant in writing of the particular violations of Section 1770 of the CLRA, and demanded that it take certain corrective actions within the period prescribed by the CLRA for such demands.

135.   Defendant has failed to adequately respond to the demands for corrective action within the time prescribed by the CLRA.

136.   Therefore, Plaintiff requests statutory and actual damages, as well as punitive damages, interest and attorneys' fees as authorized by Section 1780(a) of the CLRA, along with this claim for injunctive relief.

137.    In addition to an award of damages, Plaintiff seeks and is entitled to, pursuant to Section 1780(a)(2) of the CLRA, an order for the equitable relief described above, as well as costs, attorney's fees and any other relief which the Court deems proper.

## D. EIGHTH CAUSE OF ACTION
## DECLARATORY JUDGMENT

138.    Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through sixty (60) above.

139.    This cause of action is explicitly being pled in the alternative to Plaintiff's causes of action for Breach of Express Warranty and Breach of Implied Warranty of Merchantability.

140.    Defendant has represented on its label that its Products are "All Natural" when in fact, they are not, because they contain GMOs, a fact that Defendant fails to disclose in its advertising for the Products not related to the labeling for the Products.

141.    Plaintiff and the members of the Class seek a declaratory judgment, pursuant to the Federal Declaratory Judgments Law, 28 U.S.C. §§ 2201 *et seq.* and *Federal Rule of Civil Procedure* 57, requiring Defendant to cease using genetically modified organisms in its All Natural products and/or stopping Defendant from representing its products are All natural when they are not.  In requesting this declaratory relief, Plaintiff is requesting an interpretation of the rights, legal status and relationships of the parties under the above law and facts.

142.    Such interpretation is appropriate under the provisions of the Federal Declaratory Judgments Law, 28 U.S.C. §§ 2201 *et seq.* and *Federal Rule of Civil Procedure* 57.

143.    Plaintiff seeks all available remedies pursuant to this cause of action.

## E.  NINTH CAUSE OF ACTION:
## MONEY HAD AND RECEIVED

144.    Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in paragraphs one (1) through sixty (60) above.

145.    This cause of action is explicitly being pled in the alternative to Plaintiff's causes of action for Breach of Express Warranty and Breach of Implied Warranty of Merchantability.

146.    Defendant has represented on its label that its Products are "All Natural" when in fact, they are not, because they contain GMOs, a fact that Defendant fails to disclose in its advertising for the Products, not related to the labeling of the Products.

147.    In California, a cause of action for money had and received lies where one person has received money or its equivalent under circumstances which in equity and good conscience ought not to be retained.

148.    Defendant received money from the Plaintiff and members of the Class through Defendant's sale of the Products, and Plaintiff and Class Members' purchase of the Products.

149.    Defendant accepted and retained the purchase price it earned from sales of its Products to Plaintiff and Class Members.

150.    Defendant has profited from its unlawful, unfair, misleading, and deceptive practices and advertising at the expense of Plaintiff and Class Members, under circumstances in which it would be unjust for Defendant to be permitted to retain the benefit.

151.    Plaintiff and the Class were damaged by their purchase of the Products because the Products are not All Natural, but contain GMOs, despite claiming to be All Natural.

152.    Plaintiff and Class Members do not have an adequate remedy at law against Defendant (pled in the alternative).

153.    Defendant should not be permitted to unjustly enrich themselves at the expense of the Plaintiff and members of the Class, and should be required to make restitution for all funds so unlawfully received and retained.

154.     In addition, Defendant should be required to disgorge all interest collected thereon.

155.     Accordingly, the Products were valueless such that Plaintiff and Class Members are entitled to restitution in an amount not less than the purchase price of the Products, and disgorgement of the profits Defendant derived from the sales of its Products.

