## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

### Civil Case No.: 12-21678-CIV-Lenard/O'Sullivan

| | |
|---|---|
| **KATRINA GARCIA and LAURA** | **:** |
| **EGGNATZ**, individually and on behalf of all | **:** |
| others similarly situated; **JULIE MARTIN,** | **:** |
| individually, | **:** |
| | **:** |
| *Plaintiffs,* | **:** |
| *vs.* | **:** |
| | **:** |
| **KASHI COMPANY,** a California | **:** |
| Corporation, and **THE KELLOG** | **:** |
| **COMPANY,** a Michigan Corporation, | **:** |
| | **:** |
| *Defendants.* | **:** |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

Plaintiffs, KATRINA GARCIA, LAURA EGGNATZ and JULIE MARTIN ("Plaintiffs") by and through their undersigned counsel, pursuant to all applicable *Federal Rules of Civil Procedure*, and pursuant to Plaintiffs' Unopposed Motion for Leave to File Second Amended Complaint [DE 55] and this Honorable Court's October 18, 2013 Order [DE 57], hereby file this Second Amended Class Action Complaint, on behalf of themselves and all others similarly situated throughout the United States, and allege against Defendants, KASHI COMPANY and THE KELLOG COMPANY ("Defendants") as follows:

# I. INTRODUCTION

1.      Since at least 1999, Defendants have represented themselves as reputable makers of all-natural foods.  Defendants manufacture, market, advertise, distribute and sell various breakfast cereals, cereal bars, energy bars, crackers, frozen entrées including pizza and breakfast foods, as well as snack foods.  At issue here are Defendants' Kashi® brand cereal products, snack bars, cookies, crackers, crisps, entrees, pilaf, pizza and waffle products which are advertised as "ALL NATURAL" and/or containing "nothing artificial" as set forth in paragraphs 33 and 34, a (collectively, the "Products"). *See* **Exhibit 1**, attached hereto and incorporated herein, true and correct representation of the label of the Go Lean Crunch® cereal product's rear and side packaging.

2.      Defendants represent that their products are "ALL NATURAL" and that consumers "get real nutrition, nothing artificial" in the products, when in fact, they are not, because they contain ingredients that are not "all natural," including Genetically Modified Organisms ("GMOs") and/ or contain synthetic ingredients.

3.      Defendants' products labeled as "All Natural" or containing "Nothing Artificial" that are at issue in this case include at least one of the following synthetic and/or artificial ingredients: GMO soy, GMO soy-derivatives, GMO corn, GMO corn-derivatives, Pyridoxine Hydrochloride, Alpha-Tocopherol Acetate, Hexane-Processed Soy ingredients and Calcium Pantothenate.

4.      Plaintiffs were induced to buy the Products by the words 'all natural' on the packaging and Defendants' representations that the Products had 'nothing artificial.' Plaintiffs expected to purchase products with wholesome ingredients untouched by scientific modifications—only to learn that they were in fact consuming bioengineered, artificial and synthetic ingredients.

5.      The terms GM foods or GMOs (genetically-modified organisms) commonly refer to crop plants created for human or animal consumption using the latest molecular biology techniques. These plants have been modified in the laboratory through a process whereby the genes of one species are inserted into another species.  The purported purpose of genetic engineering plants is to enhance certain traits, such as, for example, increased resistance to herbicides.

6.      Genetic engineering can create plants with exact desired traits very rapidly and with great accuracy. For example, plant geneticists can isolate a gene responsible for drought tolerance and insert that gene into a different plan. The new GMO plant will also gain that modified trait.

7.      Genetic engineering is different from natural/conventional plant breeding and poses distinct risks. Specifically, the genetic engineering and associated tissue culture processes are highly mutagenic, leading to unpredictable changes in the DNA and proteins of the resulting GMO that can lead to unexpected toxic or allergenic effects. [1]

8.      Genes can be transferred from one plant to another and genes from non-plant organisms can be transferred into a plant. One common example is the use of *Bacillus thuringiensis,* (B.t.) genes into corn. B.t. is a naturally occurring bacterium that produces crystal proteins that are lethal to insect larvae. Using B.t. crystal protein genes in corn enable the corn to produce its own pesticides against insects.

9.      The Products pose a potential threat to consumers because medical research and scientific studies have yet to determine the long-term health effects of genetically engineered foods.   Recent studies suggest that GMOs may in fact be harmful to a consumer's health.   For example, an insecticidal toxin, known as BT toxin, is often inserted into the genetic code of an array of crops to enable the plant to produce its own insecticide.   This insecticide is released when insects ingest it.[2] Though BT toxin was supposed to be safe for humans (the digestion system in the human body was supposed to destroy it), more recent studies have shown that the human gut is actually not destroying it.[3]  Canadian researchers this year reported that the blood of ninety-three percent (93%) of pregnant women and eighty percent (80%) of their umbilical-

---

1.   Michael Antoniou, Claire Robinson, and John Fagan. GMO MYTHS AND TRUTHS: AN EVIDENCE-BASED EXAMINATION OF THE CLAIMS MADE FOR THE SAFETY AND EFFICACY OF GENETICALLY MODIFIED CROPS. Earth Open Source. June 2012 at 21.

2.   Goldberg, Max. "For the First Time Ever, Monsanto will be Marketing its Products Directly to Consumers with Sweet Corn-Serious Implications." New York Times, 12 August 2011.  http://livingmaxwell.com/monsanto-gmo-sweet-corn.

3.   Goldberg, Max. "For the First Time Ever, Monsanto will be Marketing its Products Directly to Consumers with Sweet Corn-Serious Implications." New York Times, 12 August 2011.  http://livingmaxwell.com/monsanto-gmo-swet-corn.

cord blood samples contained a pesticide implanted in GMO corn by the biotech company Monsanto, though digestion was supposed to remove it from the body.[4]

10.     Federal regulations define an all-natural product as one containing no artificial or synthetic ingredient, nor any ingredient that has been more than 'minimally processed." Clearly, an organism that has undergone sophisticated bioengineering can no longer be described as minimally processed.  7 C.F.R. § 205.2. Likewise, Pyridoxine Hydrochloride, Alpha-Tocopherol Acetate, Hexane-Processed Soy ingredients and Calcium Pantothenate are artificial and/or synthetic.

11.     Defendants' false and misleading representations and omissions violate state and federal law, detailed more fully below, including Florida and California law.

## II. JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter presented by this Complaint because it is a class action arising under 18 U.S.C. § 1332(d), which, under the Class Action Fairness Act of 2005 ("CAFA"), Pub. L. No. 109-2, 119 Stat. 4 (2005), explicitly provides for the original jurisdiction of the Federal Courts of any class action in which any member of the Plaintiffs class is a citizen of a state different from any Defendant, and in which the matter in controversy exceeds in the aggregate the sum of $5,000,000, exclusive of interest and costs.

13.     Plaintiffs allege that the total claims of individual class members in this action are in excess of $5,000,000 in the aggregate, exclusive of interest and costs, as required by 28 U.S.C. § 1332(d)(2), (5).  Plaintiffs are citizens of the States of Florida and California, as set forth below, and Defendants can be considered a citizen of California (Kashi) or Michigan (Kellogg). Therefore, diversity of citizenship exists under CAFA as required by 28 U.S.C. § 1332(d)(2)(A).

14.     Furthermore, Plaintiffs alleges that the total number of members of the proposed Plaintiffs Class is greater than 100, pursuant to 28 U.S.C. § 1332(d)(5)(B).

15.     Venue in this district is proper pursuant to 28 U.S.C. §1391(b) because Defendants conduct business within, may be found  in, and is subject to personal jurisdiction in

---

4.      Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.  June 2, 2011. BUSINESS; Business Desk; Part B; Pg. 4; Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.

this judicial district, and Plaintiffs, Garcia and Eggnatz, reside in and purchased the Products that is the subject of this action in this judicial district.

## III. PARTIES

16.     Plaintiff Katrina Garcia is an individual consumer over the age of eighteen.  She resides in Miami-Dade County and is a citizen of Florida.  Plaintiff Garcia seeks injunctive relief and damages on behalf of herself and the Class, and respectfully requests a jury trial on damage claims.

17.     Plaintiff Laura Eggnatz (formerly Laura Gabbamonte), is an individual consumer over the age of eighteen.  She resides in Broward County and is a citizen of Florida.  Plaintiff Eggnatz seeks injunctive relief and damages on behalf of herself and the Class, and respectfully requests a jury trial on damage claims.

18.     Plaintiff Julie Martin, is an individual more than 18 years old, and is a citizen of California, who resides in the city and County of San Francisco. Plaintiff Martin seeks injunctive relief and damages and respectfully requests a jury trial on damage claims.

19.     Defendant Kellogg Company ("Kellogg") is a Delaware corporation with its principal place of business located in the State of Michigan at One Kellogg Square, Battle Creek, Michigan 49017.   Kellogg lists with the Michigan Secretary of State a Registered Agent designated as The Corporation Company located at 30600 Telegraph Road, Suite 2345, Bingham Farms, Michigan 48025.  Therefore, Kellogg is a "citizen" of the State of Michigan.  Defendant Kellogg also promoted and marketed the Products at issue in this jurisdiction and in this judicial district.

20.     Defendant Kashi Company ("Kashi") is a California corporation with headquarters located at P.O. Box 8557, La Jolla, California 92037.  Kashi is a subsidiary of co-Defendant Kellogg Company and also lists with the California Secretary of State a principal place of business at One Kellogg Square, Battle Creek, Michigan 49017.  Kashi also lists with the California Secretary of State a Registered Agent designated as CT Corporation System located at 818 W Seventh Street, Los Angeles, California, 90017.  Kashi Company is a "citizen" of the State of California.  Defendant Kashi promoted and marketed the Products at issue.

//

## IV. FACTUAL ALLEGATIONS COMMON TO ALL COUNTS

### Plaintiffs' Purchases of the Products

21.     Plaintiff Garcia has purchased Go Lean Crunch®, and the snack bars Kashi Go Lean® Crunchy! All Natural Protein and Fiber Bars (chocolate peanut butter), and Kashi Go Lean® Roll! All Natural Protein and Fiber Bars (chocolate peanut butter) during the Class period, from a Publix Supermarket located at 2270 SW 27th Avenue, Miami, Florida 33145 as well as the Whole Foods located at 10th and Alton in Miami Beach, Florida, 33139.

22.     Plaintiff Eggnatz has purchased the Go Lean Crunch® Kashi Chewy Granola Bars Trail Mix, Kashi Chewy Granola Bars Honey Almond Flax, Kashi Chewy Granola Bars Peanut Butter, Kashi Chewy Granola Bars Cherry Dark Chocolate, and Kashi Crunchy Granola Bars Pumpkin Spice Flax, during 2011, from various Publix Supermarkets, including a Publix Supermarket located at 601 S. Andrews Avenue, Fort Lauderdale, Florida 33301.