156.     Therefore, Plaintiff seeks all available remedies pursuant to this cause of action.

### VIII. <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, prays for relief, jointly and severally pursuant to each cause of action set forth in this Complaint as follows:

1.     For an order certifying that the action may be maintained as a class action and Plaintiffs' counsel be appointed as Class Counsel;

2.     For an award of equitable relief as follows:

a.     Enjoining Defendants from continuing to engage, use, or employ any unfair and/or deceptive business acts or practices related to the design, testing, manufacture, assembly, development, marketing and advertising of the Products for the purpose of selling the Products in such manner as set forth in detail above;

b.     Restoring all monies that may have been acquired by Defendants as a result of such unfair and/or deceptive act or practices; and

c.     Requiring Defendant to disgorge all ill-gotten gains flowing from the conduct described herein.

3.     For a Declaratory Judgment as specified above;

4.     For actual damages in an amount to be determined at trial;

5.      For an award of attorney's fees and costs;

6.      For pre- and post-judgment interest on any amounts awarded; and

7.      For any other award the Court might deem just, appropriate, or proper.

## IX. DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

**Respectfully Submitted,**

Dated: <u>February 1, 2013</u>

By: <u>/s/   Howard W. Rubinstein</u>
Howard W. Rubinstein, Esq.
Fla. SBN:  0104108
*howardr@pdq.net*
THE   LAW   OFFICES   OF   HOWARD   W.
RUBINSTEIN, P.A.
1615 Forum Place, Suite 4C
West Palm Beach, FL 33401
(800) 436-6437 (o)
(415) 692-6607 (f)

Benjamin M. Lopatin, Esq.
Cal. Bar No.: 281730
*lopatin@hwrlawoffice.com*
THE LAW OFFICES OF
HOWARD W. RUBINSTEIN, P.A.
One Embarcadero Center, Suite 500
San Francisco, CA 94111
(800) 436-6437
(415) 692-6607 (fax)
(Admitted *pro hac vice*)

Angela Arango-Chaffin, Esq.
Fla. Bar No: 87919
*angela@chaffinlawfirm.com*
1455 Ocean Drive, Suite 811
Miami Beach, FL 33139
(713) 818-2515 (o); (713) 952-5972 (f)

Robert A. Chaffin
Texas Bar #04057500
The Chaffin Law Firm
4265 San Felipe #1020
Houston, Texas 77027

713-5281000
713-9525972 Fax
robert@chaffinlawfirm.com
(Admitted *pro hac vice*)

L. De-Wayne Layfield, Esq.
Texas Bar No.:  12065710
*dewayne@layfieldlaw.com*
LAW OFFICE OF L.
DEWAYNE LAYFIELD
PO Box 3829
Beaumont, TX 77704-3829
(409) 832-1891
(866) 280-3004 (fax)
(Admitted *pro hac vice*)

Attorneys for Plaintiffs and the Proposed Class

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this <u>1st day of February, 2013</u>, I electronically filed the
foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing
document is being served this day on all counsel of record by transmission of Notices of
Electronic Filing generated by CM/ECF.

<u>/s/   Howard W. Rubinstein</u>
Howard W. Rubinstein, Esq.

# EXHIBIT

# 1

# Stay satisfied throughout the day with **Kashi**® **GOLEAN**® Cereals & Bars

Just like **Kashi**® **GOLEAN**® cereals, our tasty **GOLEAN**® bars are designed with a unique blend of protein and fiber to help you stay satisfied and committed to eating right.



**GOLEAN®** Crunchy!
Chocolate Caramel

**GOLEAN®** Roll!
Caramel Peanut

**PROTEIN** **Stay Fuller Longer!***

**FIBER** **ALL NATURAL**

**GOLEAN®** Protein & Fiber
Chocolate Peanut Butter



Expires 9/30/2012

## 50¢ off
any single **Kashi**® **GOLEAN**® Crunchy!, Roll! or Protein & Fiber Bar

Expires 9/30/2012

## $1 off
any **Kashi**® **GOLEAN**® Crunchy!, Roll! or Protein & Fiber 4-Pack



✂ clip here & save!