23.     Plaintiff Martin purchased Go Lean Crunch® cereal, Kashi Chewy Granola Bars Cherry Dark Chocolate, and Kashi Crunchy Granola Bars Pumpkin Spice Flax, during the Class Period, and specifically during 2012, from a Trader Joes Market, located in San Francisco, California.

24.     Plaintiffs believed the material All-Natural representation in regards to the Products meant that the Products did not contain, nor were they made with, any genetically modified ingredients, nor any synthetic or artificial ingredients.  If Plaintiffs had known the Products contained GMOs and/or other synthetic and artificial ingredients and thus were not all-natural, they would not have purchased them.

25.     The Products containing GMOs and synthetic/ artificial ingredients are not "all natural" do contain "something artificial" and that Defendants' advertising and labeling is deceptive and likely to mislead the public as a result.  Plaintiffs would not have purchased the Products if they had known that Defendants' "all natural" statements about the Products are false because they contain GMOs and/or artificial and synthetic ingredients such as Pyridoxine Hydrochloride, Alpha-Tocopherol Acetate, Hexane-Processed Soy ingredients and Calcium Pantothenate.

26.     In purchasing the Products, Plaintiffs saw, read, and relied on the packages and advertising for the Products claiming to be all natural and/or natural.  Plaintiffs have been damaged by their purchase of the Products because the labeling and advertising for the Products

was and is deceptive and misleading; therefore, the Products are worth less than what Plaintiffs paid for them, and Plaintiffs did not receive what they reasonably intended to receive, which was a product that was GMO-free and/or did not contain artificial and synthetic ingredients.

27.    Plaintiffs purchased the Products because they believed that the Products had nothing artificial and were "All Natural," which they interpreted to mean that the Products do not contain any GMOs and/or artificial and synthetic ingredients.

28.    Defendants' statement that the Products had nothing artificial and were "All Natural," was important to Plaintiffs in deciding to purchase and consume the Products because they would not have purchased and consumed the Products had they not been advertised and labeled as "All Natural," or if the Products had clearly disclosed that they contain GMOs and/or artificial and synthetic ingredients in advertising for the Products not related to the labeling.

29.    Plaintiffs reasonably relied on Defendants' "all natural" and "nothing artificial" representations, given Defendant Kashi Company and Kashi Sales, LLC's strategic branding in the marketplace as a progressive food company. This branding is further supported by Defendants' statements on its website, such as:

    a.    "foods with simple, natural ingredients"

    b.    "we believe real food comes from real ingredients-found in kitchens like yours";

    c.    "We find simple, natural ingredients and minimally process them to keep their inherent nutrition intact";

    d.    "we never add any synthetic colors, artificial flavors, preservatives or sweeteners. So real food stays that way."

30.    In addition, Defendants kept the price of the Products artificially high in order to encourage this favorable perception of the Kashi brand among buyers, making consumers believe the Products were superior to other, comparable products because the Kashi Products were "all natural" whereas the others were not. Plaintiffs paid this price premium for the Products because they believed the Products were GMO-free and did not contain artificial and synthetic ingredients (in other words, they believed they are "All Natural" and contained "Nothing Artificial").

### Defendants' Advertising and Labeling of its All Natural Products

31.    Defendants manufacture, market, advertise, distribute and sell various cereal products; snack bars, cookies, crackers, crisps, entrees, pilaf, pizza and waffles.

32.     Defendants have promised that the Kashi brand delivers products that are "all-natural" and contain "nothing artificial" for over twelve years.  in association with the Kashi name.

33.     The following products are labeled "All Natural" but contain at least one synthetic and artificial ingredients and/or genetically modified organisms, as follows:

    a.    Kashi® 7 Grain Waffles
        i.  GMO Ingredients:  Soy Lecithin, Expeller Pressed Canola Oil, Yellow Corn Meal;
        ii.  Artificial/ Synthetic Ingredients: Hexene-Processed Soy

    b.    Kashi® Berry Blossoms™ Squares
        i.  GMO Ingredients:  Corn Bran, Expeller Pressed Canola Oil, Soy Lecithin;
        ii.  Artificial/ Synthetic Ingredients: Hexene-Processed Soy

    c.    Kashi® Blueberry Waffles;
        i.  GMO Ingredients:  Soy Lecithin, Expeller Pressed Canola Oil, Yellow Corn Meal;
        ii.  Artificial/ Synthetic Ingredients: Hexene-Processed Soy

    d.    Kashi® Caribbean Carnival Stone-Fired Thin Crust Pizza;
        i.  GMO Ingredients: Expeller Pressed Canola Oil, Corn Starch;
        ii.  Artificial/ Synthetic Ingredients: Hexene-Processed Soy

    e.    Kashi® Frozen Entrees Chicken Florentine;
        i.  GMO Ingredients:  Soy Flour, Canola Oil;
        ii.  Artificial/ Synthetic Ingredients: Hexene-Processed Soy

    f.    Kashi® Frozen Entrees Chicken Pasta Pomodoro
        i.  GMO Ingredient:  Soy Flour;
        ii.  Artificial/ Synthetic Ingredients: Hexene-Processed Soy

    g.    Kashi® Cocoa Beach Granola;
        i.  GMO Ingredients: Expeller Pressed Canola Oil, Soy Lecithin;
        ii.  Artificial/ Synthetic Ingredients: Hexene-Processed Soy

    h.    Kashi® GOLEAN® Blueberry Waffles;

   i. GMO Ingredients:  Soy Lecithin, Expeller Pressed Canola Oil, Yellow Corn Meal;

   ii. Artificial/ Synthetic Ingredients: Hexene-Processed Soy

 i. Kashi® GOLEAN® Chewy Chocolate Almond Toffee Protein & Fiber Bars;

   i. GMO Ingredients:  Soy Protein Isolate, Soy Protein Concentrate, Soy, Soy Lecithin, Corn, Corn Bran;

   ii. Artificial/ Synthetic Ingredients: Hexene-Processed Soy

 j. Kashi® Chewy Cookies 'N Cream Protein & Fiber Bars;

   i. GMO Ingredients:  Soy Protein Concentrate, Soy Protein Isolate, Soy Lecithin, Corn, Corn Starch, Expeller Pressed Canola Oil;

   ii. Artificial/ Synthetic Ingredients: Hexene-Processed Soy

 k. Kashi® GOLEAN® Chewy Malted Chocolate Crisp Protein & Fiber Bars;

   i. GMO Ingredients:  Corn, Corn Starch, Soy Protein Concentrate, Soy Protein Isolate, Soy Lecithin;

   ii. Artificial/ Synthetic Ingredients: Hexene-Processed Soy

 l. Kashi® GOLEAN® Chewy Oatmeal Raisin Cookie Protein & Fiber Bars;

   i. GMO Ingredients:  Corn, Corn Bran, Soy Protein Concentrate, Soy Protein Isolate, Soy Lecithin;

   ii. Artificial/ Synthetic Ingredients: Hexene-Processed Soy

 m. Kashi® GOLEAN® Chewy Peanut Butter & Chocolate Protein & Fiber Bars;

   i. GMO Ingredients:  Corn, Corn Bran, Soy Protein Concentrate, Soy Protein Isolate, Soy Lecithin;

   ii. Artificial/ Synthetic Ingredients: Hexene-Processed Soy

 n. Kashi® GOLEAN® Chocolate Malted Crisp Protein & Fiber Bars;

   i. GMO Ingredients:  Soy Protein Concentrate, Soy Protein Isolate, Soy Protein, Expeller Pressed Canola Oil, Soy Lecithin;

   ii. Artificial/ Synthetic Ingredients: Hexene-Processed Soy

 o. Kashi® GO LEAN® Chocolate Shake;

        i.   GMO Ingredients:  Soy Protein Isolate, Expeller Pressed Canola Oil, Soy Lecithin;

        ii.   Artificial/ Synthetic Ingredients: Calcium Pantothenate , Hexene-Processed Soy, Pyridoxine Hydrochloride, Tocopherol Acetate

p.   Kashi® GOLEAN® Creamy Instant Hot Cereal Truly Vanilla;

        i.   GMO Ingredients:  Whey Protein Isolate, Soy Protein Isolate;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

q.   Kashi® GOLEAN® Crisp! Toasted Berry Crumble Cereal;

        i.   GMO Ingredients:  Soy Protein Concentrate, Soy Grits, Expeller Pressed Canola Oil, Yellow Corn Flour, Soy Protein Isolate, Soy Lecithin;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

r.   Kashi® GOLEAN® Crunch! Cereal;

        i.   GMO Ingredient:  Expeller Pressed Canola Oil;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

s.   Kashi® GOLEAN® Crunch! Honey Almond Flax Cereal;

        i.   GMO Ingredients:  Soy Protein Concentrate, Expeller Pressed Canola Oil;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

t.   Kashi® GOLEAN® Crunchy! Chocolate Almond Protein & Fiber Bars;

        i.   GMO Ingredients:  Soy Protein Isolate, Corn Flour, Toasted Soy Grits;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy, Pyridoxine Hydrochloride, Tocopherol Acetate

u.   Kashi® GOLEAN® Crunchy! Chocolate Caramel Protein & Fiber Bars;

        i.   GMO Ingredients:  Soy Protein Isolate, Corn Grits, Corn Bran, Soy Lecithin;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy, Tocopherol Acetate

v.   Kashi® GOLEAN® Crunchy! Chocolate Peanut Protein & Fiber Bars;

        i.   GMO Ingredients:  Soy Protein Isolate, Corn Grits, Corn Bran, Soy Lecithin;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy, Pyridoxine Hydrochloride, Tocopherol Acetate

w.     Kashi® GO LEAN® Crunchy! Chocolate Pretzel Protein & Fiber Bars;

        i.   GMO Ingredients:  Soy Protein Isolate, Soy Bean Oil, Milled Corn, Corn Bran, Soy Lecithin;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy, Pyridoxine Hydrochloride

x.     Kashi® GOLEAN® Crunchy! Cinnamon Coffee Cake Protein & Fiber Bars,

        i.   GMO Ingredients:  Soy Protein Isolate, Soybean Oil, Milled Corn, Corn Bran, Soy Lecithin;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy, Pyridoxine Hydrochloride

y.     Kashi® GOLEAN® Hearty Instant Hot Cereal with Clusters Honey & Cinnamon;

        i.   GMO Ingredients:  Soy Protein Concentrate, Expeller Pressed Canola Oil, Soy Protein Isolate;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

z.     Kashi® GOLEAN® Oatmeal Raisin Protein & Fiber Bars;