Look for **Kashi**® **GOLEAN**® bars in the pharmacy and energy bar aisles.

*GOLEAN products are designed to promote a feeling of fullness by increasing daily intake of protein and fiber.
For more about the **GOLEAN** family, visit us at www.kashi.com/GOLEAN

# EXHIBIT

# 2



**Kashi**
The Seven Whole Grain Company

# GO LEAN
## Crunch! ®

## Nutrition Facts

Serving Size 1 Cup (53g/1.9 oz.)
Servings Per Container About 8

**Amount Per Serving**

| | |
|---|---|
| Calories 190 | Calories from Fat 25 |

| | % Daily Value* |
|---|---|
| **Total Fat** 3g | 5% |
| Saturated Fat 0g | 0% |
| Trans Fat 0g | |
| Polyunsaturated Fat 1g | |
| Monounsaturated Fat 2g | |
| **Cholesterol** 0mg | 0% |
| **Sodium** 100mg | 4% |
| **Potassium** 300mg | 9% |
| **Total Carbohydrate** 37g | 12% |
| Dietary Fiber 8g | 32% |
| Soluble Fiber 3g | |
| Insoluble Fiber 5g | |
| Sugars 13g | |
| **Protein** 9g | 14% |

| | | | |
|---|---|---|---|
| Vitamin A 0% | • | Vitamin C 0% | |
| Calcium 4% | • | Iron 10% | |
| Phosphorus 10% | • | Magnesium 10% | |

* Percent Daily Values are based on a 2,000 calorie diet. Your daily values may be higher or lower depending on your calorie needs.

| | Calories: | 2,000 | 2,500 |
|---|---|---|---|
| Total Fat | Less than | 65g | 80g |
| Sat. Fat | Less than | 20g | 25g |
| Cholesterol | Less than | 300mg | 300mg |
| Sodium | Less than | 2,400mg | 2,400mg |
| Potassium | | 3,500mg | 3,500mg |
| Total Carbohydrate | | 300g | 375g |
| Dietary Fiber | | 25g | 30g |
| Protein | | 50g | 65g |

Calories per gram:
Fat 9 • Carbohydrate 4 • Protein 4

**INGREDIENTS: KASHI SEVEN WHOLE GRAINS & SESAME BLEND (WHOLE: HARD RED WHEAT, BROWN RICE, BARLEY, TRITICALE, OATS, RYE, BUCKWHEAT, SESAME SEEDS), SOY PROTEIN CONCENTRATE, EVAPORATED CANE JUICE CRYSTALS, BROWN RICE SYRUP, CHICORY ROOT FIBER, WHOLE GRAIN OATS, EXPELLER PRESSED CANOLA OIL, HONEY, SALT, CINNAMON, MIXED TOCOPHEROLS FOR FRESHNESS. CONTAINS WHEAT AND SOY INGREDIENTS.**

DISTRIBUTED BY
Kashi Sales L.L.C.
La Jolla, CA 92038 U.S.A.
®, ™, ©2012 Kashi Company

Have something to share?
We'd love to hear from you!
Visit us at www.kashi.com

Call 877-7GRAINS
(877-747-2467)

25 grams of soy protein a day, as part of a diet low in saturated fat and cholesterol, may reduce the risk of heart disease. A serving of Kashi® GOLEAN Crunch!® cereal provides 6.25 grams of soy protein.

**Exchange:** 2 Carbohydrates & 1 Very Lean Protein
The dietary exchanges are based on the *Choose Your Foods: Exchange Lists for Diabetes,* ©2008 by American Dietetic Association and American Diabetes Association.

**WHOLE GRAIN**
17g or more per serving
WholeGrainsCouncil.org

EAT 48g OR MORE OF
WHOLE GRAINS DAILY

The Whole Grain Stamp is a trademark of Oldways/WGC.