        i.   GMO Ingredients:  Corn, Corn Bran, Soy Protein Concentrate, Soy Protein Isolate, Expeller Pressed Canola Oil, Soy Lecithin;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

aa.    Kashi® GO LEAN® Original 7 Grain Waffles;

        i.   GMO Ingredients:  Expeller Pressed Canola Oil, Yellow Corn Meal, Soy Lecithin;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

bb.    Kashi® GO LEAN® Peanut Butter & Chocolate Protein & Fiber Bars;

        i.   GMO Ingredients:  Corn, Corn Bran, Soy Protein Concentrate, Soy Protein Isolate, Soy Lecithin;

        ii.    Artificial/ Synthetic Ingredients: Hexene-Processed Soy

cc.    Kashi® GOLEAN® Roll! Caramel Peanut Protein & Fiber Bars;

        i.    GMO Ingredients: Soy Protein Isolate, Expeller Pressed Canola Oil, Soy Lecithin;

        ii.    Artificial/ Synthetic Ingredients: Hexene-Processed Soy, Pyridoxine Hydrochloride, Tocopherol Acetate

dd.    Kashi® GOLEAN® Roll! Chocolate Peanut Protein & Fiber Bars;

        i.    GMO Ingredients:  Soy Protein Isolate, Expeller Pressed Canola Oil, Soy Lecithin;

        ii.    Artificial/ Synthetic Ingredients:

ee.    Kashi® GOLEAN® Roll! Chocolate Turtle Protein & Fiber Bars;

        i.    GMO Ingredients:  Soy Protein Isolate, Expeller Pressed Canola Oil, Soy Lecithin;

        ii.    Artificial/ Synthetic Ingredients: Hexene-Processed Soy, Pyridoxine Hydrochloride, Tocopherol Acetate

ff.    Kashi® GOLEAN® Roll! Fudge Sundae Protein & Fiber Bars;

        i.    GMO Ingredients:  Soy Protein Isolate, Expeller Pressed Canola Oil, Soy Lecithin;

        ii.    Artificial/ Synthetic Ingredients: Hexene-Processed Soy, Pyridoxine Hydrochloride, Tocopherol Acetate

gg.    Kashi® GOLEAN® Roll! Oatmeal Walnut Protein & Fiber Bars;

        i.    GMO Ingredients:  Soy Protein Isolate, Expeller Pressed Canola Oil, Soy Lecithin;

        ii.    Artificial/ Synthetic Ingredients: Hexene-Processed Soy, Pyridoxine Hydrochloride, Tocopherol Acetate

hh.    Kashi® GOLEAN® Strawberry Flax Waffles;

        i.    GMO Ingredients:  Soy Protein Isolate, Expeller Pressed Canola Oil, Soy Lecithin;

        ii.    Artificial/ Synthetic Ingredients: Hexene-Processed Soy

ii.    Kashi® GO LEAN® Vanilla Shake Mix;

        i.    GMO Ingredients:  Soy Protein Concentrate, Soy Lecithin;

ii.   Artificial/ Synthetic Ingredients: Calcium Pantothenate, Hexene-Processed Soy, Pyridoxine Hydrochloride, Tocopherol Acetate

jj.   Kashi® Honey Sunshine Cereal;

i.   GMO Ingredients: Corn Bran, Expeller Pressed Canola Oil, Soy Lecithin;

ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

kk.   Kashi® Lemongrass Coconut Chicken Entrée;

i.   GMO Ingredients: Canola Oil. Soy Flour;

ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

ll.   Kashi® Mayan Harvest Bake Entrée;

i.   GMO Ingredients: Milled Corn, Soybean Oil, Expeller Pressed Canola Oil, Soy Flour;

ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

mm.   Kashi® Mountain Medley Granola;

i.   GMO Ingredients: Expeller Pressed Canola Oil, Soy Lecithin;

ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

nn.   Kashi® Pesto Pasta Primavera Entrée;

i.   GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin;

ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

oo.   Kashi® Southwest Style Chicken Entrée;

i.   GMO Ingredients:  Roasted Corn, Canola Oil, Soy Flour;

ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

pp.   Kashi® Spicy Black Bean Enchilada Entrée;

i.   GMO Ingredients:  Corn Tortilla, Ground Corn Treated with Lime, Corn Starch, Roasted Corn, Defatted Soy Flour, Expeller Pressed Canola Oil;

ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

qq.   Kashi® Summer Berry Granola;

i.   GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin;

ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

rr.   Kashi® TLC Baked Apple Spice Soft-Baked Cereal Bars;

        i.   GMO Ingredients:  Unmodified Corn Starch, Expeller Pressed Canola Oil, Soy Lecithin;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

ss.     Kashi® TLC Blackberry Graham Soft-Baked Cereal Bars;

        i.   GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

tt.     Kashi® TLC Cherry Dark Chocolate Chewy Granola Bars;

        i.   GMO Ingredients: Soy Lecithin, Soy Protein Isolate, Soy Grits, Corn Flour, Expeller Pressed Canola Oil;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

uu.     Kashi® TLC Cherry Vanilla Soft-Baked Cereal Bars;

        i.   GMO Ingredients: Unmodified Corn Starch, Expeller Pressed Canola Oil, Soy Lecithin;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

vv.     Kashi® TLC Country Cheddar Cheese Crackers;

        i.   GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

ww.     Kashi® TLC Cranberry Walnut Fruit & Grain Bars;

        i.   GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin, Unmodified Corn Starch, Corn Flour, Soy Grits;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

xx.     Kashi® TLC Dark Chocolate Coconut Fruit & Grain Bars;

        i.   GMO Ingredients:  Unmodified Corn Starch, Soy, Corn Flour, Soy Protein Isolate, Soy Grits, Soy Lecithin, Expeller Pressed Canola Oil;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

yy.     Kashi® TLC Dark Chocolate Coconut Layered Granola Bar;

        i.   GMO Ingredients:  Soy Protein Isolate, Soy Grits, Soy Lecithin, Unmodified Corn Starch, Yellow Corn Flour, Expeller Pressed Canola Oil;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

zz.     Kashi® TLC Dark Mocha Almond Chewy Granola Bars;

   i.    GMO Ingredients:  Soy Protein Isolate, Soy Lecithin, Soy Grits, Corn Flour, Expeller Pressed Canola Oil;

   ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

aaa.    Kashi® TLC Happy Trail Mix Chewy Cookies;

   i.    GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin;

   ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

bbb.    Kashi® TLC Honey Almond Flax Chewy Granola Bars;

   i.    GMO Ingredients:  Soy Protein Isolate, Soy Grits Expeller Pressed Canola Oil, Soy Lecithin;

   ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

ccc.    Kashi® TLC Honey Sesame Snack Crackers;

   i.    GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin;

   ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

ddd.    Kashi® TLC Honey Toasted 7 Grain Crunchy Granola Bars;

   i.    GMO Ingredients:  Soy Protein Isolate, Expeller Pressed Canola Oil, Soy Lecithin;

   ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

eee.    Kashi® TLC Oatmeal Dark Chocolate Chewy Cookies;

   i.    GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin;

   ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

fff.    Kashi® TLC Oatmeal Raisin Flax Chewy Cookies;

   i.    GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin;

   ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

ggg.    Kashi® TLC Original 7 Grain with Sea Salt Pita Crisps;

   i.    GMO Ingredients:  Yellow Corn Meal, Expeller Pressed Canola Oil, Soy Lecithin;

   ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

hhh.    Kashi® TLC Peanut Peanut Butter Chewy Granola Bars;

   i.    GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin, Soy Protein Isolate, Soy Grits, Corn Flour;

           ii.    Artificial/ Synthetic Ingredients: Hexene-Processed Soy

iii.    Kashi® TLC Peanutty Dark Chocolate Layered Granola Bars;

           i.    GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin, Soy Protein Isolate, Soy Grits, Yellow Corn Flour;

           ii.    Artificial/ Synthetic Ingredients: Hexene-Processed Soy

jjj.    Kashi® TLC Pumpkin Pecan Fruit & Grain Bars;

           i.    GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin, Soy Grits;

           ii.    Artificial/ Synthetic Ingredients: Hexene-Processed Soy

kkk.    Kashi® TLC Pumpkin Pecan Layered Granola Bars;

           i.    GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin;

           ii.    Artificial/ Synthetic Ingredients: Hexene-Processed Soy

lll.    Kashi® TLC Pumpkin Pie Fruit & Grain Bars;

           i.    GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin, Soy Grits, Soy Protein Isolate;

           ii.    Artificial/ Synthetic Ingredients: Hexene-Processed Soy

mmm. Kashi® TLC Pumpkin Spice Flax Crunchy Granola Bars;

           i.    GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin;

           ii.    Artificial/ Synthetic Ingredients: Hexene-Processed Soy

nnn.    Kashi® TLC Raspberry Chocolate Fruit & Grain Bars;

           i.    GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin, Soy Grits, Soy Protein Isolate;

           ii.    Artificial/ Synthetic Ingredients: Hexene-Processed Soy

ooo.    Kashi® TLC Ripe Strawberry Soft-Baked Cereal Bars;

           i.    GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin;

           ii.    Artificial/ Synthetic Ingredients: Hexene-Processed Soy

ppp.    Kashi® TLC Roasted Almond Crunch Crunchy Granola Bars;

           i.    GMO Ingredients:  Expeller Pressed Canola Oil, Soy Lecithin, Soy Protein Isolate;

           ii.    Artificial/ Synthetic Ingredients: Hexene-Processed Soy

qqq.    Kashi® TLC Trail Mix Chewy Granola Bars;

        i.    GMO Ingredients:  Corn Flour, Expeller Pressed Canola Oil, Soy Lecithin, Soy Grits, Soy Protein Isolate;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

rrr.    Kashi® TLC Zesty Salsa Pita Crisps;

        i.    GMO Ingredients:  Yellow Corn Flour, Soy Lecithin;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

sss.    Kashi® Tuscan Veggie Bake Entrée;

        i.    GMO Ingredients:  Soy Flour, Unmodified Corn Starch;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

ttt.    Kashi® Chewy Granola Bars Honey Almond Flax;

        i.    GMO Ingredients:  Expeller Pressed Canola Oil, Soy Protein Isolate, Soy Grits, Soy Lecithin, Corn Flour

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy

34.    The following products are labeled "Nothing Artificial" but contain at least one synthetic and artificial ingredients and/or genetically modified organisms, as follows:

a.    Kashi® Heart to Heart® Honey Oat Waffles;

        i.    GMO Ingredients:  Degerminated Yellow Corn Meal, Yellow Corn Flour, Expeller Pressed Canola Oil;

        ii.   Artificial/ Synthetic Ingredients: Hexene-Processed Soy Ingredients, Pyridoxine Hydrochloride, Alpha Tocopherol Acetate

b.    Kashi®  Heart to Heart Honey® Toasted Oat Cereal;

        i.    GMO Ingredients:  Degerminated Yellow Corn Meal, Yellow Corn Flour, Expeller Pressed Canola Oil;

        ii.   Artificial/ Synthetic Ingredients:  Pyridoxine Hydrochloride, Alpha Tocopherol Acetate

c.    Kashi® Heart to Heart® Instant Oatmeal Apple Cinnamon;

        i.    Artificial/ Synthetic Ingredients: Pyridoxine Hydrochloride, Alpha Tocopherol Acetate

d.    Kashi® Heart to Heart® Instant Oatmeal Golden Maple;

        i.    Artificial/ Synthetic Ingredients: Pyridoxine Hydrochloride, Alpha Tocopherol Acetate

     e.      Kashi® , Heart to Heart® Instant Oatmeal Raisin Spice;

          i.     Artificial/ Synthetic Ingredients: Pyridoxine Hydrochloride, Alpha Tocopherol Acetate

     f.      Kashi® , Heart to Heart® Oat Flakes & Blueberry Clusters Cereal;

          i.     GMO Ingredient:  Yellow Corn Flour;

         ii.     Artificial/ Synthetic Ingredients: Pyridoxine Hydrochloride, Alpha Tocopherol Acetate

     g.      Kashi® , Heart to Heart® Roasted Garlic Whole Grain Crackers;

          i.     GMO Ingredients:  Expeller Pressed Canola Oil, Corn Starch;

         ii.     Artificial/ Synthetic Ingredients: Pyridoxine Hydrochloride, Alpha Tocopherol Acetate

     h.      Kashi® , Heart to Heart® Warm Cinnamon Oat Cereal;

          i.     GMO Ingredients:  Expeller Pressed Canola Oil, Corn Flour, Yellow Corn Meal;

         ii.     Artificial/ Synthetic Ingredients: Pyridoxine Hydrochloride, Alpha Tocopherol Acetate

     i.      Kashi® , Heart to Heart® Original Whole Grain Crackers;

          i.     GMO Ingredient: Expeller Pressed Canola Oil;

         ii.     Artificial/ Synthetic Ingredients: Pyridoxine Hydrochloride, Alpha Tocopherol Acetate

35.     All products listed in paragraphs 33 and 34 above are collectively referred to as the "Products."

**Genetically Modified Ingredients Are Not "All Natural"**

36.     Defendants label, market, and/or advertise the Products as "ALL NATURAL." Defendants' claim is misleading, however, because Defendants' Products contain GMOs, ingredients that have been modified through biotechnology and are therefore not all natural.

37.     GMOs are not expected to be in foods labeled "All Natural." Recently, Americans have expressed a heightened concern about the safety of GMO Products, as evinced by the fact that legislation requiring labeling GMOs have been proposed in more than a dozen states since

2011.[5]   In addition,  polls taken by the Pew Center, Consumers Union, Harris Interactive and ABC over the last decade that have consistently found that the vast majority of Americans would like to see genetically modified foods better regulated and labeled.[6]

38.   Concerns about GMOs fall into three categories: environmental hazards, human health risks and economic concerns.

39.   Concerns for human health risks associated with GMOs include the possibility that introducing a new gene into a plant may create a new allergen, cause an allergic reaction in susceptible individuals or have an unexpected and negative impact on overall human health

40.   Furthermore, the FDA has loosely defined the term "natural" as a product that contains no synthetic or artificial ingredients.[7] According to federal regulations, an ingredient is synthetic if it is:

> [a] substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes." 7 C.F.R. §205.2.

41.   Similarly, the USDA's Food Safety and Inspection Service ("FSIS") defines a "natural" product as a product that does not contain any artificial or synthetic ingredient and does not contain any ingredient that is more than "minimally processed," defined as:

> (a) those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes which do not fundamentally alter the raw

---

5.   *See     http://www.nytimes.com/2012/05/25/science/dispute-over-labeling-of-genetically-modified-food.html?_r=0* (last visited January 15, 2013).

6.   Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.  June 2, 2011. BUSINESS; Business Desk; Part B; p. 4.

7.   FDA Consumer Health Information, Food Label Helps Consumers Make Healthier Choices, available at www.fda.gov/downloads/ForConsumers/ConsumerUpdates!UCM199361.pdf.

> product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices.
>
> Relatively severe processes, e.g., solvent extraction, acid hydrolysis, and chemical bleaching would clearly be considered more than minimal processing . . . .

USDA FSIS, Food Standards and Labeling Policy Book, available at *www.fsis.usda.gov/OPPDE/larc/Policies/Labeling_Policy_Book_082005.pdf31.*

42.     The Kashi companies have since embraced these federal explanations and posted the following definition of "natural" on its website:

> *At Kashi, we define natural as:*
>
> Natural Food is made without artificial ingredients, colors or preservatives and is minimally processed.  A natural ingredient is one that is made from a renewable source found in nature. Minimal Processing involves only kitchen chemistry processes that can be done in a family kitchen and does not negatively impact the purity of the natural ingredients.[8]

43.     The scientific description of how GMOs are produced refutes any attempt to categorize them as 'minimally processed,' "all-natural" or substantially similar to something naturally occurring. Contemporary research on GMOs has made clear that genetic engineering is completely different from natural breeding and entails different risks because the genetic engineering and associated tissue culture processes are imprecise and highly mutagenic, leading to unpredictable changes in the DNA, proteins, and biochemical composition of the resulting GMO that can lead to unexpected toxic or allergenic effects and nutritional disturbances:

---

8.      Kashi Yearbook, www.kashi.com/meet_us/yearbook

> [T]he process of inserting a genetically modified gene into the DNA of a plant cell is crude, uncontrolled, and imprecise, and causes mutations – heritable changes – in the plant's DNA blueprint. These mutations can alter the functioning of the natural genes of the plant in unpredictable and potentially harmful ways.
>
> Because of these diverse interactions, and because even the simplest organism is extremely complex, it is impossible to predict the impacts of even a single GM gene on the organism. It is even more impossible to predict the impact of the GMO on its environment – the complexity of living systems is too great.  In short, unintended, uncontrolled mutations occur during the GM process and complex interactions occur at multiple levels within the organism as a result of the insertion of even a single new gene. For these reasons, a seemingly simple genetic modification can give rise to many unexpected changes in the resulting crop and the foods produced from it. The unintended changes could include alterations in the nutritional content of the food, toxic and allergenic effects, poor crop performance, and generation of characteristics that harm the environment.[9]

44.     At a minimum a reasonable consumer would expect a company's representation of 'all-natural' to conform to the company's own published definition, as well as the federal regulation.   However, the process of manufacturing a GMO is clearly beyond "minimal processing;" one would certainly not expect a consumer to bioengineer an ingredient in their kitchen.

45.     Despite this, Defendants have falsely represented their Products are all natural even though they contain GMOs, namely Corn, Soy, Corn variations, and/or Soy variations.

---

9.      Michael Antoniou, Claire Robinson, and John Fagan. GMO MYTHS AND TRUTHS: AN EVIDENCE-BASED EXAMINATION OF THE CLAIMS MADE FOR THE SAFETY AND EFFICACY OF GENETICALLY MODIFIED CROPS. Earth Open Source. June 2012 at 11.

Corn, Soy, Corn variations, and/or Soy variations, among other ingredients, are known to be derived from GMOs and serve as part of the main ingredients in the Products. However, Defendants' Products contain no warning or disclaimer that the Products contain GMOs in its advertising for the Products (not related to the label).

### Genetically Modified Ingredients are Hazardous to Consume

46.    To this day, no scientific studies have guaranteed that GMOs are safe for human consumption in the long-term. In fact, many indicate the contrary. More than one hundred peer-review studies have shown that GMOs damage the vital organs, immune systems and reproductive functions of animals. Conscientious consumers have been particularly alarmed by the use of gene splicing to incorporate a bacterial toxin in plants that can repel pests.[10] Canadian researchers reported that the blood of ninety-three percent of pregnant women and eighty percent of their umbilical cord blood samples contained a pesticide implanted in GMO corn by the biotech company Monsanto, though manufacturers of GMOs claim that digestion is supposed to remove it from the body. "Given the potential toxicity of these environmental pollutants and the fragility of the fetus, more studies are needed," they wrote in Reproductive Toxicology.[11]

47.    Other concerns that have been raised by environmental groups include the possibility that GMOs contribute to the spread of antibiotic resistance, and could introduce new allergens into foods.[12] Concern surrounding the latter topic of allergens relates to two factors; the possibility that genes from known allergens may be inserted into crops not typically associated with allergenicity and the possibility of creating new, unknown allergens by either inserting novel genes into crops or changing the expression of endogenous proteins.[13] A person

---

10.    Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.

11.    Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011. *See also* Goldberg, Max. "For the First Time Ever, Monsanto will be Marketing its Products Directly to Consumers with Sweet Corn-Serious Implications." New York Times, 12 August 2011. http://livingmaxwell.com/monsanto-gmo-sweet-corn.

12.    Bakshi A (2003). "Potential adverse health effects of genetically modified crops". *J Toxicol Environ Health B Crit Rev 6* (3): 211–25.

13.    Key S, Ma JK, Drake PM (June 2008). "Genetically modified plants and human health". *J R Soc Med* 101 (6): 290–8.

allergic to Brazil nuts, for example only, would be at risk of suffering an allergic reaction from consuming a product that contained a GMO bioengineered to contain DNA from Brazil nuts. The consumer would be unaware of the potential allergic reaction because the product containing the GMO would in no way warn of or even indicate its genetically modified condition.

48.     While the Food and Drug Administration (FDA) has allowed the sale and planting of genetically modified foods for 15 years,  the FDA wrote in a statement to the Tribune that " [u]ltimately, it is the food producer who is responsible for assuring safety,"  noting also that manufacturers are encouraged to consult with the agency about their products.[14] The European Union has recognized the potential dangers inherent in consuming genetically modified organisms and has some of the most stringent GMO regulations in the world.  In the European Union all GMOs are considered "new food" and subject to extensive, case-by-case, science based food evaluation by the European Food Safety Authority (EFSA). The EFSA reports to the European Commission who then draft a proposal which if accepted will be adopted by the EC or passed on to the Council of Agricultural Ministers. [15] There is also a safeguard clause that Member States can invoke to restrict or prohibit the use and/or sale of a GMO within their territory if they have a justifiable reason to consider that the approved GMO constitutes a risk to human health or the environment.[16] In February 2008, for example, the French government used the safeguard clause to ban the cultivation of MON810 after Senator Jean-François Le Grand, chairman of a committee set up to evaluate biotechnology, said there were "serious doubts" about the safety of the product.[17]   By 2010, the only GMO food crop with approval for cultivation in Europe is the GM maize MON810, and a second GMO, a potato called Amflora, was approved for cultivation for industrial applications in the EU by the European

---

14.     Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.

15.     Davison, J. (February 2010). "GM plants: Science, politics and EC regulations". *Plant Science* 178 (2): 94–98.

16.     European Commission. "Food Safety: From the farm to the fork (What are the National safeguard measures)". Europa.

17.     AFP – Feb 8, 2008 (2008-02-08). "AFP: French GM ban infuriates farmers, delights environmentalists."

Commission.[18]   Despite the European Union's approval of MON 810, however, it has been banned for cultivation by Germany, Austria, France, Greece, Luxembourg, Poland and Bulgaria. Meanwhile, Italy does not allow for the cultivation if GMOs.[19]

49.   In addition, independent scientific testing of the effects of GMOs on rats, hamsters, and mice have generated great concern as to the safety of GMOs. The tests have been conducted by: Dr. Irina Ermakova, the Institute of High Neural Activity and Neurophysiology of Russian Academy of Sciences, Moscow; Dr. Alexey Surov and Dr. Alexander Baranov, the Institute of Environmental and Evolution Problems and the Institute of Developmental Biology, Moscow); and Dr. Maria Konovalova, the Saratov Agrarian University. All three of these studies demonstrate significant biological and behavioral changes in the animals when GM soy or GM corn was put into their feed. Some of the biological effects include increased mortality among newborns in the first generation, reduced quantity of offspring, and spike in sterility among second generation animals. On the behavioral front, animals became more aggressive and lost maternal instincts.[20]

50.   Another study conducted by Dr. Arpad Pusztai the potential health risks that GMOs pose to internal organs.  Dr. Arpad Pusztai's research has shown that rats fed with GE potatoes had enlarged pancreases, their brains had shrunk, and their immunity had been damaged. Dr. Eric Seralini's research demonstrated that organ damage can occur.  In addition, the Committee of Independent Research and Information on Genetic Engineering (CRIIGEN) and universities at Caen and Rouen were able to get raw data of Monsanto's 2002 feeding trials on rats at the European Council order and made it public in 2005. The researchers found that rats fed with three approved corn varieties of GE corn—Mon 863, insecticide products, Mon 810, and Roundup Ready herbicide —suffered organ damage. The data "clearly underlines adverse impacts on kidneys and liver, the dietary, detoxifying organs as well as different levels of

---

18.   "European Commission approves Amflora starch potato - BASF - The Chemical Company - Corporate Website". BASF. http://www.basf.com/group/pressrelease/P-10-179. Retrieved 2010-09-24.

19.   Barker, Debbie. "Part II: The Emperor has No Clothes." p. 37.

20.   Barker, Debbie. "Part II: The Emperor has No Clothes." P. 39.

damages to the heart, adrenal glands, spleen and hematopoietic systems," according to Dr. Gilles Eric Seralini, a molecular biologist at the University of Caen.[21]

51.    Additionally, evidence of liver and kidney toxicity appeared when rats were fed an approved GE maize variety (Mon 863) (Seralini GE, Cellier D. & Spironx de Vendomois, J, 2007, "New analysis of rat feeding study with a GM Maize", Archives of Environmental Contamination and Toxicology, 10,1007, S 00244-006-0149-5). Similar effects were observed when Monsanto fed its GT-73 Roundup Ready canola variety to rats. The rats showed a 12 percent to 16 percent increase in liver weight.[22]

52.    Even the World Health Organization (WHO) cautions that "Different GM organisms include different genes inserted in different ways. This means that individual GM foods and their safety should be assessed on a case-by-case basis and that it is not possible to make general statements on the safety of all GM foods."[23]  More recently, Americans have also expressed a heightened concern about the safety of GMO products, as evinced by the fact that 14 states have currently introduced legislation on GMO labeling. Alaska, with its huge wild salmon industry, has already passed a biotech seafood labeling law.[24]  In addition,  polls taken by the Pew Center, Consumers Union, Harris Interactive and ABC over the last decade that have consistently found that the vast majority of Americans would like to see genetically modified

---

21.    Dr. Shiva Vandana, "Introduction: The GMO Emperor has No Clothes." p. 17. "A Comparison of the Effects of Three GM Corn Varieties on Mammalian Health," Joel Spiroux de Veu de Mois, Francois Roullier, Dominique Cellise, Gilles Eric Serelini, *International Journal of Biological Science*s, 2009, 5: 706-726.

22.    Dr. Shiva Vandana, "Introduction: The GMO Emperor has No Clothes." p. 18. *See* Greenpeace (2004) "Greenpeace critique of Monsanto's Roundup Ready Oilseed rape, GT-73," *http://www.greenpeace.at/uploads/media/GT73_Greenpeace_comments_Oct_2004_01.pdf*.

23.    Dr. Shiva Vandana, "Introduction: The GMO Emperor has No Clothes." p. 19. *See* "20 Questions on Genetically Modified Foods." World Health Organization. *http://www.who.int/foodsafety/publications/biotech/20questions/en/*.

24.    Eng, Monica. "Altered food labeling sought \ Prevalence of genetically modified fare sparks protests." Chicago Tribune. May 25, 2011.

foods better regulated and labeled.[25]  Plaintiffs contend that Defendants' failure to disclose in its advertising for the Products, not related to the labeling for the Products, the presence of GMOs in its Products, amounts to a material misrepresentation. Plaintiffs would not have purchased the Products had she known they contain GMOs.

53.     At a minimum, Plaintiffs contend that Defendant should cease labeling the Products "All Natural" and/or that Defendants should identify that the Products contain genetically modified ingredients in its advertising not related to the labeling.  Failure to is an omission of a material fact and violates a consumer's democratic right to information and choice. Most people consider the decision of what they put into their bodies to be tremendously important.  People follow restricted diets for religious reasons (some observers of the Jewish faith keep Kosher, some observers of Muslim faith only eat Halal food, and some observers of Hindu faith refuse beef), for moral or personal reasons (many vegetarians and vegans restrict their diets for moral reasons), or because they physically cannot eat certain foods (those with celiac disease cannot eat wheat, those who are lactose intolerant cannot consume dairy products, and those with other food allergies face similar restrictions). In the latter scenario, eating the food in question could cause severe physical harm or death. In the first two scenarios, while the diets may be driven by personal choice rather than physical necessity, the beliefs behind the choices are often deeply held. If a Muslim eats soup that is labeled vegetarian but in fact contains pork, or if a vegetarian eats cereal that contains mouse parts, the mislabeling that led to the inadvertent consumption is likely to be extremely offensive.[26]  Likewise, Defendants' covert inclusion of GMOs in its Products, amounts to an unlawful affront to the health conscious consumers and the public at large.  As Wendell Berry Notes in her *Twelve Paragraphs on Biotechnology*, "[i]n biotechnology, as in any technology affecting living systems, there is nothing perfectly predictable. What we do within living bodies and in the living world is never a simple mechanical procedure such as threading a needle or winding a watch. Mystery exists;

25.     Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times.  June 2, 2011. BUSINESS; Business Desk; Part B; p. 4.

26.     Valery Federici. "Genetically Modified Food and Informed Consumer Choice: Comparing U.S. and E.U. Labeling Laws.*" 35 Brooklyn J. Int'l L. 51 5* at 528.

unforeseen and unforeseeable consequences are common."[27]   Accordingly, Defendants' failure to disclose the presence of GMOs in its Products, in advertising not related to the labeling for the Products, violates the consumer's right to know what is being introduced into his or her body/internal system, and right to choose whether he or she wishes to participate in the current experimental stage of genetically modified organisms and their comprehensive effect on human health.

### The Products Contain Additional Artificial and Synthetic Ingredients

54.   In addition to the genetically-modified ingredients contained in the Products, other ingredients in the Products are not "all natural" and do have "something artificial."

55.   Pyridoxine Hydrochloride is one of the compounds that can be called vitamin B6, which assists in the balancing of sodium and potassium as well as promoting red blood cell production. Pyridoxine Hydrochloride is used to supplement vitamins in certain foods. Commercially prepared pyridoxine is "prepared by chemical synthesis" as Pyridoxine Hydrochloride to help make the chemical more water soluble. 21 C.F.R. § 184.1676.

56.   Alpha-Tocopherol Acetate is created from the condensation of the petrochemical racemic isphytol with trimethyl hydroquinone, followed by treatment using acetic acid. 21 C.F.R. § 184.1890.

57.   Hexane-Processed Soy is the result of bathing soybeans in hexane, a byproduct of gasoline refining, to separate the soybeans' oil from protein. This includes soy lecithin, soy grits, soy flour, soybean oil and soybean fiber.

58.   Calcium Pantothenate is a water-soluble vitamin that is "prepared synthetically from isobutyraldehyde and formaldehyde." 21 C.F.R. 184.1212.

## V. CLASS ALLEGATIONS

59.   Plaintiffs re-allege and incorporate by reference all allegations set forth above.

60.   Plaintiffs bring this class action pursuant Federal Rule of Civil Procedure 23 and seek certification of the claims and certain issues in this action pursuant to the applicable provisions of Federal Rule of Civil Procedure 23 on behalf of the following individuals: (1) All persons throughout the United States who purchased a Kashi Product containing  Pyridoxine

---

27.   Wendell Berry, "Twelve Paragraphs on Biotechnology." The GMO Emperor has no Clothes." p.43.

Hydrochloride, Alpha-Tocopherol Acetate, Hexane-Processed Soy ingredients and/ or Calcium Pantothenate for personal use since May 3, 2008. Specifically excluded from this subclass only are California purchasers; and, (2) All persons throughout the United States who purchased a Kashi product containing a genetically modified ingredient since May 3, 2008.  The two subclasses shall be collectively referred to as the "Class." Specifically excluded from the Class are all persons who purchased these products in California. The Also excluded from the Class are governmental entities, Defendants, any entity in which Defendants have a controlling interest, and Defendants' officers, directors, affiliates, legal representatives, employees, co-conspirators, successors, subsidiaries, and assigns.  Also excluded from the Class is any judge, justice, or judicial officer presiding over this matter and the members of their immediate families and judicial staff.   Plaintiffs reserve the right to amend the Class definitions if further investigation and discovery indicates that the Class definitions should be narrowed, expanded, or otherwise modified.

61.     Defendants' practices and omissions were applied uniformly to all members of the Class, so that the questions of law and fact are common to all members of the Class. All members of the Class were and are similarly affected by having purchased and used the Products containing genetically modified ingredients and/or synthetic and artificial ingredients, despite the clear representation by Defendants that the Products for their intended and foreseeable purpose, and the relief sought herein is for the benefit of Plaintiffs and members of the putative Class.

62.     Plaintiffs are informed and believe, and on that basis allege, that the Plaintiff Class is so numerous that joinder of all members would be impractical. Based on the annual sales of the Products and the popularity of the Products, it is apparent that the number of consumers of the Products would at least be in the many thousands, thereby making joinder impossible.

63.     Questions of law and fact common to the Plaintiffs and the Class exist that predominate over questions affecting only individual members, including, *inter alia*:

   a.     Whether Defendants' practices in connection with the design, testing, manufacture, assembly, development, promotion, marketing, advertising and sale of the Products were deceptive or unfair in any respect, thereby violating the Florida Deceptive and Unfair Trade Practices Act, *inter alia*, sections 501.201 to 201.213, *Florida Statutes*;

b.      Whether Defendants negligently misrepresented the true nature of the Products;

c.      Whether Defendants breached express warranties in its sale of the Products, thereby causing harm to Plaintiffs and members of the Class;

d.      Whether Defendants breached implied warranties in its sale of the Products, thereby causing harm to Plaintiffs and members of the Class;

e.      Whether Defendants failed to adequately warn of, and/or concealed the dangers and health risks associated with the Products;

f.      Whether the Products are "All Natural;"

g.      Whether the ingredients contained within the Products are "All Natural;"

h.      Whether Defendants' conduct as set forth above injured consumers and if so, the extent of the injury.

i.      Whether Defendants' practices and representations related to the marketing, labeling and sales of the Products in California were fraudulent, unfair, deceptive and/or unlawful in any respect, thereby violating Cal. Bus. & Prof. Code §§ 17200 *et seq.*;

j.      Whether Defendants' practices and representations related to the marketing, labeling and sales of the Products in California were unfair, deceptive and/or unlawful in any respect, thereby violating Cal. Bus. & Prof. Code §§ 17500 *et seq.*;

k.      Whether Defendants violated Cal. Civ. Code §§ 1750 *et seq.* with its practices and representations related to the marketing, labeling and sales of the Products within California;

l.      Whether Plaintiffs are entitled to a Declaratory Judgment as a result of Defendants' practices and representations related to the marketing, labeling and sales of the Products; and

m.      Whether Defendants' practices and representations related to the marketing, labeling and sales of the Products amounts to violation of Money Had and Received.

64.     The claims asserted by Plaintiffs in this action are typical of the claims of the members of the Plaintiff Class, as the claims arise from the same course of conduct by Defendants, and the relief sought is common.

65.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Plaintiff Class.  Plaintiffs have retained counsel competent and experienced in both consumer protection and class action litigation.

66.     Certification of this class action is appropriate under Federal Rule of Civil Procedure 23 because the questions of law or fact common to the respective members of the Class predominate over questions of law or fact affecting only individual members. This predominance makes class litigation superior to any other method available for the fair and efficient adjudication of these claims.

67.     Absent a class action, it would be highly unlikely that the representative Plaintiffs or any other members of the Class would be able to protect its own interests because the cost of litigation through individual lawsuits might exceed expected recovery.

68.     Certification is also appropriate because Defendants acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive relief with respect to the Class as a whole.

69.     Further, given the large number of class members, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

70.     A class action is a fair and appropriate method for the adjudication of the controversy, in that it will permit a large number of claims to be resolved in a single forum simultaneously, efficiently, and without the unnecessary hardship that would result from the prosecution of numerous individual actions and the duplication of discovery, effort, expense and burden on the courts that such individual actions would engender.

71.     The benefits of proceeding as a class action, including providing a method for obtaining redress for claims that would not be practical to pursue individually, outweigh any difficulties that might be argued with regard to the management of this class action.

//

//

//

## VI.  FLORIDA CAUSES OF ACTION BY PLAINTIFFS GARCIA AND EGGNATZ, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

### FIRST CAUSE OF ACTION:
### FOR VIOLATIONS OF FLORIDA'S DECEPTIVE AND UNFAIR TRADE PRACTICES ACT, FLA. STAT. §§ 501.201, *ET SEQ.*

72.     Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in the preceding paragraphs.

73.     This cause of action is brought pursuant to the Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 to 201.213, *Florida Statutes*. The express purpose of the Act is to "protect the consuming public...from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce" Section 501.202(2).

74.      The sale of the Products at issue in this cause was a "consumer transaction" within the scope of the Florida Deceptive and Unfair Trade Practices Act, Sections 501.201 to 201.213, *Florida Statutes*.

75.     Plaintiffs are "consumers" as defined by Section 501.203, *Florida Statutes*.  Each of Defendants' Products is a "good" within the meaning of the Act.  Defendants are engaged in trade or commerce within the meaning of the Act.

76.     Section 501.204(1), *Florida Statutes* declares as unlawful "unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce".

77.      Section 501.204(2), *Florida Statutes* states that "due consideration be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a)(1) of the Trade Commission Act".  Defendants' unfair and deceptive practices are likely to mislead – and have misled – the consumer acting reasonably under the circumstances and, therefore, violate Section 500.04, Florida Statutes and 21 U.S.C. Section 343.

78.     Defendants have violated the Act by engaging in the unfair and deceptive practices described above, which offend public policies and are immoral, unethical, unscrupulous and substantially injurious to consumers.  Specifically, Defendants have represented that their

Products are "ALL NATURAL" and contain nothing artificial, when in fact the Products contain GMOs.

79.     Plaintiffs and Class Members have been aggrieved by Defendants' unfair and deceptive practices in that they purchased and consumed Defendants' Products.

80.     The Reasonable Consumer necessarily relies on the food companies to honestly represent the true nature of their ingredients.

81.     As described in detail above, Defendants have represented that its products are 'all-natural' and contain nothing artificial when in reality they contain GMOs.  Moreover, Defendants specifically described 'natural' products as those having undergone only 'minimal processing,' or simple kitchen chemistry.  Clearly an ingredient that has been bioengineered has undergone far more severe processing than family-style kitchen chemistry.

82.     Defendants have deceived reasonable consumers, like Plaintiff and the Class, into believing its Products were something they were not—"All Natural."

83.     The knowledge required to discern the true nature of Defendants' Products is beyond that of the reasonable consumer—namely that the Products contain GMOs and other artificial and synthetic ingredients, such as pyridoxine hydrochloride, alpha-tocopherol acetate, hexane-processed soy ingredients and calcium pantothenate.

84.     Federal and State Courts decide omission and misrepresentation matters regularly, including those involving a reasonable consumer's understanding of the meaning of 'all-natural.' Accordingly, the issue of whether the all-natural label is misleading to a reasonable consumer is well within the jurisdiction of the Court.

85.     The damages suffered by the Plaintiffs and the Class were directly and proximately caused by the deceptive, misleading and unfair practices of Defendants, as described above.

86.     Pursuant to Section 501.211(1), *Florida Statutes*, Plaintiffs and the Class seek a declaratory judgment and court order enjoining the above described wrongful acts and practices of the Defendants and for restitution and disgorgement.

87.     Additionally, pursuant to sections 501.211(2) and 501.2105, *Florida Statutes*, Plaintiffs and the Class make claims for damages, attorney's fees and costs.

//

//

## SECOND CAUSE OF ACTION:

## <u>NEGLIGENT MISREPRESENTATION</u>

88.     Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in the preceding paragraphs.

89.     Defendants have negligently represented that the Products have nothing artificial and are all "ALL NATURAL," when in fact, they are not because it contains GMOs.

90.     Defendants have omitted a material fact to the public, including Plaintiffs and Class Members, about its Products.  Through advertising not related to the label, Defendants have failed to disclose that the Products contain Genetically Modified Organisms and other artificial and synthetic ingredients, such as pyridoxine hydrochloride, alpha-tocopherol acetate, hexane-processed soy ingredients and calcium pantothenate.

91.     Defendants knew or should have known that these omissions would materially affect Plaintiffs' and Class Members' decisions to purchase the Products.

92.     Plaintiffs and other reasonable consumers, including the Class members, reasonably relied on Defendants' representations set forth herein, and, in reliance thereon, purchased the Products.

93.     The reliance by Plaintiffs and Class members was reasonable and justified in that Defendants appeared to be, and represented itself to be, a reputable business, and it distributed the Products through reputable companies.

94.     Plaintiffs would not have been willing to pay for Defendants' Products if they knew that they contained genetically modified organisms and/or other artificial and synthetic ingredients, such as pyridoxine hydrochloride, alpha-tocopherol acetate, hexane-processed soy ingredients and calcium pantothenate.

95.     As a direct and proximate result of these misrepresentations, Plaintiffs and Members of the Class were induced to purchase and consume Defendants' Products, and have suffered damages to be determined at trial in that, among other things, they have been deprived of the benefit of their bargain in that they bought Products that were not what they were represented to be, and they have spent money on Products that had less value than was reflected in the premium purchase price they paid for the Products.

//

//

### THIRD CAUSE OF ACTION:

### <u>BREACH OF IMPLIED WARRANTY OF FITNESS FOR PURPOSE</u>

96.     Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in the preceding paragraphs.

97.     Defendants have represented that the Products are "ALL NATURAL" and contain nothing artificial when in fact, they contain GMOs and other artificial and synthetic ingredients, such as pyridoxine hydrochloride, alpha-tocopherol acetate, hexane-processed soy ingredients and calcium pantothenate. Therefore, Defendant impliedly warranted that the Products do not contain GMOs or do not contain other artificial and synthetic ingredients, such as pyridoxine hydrochloride, alpha-tocopherol acetate, hexane-processed soy ingredients and calcium pantothenate.

98.     Plaintiffs and other Members of the Class sought a conventional, safe and healthy salad dressing. In doing so, Plaintiffs and other Members of the Class relied on Defendants' skill and judgment to select and furnish suitable goods for that purpose, and on or about that time, Defendants sold the Products to Plaintiffs and other Members of the Class.

99.     By their representations regarding the reputable nature of its companies and related entities, and by their promotion and marketing of their Products, Defendants warranted that the Products were safe, healthy, and natural foods for use by consumers. Plaintiffs and Members of the Class bought the Products from Defendant, relying on Defendants' skill and judgment.  However, Defendants' Products were not safe and conventional products because they contained genetically modified organisms as set forth in detail above.

100.    At the time of sale, Defendants had reason to know the particular purpose for which the goods were required, and that Plaintiffs and Members of the Class were relying on Defendants' skill and judgment to select and furnish safe and conventional goods, so that there was an implied warranty that the goods (the Products), were fit for this purpose.

101.    However, Defendants breached the warranty implied at the time of sale because Plaintiffs and Members of the Class did not receive suitable goods in as much as the goods contained GMOs and other artificial and synthetic ingredients, such as pyridoxine hydrochloride, alpha-tocopherol acetate, hexane-processed soy ingredients and calcium pantothenate.

102.     Because the Products have not been scientifically proven to be safe and healthy for consumption through any long-term studies and contain ingredients that are not "all natural" and do indeed contain something "artificial," the Products were not fit for the particular purpose for which it was marketed.

103.     As a proximate result of this breach of warranty by Defendants, Plaintiffs and Members of the Class have suffered actual damages in an amount to be determined at trial in that they were induced to purchase products they would not have purchased had they known the true facts about, and have spent money on products that were not what they were represented to be, and that lack the value Defendants represented the Products to have.

## FOURTH CAUSE OF ACTION:
## **BREACH OF EXPRESS WARRANTY**

104.     Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in the preceding paragraphs.

105.     Defendants have expressly represented that the Products have nothing artificial and are "ALL NATURAL," when in fact, they are not because they contain GMOs and other artificial and synthetic ingredients, such as pyridoxine hydrochloride, alpha-tocopherol acetate, hexane-processed soy ingredients and calcium pantothenate.

106.     Plaintiffs are informed and believe, and thereon allege, that Defendants made different express warranties, including, but not limited to, that the Products were safe, healthy, and natural foods and would not be harmful to the consumer using them.

107.     As stated hereinabove, there is no scientific evidence to support Defendants' contention that the Products are natural and safe for human consumption, and Defendants withheld the existence of the genetically modified organisms in its Products and failed to warn of the dangers and health risks associated with use of the Products as more fully described above.

108.     The failure to produce any scientific evidence ensuring the long-term safety associated with use of the Products constitutes breaches of all applicable express and implied warranties as alleged in this complaint, based on all laws that support the breach of express warranty claims by Plaintiffs and other members of the Class regarding the true nature of the Products; these laws include but are not limited to the Common Law and Florida's Consumer Protection Act.

109.     As a proximate result of the failure of the Products to perform as expressly warranted by Defendants, Plaintiffs and members of the Class have suffered actual damages in an amount to be determined at trial in that they were induced to purchase products they would not have purchased had they known the true facts about, and have spent money on products that were not what they were represented to be, and that lack the value Defendants represented the Products to have.

110.     Plaintiffs and Class members gave timely notice to Defendants of this breach on behalf of themselves and all members of the Plaintiff Class directly through a Notice letter sent to Defendants on April 13, 2012.

111.     Furthermore, Defendants continue to market the Products without extensive scientific evidence to support the claim that the Products are safe for human consumption in the long-run.

### FIFTH CAUSE OF ACTION:
### <u>DECLARATORY JUDGMENT</u>

112.     Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in the preceding paragraphs.

113.     This cause of action is explicitly being pled in the alternative to Plaintiffs' causes of action for Breach of Express Warranty and Breach of Implied Warranty of Merchantability.

114.     Defendants have represented on its label that its Products are "All Natural" when in fact, they are not, because they contain GMOs and other artificial and synthetic ingredients, such as pyridoxine hydrochloride, alpha-tocopherol acetate, hexane-processed soy ingredients and calcium pantothenate, a fact that Defendants fail to disclose in its advertising for the Products not related to the labeling for the Products.

115.     Plaintiffs and the members of the Class seek a declaratory judgment, pursuant to the Federal Declaratory Judgments Law, 28 U.S.C. §§ 2201 *et seq.* and *Federal Rule of Civil Procedure* 57, requiring Defendants to cease using genetically modified organisms in its All Natural products and/or stopping Defendants from representing its products are All Natural when they are not.  In requesting this declaratory relief, Plaintiffs are requesting an interpretation of the rights, legal status and relationships of the parties under the above law and facts.

116.     Such interpretation is appropriate under the provisions of the Federal Declaratory Judgments Law, 28 U.S.C. §§ 2201 *et seq.* and *Federal Rule of Civil Procedure* 57.

117.    Plaintiff seeks all available remedies pursuant to this cause of action.

## SIXTH CAUSE OF ACTION:
## MONEY HAD AND RECEIVED

118.    Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in the previous paragraphs.

119.    This cause of action is explicitly being pled in the alternative to Plaintiffs' causes of action for Breach of Express Warranty and Breach of Implied Warranty of Merchantability.

120.    Defendants have represented on its label that its Products are "All Natural" when in fact, they are not, because they contain GMOs, a fact that Defendants fail to disclose in their advertising for the Products, not related to the labeling of the Products.

121.    In California, a cause of action for money had and received lies where one person has received money or its equivalent under circumstances which in equity and good conscience ought not to be retained.

122.    Defendants received money from the Plaintiffs and members of the Class through Defendants' sale of the Products, and Plaintiffs and Class Members' purchase of the Products.

123.    Defendants accepted and retained the purchase price obtained from sales of the Products to Plaintiffs and Class Members.

124.    Defendants have profited from their unlawful, unfair, misleading, and deceptive practices and advertising at the expense of Plaintiffs and Class Members, under circumstances in which it would be unjust for Defendants to be permitted to retain the benefit.

125.    Plaintiffs and the Class were damaged by their purchase of the Products because the Products are not All Natural, but contain GMOs, despite claiming to be All Natural.

126.    Plaintiffs and Class Members do not have an adequate remedy at law against Defendants (pled in the alternative).

127.    Defendants should not be permitted to unjustly enrich themselves at the expense of the Plaintiffs and members of the Class, and should be required to make restitution for all funds so unlawfully received and retained.

128.    In addition, Defendants should be required to disgorge all interest collected thereon.

129.    Accordingly, the Products were valueless such that Plaintiffs and Class Members are entitled to restitution in an amount not less than the purchase price of the Products, and disgorgement of the profits Defendants derived from the sales of its Products.

130.    Therefore, Plaintiffs seek all available remedies pursuant to this cause of action.

## VII.  CALIFORNIA CAUSES OF ACTION  BY PLAINTIFFS, INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED

### SEVENTH CAUSE OF ACTION:

### VIOLATIONS OF CAL. BUS. & PROF. CODE §§ 17500 *ET SEQ*.

131.    Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in the preceding paragraphs.

132.    In violation of California Bus. & Prof. Code § 17500, Defendants disseminated, or caused to be disseminated, the deceptive Products' labeling and advertising representations that misleadingly claim that the Products are "All NATURAL."

133.    Plaintiffs contend Defendants should cease labeling and advertising the Products as "All NATURAL," because the presence of GMOs and other artificial and synthetic ingredients, such as pyridoxine hydrochloride, alpha-tocopherol acetate, hexane-processed soy ingredients and calcium pantothenate in the Products, renders them not "All NATURAL."

134.    Defendants' Products' labeling and advertising representations are misleading because it cannot support its claim that the Products are "All NATURAL."

135.    Defendants' labeling and advertising representations for the Products are by their very nature unfair, deceptive and/or unlawful within the meaning of California Bus. & Prof. Code § 17500 et seq. The representations were likely to deceive reasonable consumers.

136.    In making and disseminating the deceptive representations alleged herein, Defendant knew or should have known that the representations were misleading, and acted in violation of California's Bus. & Prof. Code §§17500 *et seq.*

137.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and purchasers of the Products have suffered substantial monetary and non-monetary damage.

138.    Pursuant to Bus. & Prof. Code § 17535, Plaintiffs individually and on behalf of all purchasers, seek an order of this Court requiring Defendants to restore to purchasers of the

Products, all monies that may have been acquired by Defendants as a result of such unfair, deceptive and/or unlawful acts or practices.

139.    As a result of Defendants' violations of the FAL, Plaintiffs and purchasers of the Products are entitled to restitution for out-of-pocket expenses and economic harm.

140.    Pursuant to Civil Code § 3287(a), Plaintiffs and purchasers of the Products are further entitled to pre-judgment interest as a direct and proximate result of Defendants' wrongful conduct.

141.    The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiffs and purchasers of the Products are entitled to interest in an amount according to proof.

## EIGHTH CAUSE OF ACTION:
## VIOLATIONS OF CAL. CIV. CODE §§ 1750 *ET SEQ*.

142.    Plaintiffs re-allege and incorporate by reference verbatim the allegations set forth in the preceding paragraphs above.

143.    This cause of action is brought by Plaintiffs pursuant to Cal. Civ. Code §§ 1750 *et seq*.

144.    Plaintiffs and each purchaser of the Products are "consumers" within the meaning of Civil Code §1761(d).

145.    The purchases of the Products by Plaintiffs and purchasers of the Products were and are "transactions" within the meaning of Civil Code §1761(e).

146.    Defendants have represented that the Products are "All NATURAL."  Plaintiffs contend Defendants labeled and advertised the Products as "All NATURAL," when they are not because of the presence of GMOs and other artificial and synthetic ingredients, such as pyridoxine hydrochloride, alpha-tocopherol acetate, hexane-processed soy ingredients and calcium pantothenate in the Products, which also renders them not "All NATURAL," and which violated the CLRA in at least the following respect:

a.      In violation of Civil Code §1770(a)(5), Defendants represented that the Products have characteristics, ingredients, uses, and benefits which they do not have; and

b.      In violation of Civil Code §1770(a)(7), Defendants represented that the Products are of a particular standard, quality, or grade, which they are not.

c.      In violation of Civil Code §1770(a)(9), Defendants advertised the Products with an intent not to sell the Products as advertised;

d.      In violation of Civil Code §1770(a)(14), Defendants represented that the purchase of the Products confers or involves rights, remedies, or obligations which it does not have or involve, or which are prohibited by law; and

e.      In violation of Civil Code §1770(a)(16), Defendants represented that the subject of the sale of the Products has been supplied in accordance with a previous representation when it has not.

147.   Plaintiffs seek, and are is entitled to, injunctive, equitable relief in the form of an order requiring Defendants to make full restitution to purchasers of the Products of all monies wrongfully obtained as a result of the conduct described above.

148.   Plaintiffs, by and through counsel, notified Defendants in writing of the particular violations of Section 1770 of the CLRA, and demanded that it take certain corrective actions within the period prescribed by the CLRA for such demands.

149.   Defendants failed to adequately respond to the demands for corrective action within the time prescribed by the CLRA.

150.   Therefore, Plaintiffs request statutory and actual damages, as well as punitive damages, interest and attorneys' fees as authorized by Section 1780(a) of the CLRA, along with this claim for injunctive relief.

151.   In addition to an award of damages, Plaintiffs seek and are entitled to, pursuant to Section 1780(a)(2) of the CLRA, an order for the equitable relief described above, as well as costs, attorney's fees and any other relief which the Court deems proper.

## NINTH CAUSE OF ACTION:
## VIOLATIONS OF THE "UNFAIR" AND "FRAUDULENT" PRONGS OF
## CAL. BUS & PROF. CODE §§ 17200 *ET SEQ.*

152.   Plaintiffs re-allege and incorporate by reference verbatim allegations set forth in the preceding paragraphs.

153.   This cause of action is brought on behalf of Plaintiffs and members of the general public, pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq*., which provides that "unfair competition shall mean and include any unlawful, unfair or deceptive business act or practice

and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter I (commencing with Section 17500) as Part 3 of Division 7 of the Business and Professions Code."

154.    As alleged hereinabove, Plaintiffs have standing to pursue this claim as they have suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth herein. Specifically, prior to the filing of this action, Plaintiffs purchased at least one of the Products listed in paragraphs 33 and 34 for their own personal use. In doing so, they relied upon the false representations that the Products are "ALL NATURAL" and contain "nothing artificial." As detailed hereinabove, contrary to these representations by Defendants, the presence of GMOs and other artificial and synthetic ingredients, such as pyridoxine hydrochloride, alpha-tocopherol acetate, hexane-processed soy ingredients and calcium pantothenate in the Products renders them not "ALL NATURAL."

155.    In its marketing and advertising, Defendants make false and misleading statements regarding the uses and benefits of the Products, namely, that they are "ALL NATURAL" and contain "nothing artificial."

156.    Defendants are aware that the claims they made about the Products are false and misleading.

157.    The misrepresentations Defendants made about the Products are important to reasonable consumers and constitute an unfair and fraudulent business practice within the meaning of California Business & Professions Code section 17200, *et seq.*

158.    Defendants' business practices, as alleged herein, are unfair because: (1) the injury to consumers are substantial; (2) the injury is not outweighed by any countervailing benefits to consumers or competition; and, (3) consumers could not reasonably have avoided the information because Defendants intentionally mislead the consuming public by means of the claims made with respect to the Products as set forth herein.

159.    Defendants' business practices as alleged herein are fraudulent because they are likely to deceive customers into believing the Products have characteristics, uses and benefits they do not have, and the "ALL NATURAL" claims are literally false.

160.    In addition, Defendants' use of various forms of advertising media to advertise, call attention to or give publicity to the sale of goods or merchandise which are not as represented in any manner constitutes unfair competition, unfair, deceptive, untrue or misleading

advertising and an unlawful business practice within the meaning of Business & Professions Code section 17200, *et seq.*

161. Defendants' wrongful business practices constituted (and constitute) a continuing course of conduct of unfair competition since Defendants are marketing and selling the Products in a manner likely to deceive the public.

162. Defendants have peddled, and continue to peddle, its misrepresentations through a nationwide advertising campaign, emanating from its headquarters in La Jolla, California.

163. There were reasonably available alternatives to further Defendants' legitimate business interests, other than the conduct described herein.

164. Plaintiffs and members of the Class were misled into purchasing the Products by Defendants' deceptive and fraudulent conduct as alleged hereinabove.

1. Plaintiffs were misled and, because the misrepresentations and omissions were uniform and material, presumably believed that the Products were "ALL NATURAL" and "contained nothing artificial."

2. Defendants had an improper motive (profit before accurate marketing) in its practices related to the deceptive labeling and advertising of the Products, as set forth above.

3. The use of such unfair and fraudulent business acts and practices was and is under the sole control of Defendants, and was deceptively hidden from members of the general public in Defendants' marketing, advertising and labeling of the Products.

4. As purchasers and consumers of Defendants' Products, and as members of the general public who purchased and used the Products, Plaintiffs and the Class are entitled to and bring this class action seeking all available remedies under the UCL.

5. Pursuant to California Bus. & Prof. Code § 17203, Plaintiffs, on behalf of themselves and the Class, seeks an order of this Court requiring Defendants to restore all monies that may have been acquired by Defendants as a result of such unfair, deceptive and/or fraudulent business acts or practices.

6. Plaintiffs and the Class will be denied an effective and complete remedy in the absence of such an order.

7. As a result of Defendants' violations of the UCL, Plaintiffs and the Class are entitled to restitution for out-of-pocket expenses and economic harm. Pursuant to Civil Code §

3287(a), Plaintiffs and the Class are further entitled to pre-judgment interest as a direct and proximate result of Defendants' unfair and fraudulent business conduct.

8.      The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiffs and the Class are entitled to interest in an amount according to proof.

## TENTH CAUSE OF ACTION:
## VIOLATIONS OF THE "UNLAWFUL" PRONG OF
## CAL. BUS & PROF. CODE §§ 17200 *ET SEQ.*

165.    Plaintiffs re-allege and incorporate by reference verbatim allegations set forth in the preceding paragraphs.

166.    This cause of action is brought on behalf of Plaintiffs and members of the general public pursuant to Cal. Bus. & Prof. Code §§ 17200 *et seq.*, which provides that "unfair competition shall mean and include any unlawful, unfair or deceptive business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by Chapter I (commencing with Section 17500) as Part 3 of Division 7 of the Business and Professions Code."

167.    As alleged hereinabove, Plaintiffs have standing to pursue this claim as they have suffered injury in fact and have lost money or property as a result of Defendants' actions as set forth herein. Specifically, prior to the filing of this action, Plaintiffs purchased at least one of the Products listed in paragraphs 33 and 34 for their own personal use. In doing so, they relied upon the false representations that the Products are "ALL NATURAL" and contain "nothing artificial." As detailed hereinabove, contrary to these representations by Defendants, the presence of GMOs and other artificial and synthetic ingredients, such as pyridoxine hydrochloride, alpha-tocopherol acetate, hexane-processed soy ingredients and calcium pantothenate in the Products renders them not "ALL NATURAL."

168.    In its marketing and advertising, Defendants make false and misleading statements regarding the uses and benefits of the Products, namely, that they are "ALL NATURAL" and contain "nothing artificial." Such marketing, advertising and sale of the Products by Defendants is unlawful because (1) they are violating sections 1770(a)(5), 1770(a)(7) and 1770(a)(9) of the CLRA, California Civil Code section 1750, *et seq.*; and (2) they are violating the FAL, California Business & Professions Code section 17500.

169.     Because Defendants' business conduct in advertising, marketing and selling the Products using false and misleading statements, in violation of the CLRA, FAL other state and federal statutes, laws and/or regulations, constitute a per se violation of the "unlawful" prong of the UCL.

170.     As purchasers and consumers of Defendants' Products, and as members of the general public who purchased and used the Products, Plaintiffs and the Class are entitled to and bring this class action seeking all available remedies under the UCL.

171.     Pursuant to California Bus. & Prof. Code § 17203, Plaintiffs, on behalf of themselves and the Class,  seek an order of this Court requiring Defendants to restore all monies that may have been acquired by Defendants as a result of such unlawful business acts or practices.

172.     Plaintiffs and the Class will be denied an effective and complete remedy in the absence of such an order.

173.     As a result of Defendants' violations of the UCL, Plaintiff and the Class are entitled to restitution for out-of-pocket expenses and economic harm. Pursuant to Civil Code § 3287(a), Plaintiffs and the Class are further entitled to pre-judgment interest as a direct and proximate result of Defendants' unlawful business conduct.

174.     The amount on which interest is to be calculated is a sum certain and capable of calculation, and Plaintiffs and the Class are entitled to interest in an amount according to proof.

## <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiffs, on behalf of themselves and all others similarly situated, prays for relief, jointly and severally pursuant to each cause of action set forth in this Complaint as follows:

1.     For an order certifying that the action may be maintained as a class action and Plaintiffs' counsel be appointed as Class Counsel and Plaintiffs be appointed as class representatives;

2.     For an award of equitable relief as follows:

a.     Enjoining Defendants from continuing to engage, use, or employ any unfair and/or deceptive business acts or practices related to the design, testing, manufacture, assembly, development, marketing and advertising

of the Products for the purpose of selling the Products in such manner as set forth in detail above;

b.    Restoring all monies that may have been acquired by Defendants as a result of such unfair and/or deceptive act or practices; and

c.    Requiring Defendant to disgorge all ill-gotten gains flowing from the conduct described herein.

3.    For a Declaratory Judgment as specified above;

4.    For actual damages in an amount to be determined at trial;

5.    For an award of attorney's fees and costs;

6.    For pre- and post-judgment interest on any amounts awarded; and

7.    For any other award the Court might deem just, appropriate, or proper.

## IX. DEMAND FOR JURY TRIAL

Plaintiffs demand a jury trial on all issues so triable.

**Respectfully Submitted,**

Dated:  October 18, 2013                    By: /s/   Howard W. Rubinstein
                                            Howard W. Rubinstein, Esq.
                                            Fla. SBN:  0104108
                                            *howardr@pdq.net*
                                            THE LAW OFFICES OF
                                            HOWARD W. RUBINSTEIN, P.A.
                                            1615 Forum Place, Suite 4C
                                            West Palm Beach, FL 33401
                                            (800) 436-6437
                                            (415) 692-6607 (fax)

                                            Benjamin M. Lopatin, Esq.
                                            Cal. Bar No.: 281730
                                            *lopatin@hwrlawoffice.com*
                                            THE LAW OFFICES OF
                                            HOWARD W. RUBINSTEIN, P.A.
                                            One Embarcadero Center, Suite 500
                                            San Francisco, CA 94111
                                            (800) 436-6437
                                            (415) 692-6607 (fax)
                                            (Admitted *pro hac vice*)

Angela Arango-Chaffin, Esq.
Fla. Bar No: 87919
*angela@chaffinlawfirm.com*
1455 Ocean Drive, Suite 811
Miami Beach, FL 33139
(713) 818-2515
(713) 952-5972 (fax)

Robert A. Chaffin
Texas Bar #04057500
The Chaffin Law Firm
4265 San Felipe #1020
Houston, Texas 77027
(713) 528-1000
(713) 952-5972 Fax
robert@chaffinlawfirm.com
(Admitted *pro hac vice*)

L. De-Wayne Layfield, Esq.
Texas Bar No.:  12065710
*dewayne@layfieldlaw.com*
LAW OFFICE OF L.
DEWAYNE LAYFIELD
PO Box 3829
Beaumont, TX 77704-3829
(409) 832-1891
(866) 280-3004 (fax)
(Admitted *pro hac vice*)

Mark A. Milstein
California Bar No.: 155513
Gillian L. Wade
California Bar No.: 229124
Sara D. Avila
California Bar No.: 263213
MILSTEIN ADELMAN, LLP
2800 Donald Douglas Loop North
Santa Monica, California 90405
(310) 396-9600
(310) 396-9635 (fax)
mmilstein@milsteinadelman.com
gwade@milsteinadelman.com
savila@milsteinadelman.com
(Applications for *pro hac vice* pending)

Attorneys for Plaintiffs and the Proposed Class

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on this <u>18th day of October, 2013</u>, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record by transmission of Notices of Electronic Filing generated by CM/ECF.

<u>/s/   Howard W. Rubinstein</u>
Howard W. Rubinstein, Esq.