## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

CASE NO. 12-21678-CIV-LENARD/GOODMAN

**KATRINA GARCIA, LAURA
EGGNATZ, and JULIE MARTIN,
individually, and on behalf of all
others similarly situated,**

       Plaintiffs,

v.

**KASHI COMPANY, a California
Corporation, and THE KELLOGG
COMPANY, a Michigan Corporation,**

       Defendants.

_____/

**OMNIBUS ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED
COMPLAINT (D.E. 74);  GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION REQUESTING JUDICIAL NOTICE IN SUPPORT OF
THEIR MOTION TO DISMISS (D.E. 72); GRANTING AGREED MOTION TO
FILE DOCUMENTS UNDER SEAL (D.E. 73); GRANTING PLAINTIFFS'
UNOPPOSED MOTION TO REQUEST JUDICIAL NOTICE IN SUPPORT OF
THEIR RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO
DISMISS (D.E. 81); AND GRANTING AGREED MOTION TO FILE
DOCUMENTS UNDER SEAL (D.E. 88)**

**THIS CAUSE** is before the Court on Defendants Kashi Company and The

Kellogg Company's Motion to Dismiss Plaintiffs' Second Amended Complaint

("Motion," D.E. 74), filed December 4, 2013.  Plaintiffs Katrina Garcia, Laura Eggnatz

and Julie Martin ("Plaintiffs") filed a Response on December 23, 2013 ("Response," D.E.

80), to which Defendants filed a Reply on January 9, 2014 ("Reply," D.E. 89).

Also before the Court is Defendants' Motion Requesting Judicial Notice in Support of their Motion to Dismiss (D.E. 72), filed December 2, 2013, Plaintiffs' Response in Opposition to the Motion for Judicial Notice (D.E. 82), filed December 23, 2013, and Defendants' Reply thereto (D.E. 83), filed January 2, 2014.

Also before the Court are an Agreed Motion to File Documents Under Seal (D.E. 73), filed December 4, 2013; Plaintiff's Unopposed Motion to Request Judicial Notice in Support of their Response in Opposition to Defendants' Motion to Dismiss (D.E. 81), filed December 23, 2013; and an Agreed Motion to File Documents Under Seal (D.E. 88), filed January 10, 2014.

The agreed and unopposed motions (D.E. 73, 81, and 88) are hereby **GRANTED**; the Court will address the contested motions separately.  And, upon review of the Motions, Responses, Replies, and the record, the Court finds as follows.

## I.     Relevant Facts[1]

Defendants manufacture, market, advertise, distribute, and sell various breakfast cereals, cereal bars, energy bars, and other foodstuffs.  (SAC, D.E. 58 ¶ 1.)  At issue in this case are Defendants' Kashi brand cereal products, snack bars, cookies, crackers, crisps, entrees, pilaf, pizza and waffle products which contain one or more of the following ingredients: Genetically Modified Organisms ("GMOs") and/or synthetic ingredients, such as GMO soy, GMO soy-derivatives, GMO corn, GMO corn-derivatives,

---

[1]     Unless otherwise noted, the following facts are gleaned from Plaintiffs' Amended Consolidated Class Action Complaint (SAC, D.E. 58), and are deemed to be true for purposes of Defendants' Motion.  The pagination the Court uses in its citations to the pleadings are the page numbers assigned by CM/ECF in the top right-corner of the document, not the page numbers assigned by the Parties at the bottom of the document.

Pyridoxine Hydrochloride, Alpha-Tocopherol Acetate, Hexane-Processed Soy ingredients and Calcium Pantothenate. (Id. ¶¶ 1, 3.) Defendants market these products as "ALL NATURAL" and/or containing "nothing artificial." (Id. ¶ 2.) Plaintiffs allege that they "were induced to buy the Products by the words 'all natural' on the packaging and Defendants' representations that the Products had 'nothing artificial.' Plaintiffs expected to purchase products with wholesome ingredients untouched by scientific modifications—only to learn that they were in fact consuming bioengineered, artificial and synthetic ingredients." (Id. ¶ 4.) Plaintiffs contend that bioengineered organisms do not meet the definition of "all-natural" in the federal regulations, and that Pyridoxine Hydrochloride, Alpha-Tocopherol Acetate, Hexane-Processed Soy ingredients and Calcium Pantothenate are artificial and/or synthetic. (Id. ¶ 10.) Thus, they claim that "Defendants' advertising and labeling is deceptive and likely to mislead the public as a result." (Id. ¶ 25.)

On May 3, 2012, Plaintiffs Eggnatz and Garcia filed a Complaint in the Southern District of Florida. (See D.E. 1.) On September 14, 2012, Plaintiff Martin filed a Class Action Complaint in the Northern District of California. (See Martin v. The Kellog Company, et al., No. CV 12-04846 CRB (N.D. Cal. Sept. 14, 2012), Compl. (D.E. 1).) On December 7, 2012, The Honorable Charles R. Breyer, United States District Judge for the Northern District of California, ordered Plaintiff Martin's case to be transferred to the Southern District of Florida. (Id. at D.E. 20.) On January 11, 2013, this Court entered an Order consolidating the two cases, and further ordered Plaintiffs to file an amended consolidated complaint. (D.E. 30.) On October 18, 2013, Plaintiffs filed their Amended

Consolidated Class Action Complaint ("SAC," D.E. 58), which is the operative pleading for the instant Motion to Dismiss.

The SAC lists the Florida causes of action as (1) violations of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, et seq. (id. ¶¶ 72-87); (2) Negligent Misrepresentation (id. ¶¶ 88-95); (3) Breach of Implied Warranty of Fitness for Purpose (id. ¶¶ 96-103); (4) Breach of Express Warranty (id. ¶¶ 104-111); (5) Declaratory Judgment (id. ¶¶ 112-117); (6) Money Had and Received (id. ¶¶ 118-130); and lists the California causes of action as violations of (7) California's Business and Professions Code §§ 17500 et seq. (id. ¶¶ 131-141); (8) California Civil Code §§ 1750, et seq. (id. ¶¶ 142-151); (9) the "unfair" and "fraudulent" prongs of California Business and Professions Code §§ 17200 et seq. (id. ¶¶ 152-164); and (10) the "unlawful" prong of California Business and Professions Code §§ 17200, et seq. (id. ¶¶ 165-174).  Plaintiffs seek declaratory and injunctive relief in addition to monetary damages and attorneys' fees and costs.  (Id. at 44-45.)

## II.   Motion for Judicial Notice

Because the Court may rely upon some of the documents contained within Defendants' Motion Requesting Judicial Notice (D.E. 72), the Court will address that Motion first.  Pursuant to Federal Rule of Evidence 201, a "court may judicially notice a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."  Fed. R. Evid. 201(b).  "The

4

contents of the Federal Register shall be judicially noticed . . . ."  44 U.S.C. § 1507; see also United States v. Wolny, 133 F.3d 758, 764 (10th Cir. 1998).

Defendants ask the Court to take judicial notice of the following:

1. A statement of policy by the Food and Drug Administration ("FDA"), printed in the Federal Register and dated January 6, 1993 (D.E. 72-1);

2. A statement of policy by the FDA, printed in the Federal Register and dated November 27, 1991 (D.E. 72-2);

3. A statement of policy by the FDA titled "Statement of Policy: Foods Derived From New Plant Varieties," printed in the Federal Register and dated May 29, 1992 (D.E. 72-3);

4. A request for information regarding a statement of policy by the FDA titled "Food Labeling; Foods Derived From New Plant Varieties," printed in the Federal Register and dated April 28, 1993 (D.E. 72-4);

5. The FDA's "Guidance for Industry Voluntary Labeling Indicating Whether Foods Have or Have Not Been Developed Using Bioengineering, Draft Guidance," released for comment in January 2001 (D.E. 72-5);

6. The FDA's "Guidance on Consultation Procedures, Foods Derived From New Plant Varieties," dated October 1997 (D.E. 72-6);

7. A "transcript of testimony" presented by the FDA before the House Subcommittee on Basic Research, dated October 19, 1999 (D.E. 72-7); and

8. A letter from the United States Department of Agriculture ("USDA") to a supplier of hexane-processed soy dated August 23, 2006 (D.E. 73-1).

(<u>See</u> Motion Requesting Judicial Notice, D.E. 72 at 1-2.)

Plaintiffs argue that the Court should deny the Motion <u>in toto</u>, because (1) "the 'facts' that Defendants request to take judicial notice of are subject to reasonable dispute;" and (2) "because, to the extent the Exhibits shed any light at all on the issues at hand, they contradict Defendants' arguments in their Motion." (Response to Defendant's Motion Requesting Judicial Notice, D.E. 82 at 2.) They argue that the purported fact that Defendants are attempting to establish—<u>i.e.</u>, "that it would be 'objectively unreasonable' for a consumer to believe that an 'all natural' label on a food package could indicate that the food within did not contain GMOs and/or the other synthetic ingredients," (<u>id.</u> at 4)— is not appropriate for judicial notice because it cannot be "accurately and readily determined" from the documents. (<u>Id.</u> (quoting Fed. R. Evid. 201(b).) Finally, with respect to Exhibit 8, they argue that "the 2006 letter to Defendants' hexane-processed soy supplier lacks foundation, is presented out of context and its accuracy is highly disputed by Plaintiffs." (<u>Id.</u>)

In reply, Defendant asserts that the "fact" of which it seeks judicial notice is "that the FDA and the USDA have made certain statements regarding natural food products and bioengineered ingredients, which are relevant to the determination of whether Plaintiffs have stated a claim upon which relief can be granted." (Reply in Support of Motion Requesting Judicial Notice, D.E. 83 at 1-2.)

The Court takes judicial notice of Exhibits 1 through 4—the Federal Register exhibits—pursuant to 44 U.S.C. section 1507. <u>See Randolph v. J.M. Smucker Co.</u>, No. 13-80581-CIV, 2014 WL 1018007, at *1-2 (S.D. Fla. Mar. 14, 2014) (taking judicial

notice of Federal Register exhibits, including Exhibits 3 and 4 above, pursuant to 44 U.S.C. § 1507). The Court also takes judicial notice of Exhibits 5 and 6. See id. (taking judicial notice of Exhibits 5 and 6 above). "In doing so, the Court simply accepts that these are true copies of the items. The Court does not take judicial notice of the various arguments made by the parties relative to the meaning and import of these documents."[2] Id. at *2.

However, the Court denies the request to take judicial notice of Exhibits 7 and 8. First, with respect to Exhibit 7, "although described by Defendant as a 'transcript', these items are copies of statements purportedly given before Congress," and "are not adjudicative facts." Id. (denying motion to take judicial notice of Exhibit 7 above).

Second, with respect to Exhibit 8, the letter Defendants seek to introduce is from the USDA to one of Defendants' primary suppliers of hexane-processed soy products. (See Letter, D.E. 73-1.) In that letter, the USDA informs the supplier that certain soy protein isolates and soy protein concentrates manufactured with hexane are acceptable as ingredients in meat and poultry products labeled as "natural." (Id.) The letter is marked "CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER, ATTORNEY'S EYES ONLY." (Id.) The Court finds that this letter does not evince an "adjudicative fact" of which the Court can take judicial notice. See Astiana v. Kashi Co., 295 F.R.D. 490, 493 (S.D. Cal. 2013) ("Kashi is mistaken in asserting that the USDA letter settles the issue of

---

[2]       Indeed, Exhibit 5 explicitly states that it "Contains Nonbinding Recommendations." (D.E. 72-5 at 1.)

whether hexane-processed soy ingredients are natural as a matter of federal law.).[3] "First, the USDA letter repeatedly states that it applies only to meat and poultry products.[4]" Id. (citing Barnes v. Campbell Soup Co., C 12-05185 JSW, 2013 WL 5530017, at *6 (N.D. Cal. July 25, 2013) (holding USDA authority is limited to meat and poultry products)). Second, it is questionable at best whether a confidential document under a court-issued protective order can establish an "adjudicative fact" of which another court may take judicial notice.   "Third, a letter from the USDA is not presumptively controlling authority.  'Interpretations such as those in opinion letters—like interpretations contained in policy statements, agency manuals, and enforcement guidelines, all of which lack the force of law—do not warrant Chevron-style deference.'" Id. (quoting Wos v. E.M.A. ex rel. Johnson, __ U.S. __, 133 S. Ct. 1391, 1402 (2013)).  Finally, characterizing hexane-produced soy as "all natural" "runs afoul of its own website," id., which defines "natural" as "minimally processed. . . . Minimal Processing involves only kitchen chemistry processes that can be done in a family kitchen . . . ."  (SAC ¶ 42 (quoting Kashi Yearbook, www.kashi.com/meet_us/yearbook).)   Nothing in the record indicates that isolating the soy protein using hexane-processing can be achieved by Defendant's

---

[3]     The issue in Astiana was whether the USDA letter, which was submitted as "new evidence," warranted modification of the court's order on class certification.  295 F.R.D. at 491.

[4]     The USDA regulates meat and poultry and the FDA regulates all other types of food.  Compare 21 U.S.C. § 452 (providing for the inspection of poultry and poultry products to prevent misbranding and adulteration); and 21 U.S.C. § 603 (providing for the inspection of meat and meat products to prevent misbranding and adulteration); with 21 U.S.C. §§ 393(b)(2)(A) (empowering the FDA with responsibility to protect the public health by ensuring that "foods are safe, wholesome, sanitary, and properly labeled" but exempting meat and meat food products from the FDA to the extent that the Meat Inspection Act applies).

definition of "minimal processing."  Thus, the Court rejects Defendant's request to take judicial notice of the USDA letter because it does not evince an adjudicative fact, e.g., "how consumer class members would view hexane-processed soy ingredients in Kashi products."  Kashi, 295 F.R.D. at 493.

## III.  Motion to Dismiss

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a claim for "failure to state a claim upon which relief can be granted."  In reviewing a motion to dismiss, the Court must accept the factual allegations as true and construe them broadly in the light most favorable to the plaintiff.  See Watts v. Fla. Int'l Univ., 495 F.3d 1289, 1295 (11th Cir. 2007).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Conclusory statements, assertions or labels will not survive a 12(b)(6) motion to dismiss.  Id.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Id.; see also Edwards v. Prime, Inc., 602 F.3d 1276, 1291 (11th Cir. 2010) (setting forth the plausibility standard).  In recent decisions, the Eleventh Circuit further advised that courts may make reasonable inferences in a plaintiff's favor, but they are not required to draw plaintiff's inference. Sinaltrainal v. Coca-Cola, 578 F.3d 1252, 1260 (11th Cir. 2009).

Defendants begin by asserting broader arguments for dismissal before challenging the individual claims.   The Court will discuss the arguments in the order they were presented by Defendants' Motion.

### A.  Whether Plaintiffs' claims are preempted.

Each count in the SAC alleges that Defendants violated some law by representing their products as "all natural" and containing "nothing artificial," when in fact the products contain GMOs and other allegedly synthetic ingredients.  Defendants' Motion argues that Plaintiffs are seeking "to impose new and different labeling standards for products that may have bioengineered ingredients" (Motion at 6), which would conflict with federal policy—specifically, the Food and Drug Administration's (FDA) regulation of natural and bioengineered foods under the Federal Food, Drug, and Cosmetic Act (FDCA), as amended by the Nutrition Labeling and Education Act (NLEA), 21 U.S.C. section 341, <u>et seq.</u>  Thus, Defendants argue that Plaintiffs' claims are preempted by federal law and/or policy.  (<u>See</u> Motion at 6.)  They offer four separate arguments in support: first, they argue that Plaintiffs' GMO-based claims are preempted by FDA policy and regulations (<u>id.</u>); second, they argue that Plaintiffs' GMO-based claims conflict with FDA regulations governing the identification of common ingredients (<u>id.</u> at 7); third, they appear to argue that two cases from other districts support the conclusion that Plaintiffs' challenge to the "all natural" representation on the product packaging is preempted (<u>id.</u> at 8-10); and fourth, they argue that Plaintiffs' "claims against vitamins and hexane-processed soy are preempted" because "the FDA permits 'natural' foods to contain synthetic ingredients and processing aids as long as they are normally expected in

10

food" (id. at 10).   In Response, Plaintiffs contend that the SAC does not allege Defendants are required to disclose the presence of GMOs, only that the current "all natural" labeling is deceptive and misleads reasonable consumers.  (Response at 6-7.)

"Whether federal statutes or regulations preempt state law is 'a question of congressional intent.'"  Irving v. Mazda Motor Corp., 136 F.3d 764, 767 (11th Cir. 1998) (quoting Perry v. Mercedes Benz of N. Am., Inc., 957 F.2d 1257, 1261 (5th Cir. 1992)). "Congress—through federal laws and regulations—may effectively preempt state law in three ways: (1) express preemption; (2) field preemption (regulating the field so extensively that Congress clearly intends the subject area to be controlled only by federal law); and (3) implied (or conflict) preemption."  Id.  Here, Defendants appear to argue Plaintiffs claims are expressly preempted and impliedly preempted.  (See Motion at 6 ("Plaintiffs' GMO-based claims conflict with FDA Policy on GMOs.").)

### 1.    FDA policy on GMO-based claims

Defendants argue that "[f]or two decades, the FDA has consistently rejected any requirement that bioengineered foods must be labeled differently because the FDA has determined that there is no material difference from non-bioengineered foods that would require such disclosure."  (Motion at 6.)   However, this argument is based on a misreading of the SAC: the SAC does not allege that Defendants are required to disclose the presence of GMOs on the packaging of their products, as Defendants assert; rather, the SAC merely alleges that the "all natural" representation currently on the packaging would, and does, mislead reasonable consumers.  (Response at 6-7 (citing SAC ¶¶ 7-9, 36-39, 46-53).)  Accordingly, to the extent Defendants argument is based on the mistaken

11

premise that the SAC seeks to impose a <u>disclosure</u> requirement on Defendants GMO products, it is rejected.   The Court turns to whether Plaintiffs' claims are otherwise preempted.

### a.  Express Preemption

"'[A] strong presumption exists against finding express preemption when the subject matter . . . is one that has traditionally been regarded as properly within the scope of the states' rights.'"  <u>Irving</u>, 136 F.3d at 767 (quoting <u>Taylor v. Gen. Motors Corp.</u>, 875 F.2d 816, 823 (11th Cir. 1989)).  "'If there be any subject over which it would seem the states ought to have plenary control . . . it is the protection of the people against fraud and deception in the sale of food products.'"  <u>Holk v. Snapple Beverage Corp.</u>, 575 F.3d 329, 334-35 (3d Cir. 2009) (quoting <u>Plumley v. Massachusetts</u>, 155 U.S. 461, 472 (1894)).  Thus, the NLEA's express preemption provision must be construed narrowly.  <u>See</u> <u>Irving</u>, 136 F.3d at 767 (citing <u>Taylor</u>, 875 F.2d at 823-24).

The NLEA's express preemption provision provides, in relevant part: "[N]o State . . . may directly or indirectly establish . . . any requirement for the labeling of food of the type required by section 343(k) of this title that is not identical to the requirement of such section[.]"  21 U.S.C. § 343-1(a)(3).  Section 343(k), in turn, provides that food is misbranded "[i]f it bears or contains any artificial flavoring, artificial coloring, or chemical preservative[.]"  This provision does not apply to the SAC, because Plaintiffs do not allege that Kashi's products contain artificial flavoring, coloring, or chemical preservatives, but rather that the GMOs and other allegedly synthetic ingredients precludes the products from being characterized as "all natural."  Accordingly, the Court

finds that Plaintiffs claims are not expressly preempted.   See Lockwood v. Conagra Foods, Inc., 597 F. Supp. 2d 1028, 1031 (N.D. Cal. 2009) (finding NLEA did not expressly preempt plaintiffs' claim that defendant's pasta sauce was not "all natural" because it contained high fructose corn syrup); Astiana v. Ben & Jerry's Homemade, Inc., Nos. C 10-4387 PJH, C 10-4937 PJH, 2011 WL 2111796, at *9-10 (N.D. Cal. May 26, 2011) (finding NLEA did not expressly preempt plaintiff's claims that defendants engaged in fraud under the UCL by describing their ice cream as "all natural" when it contained alkalized cocoa); Hitt v. Ariz. Beverage Co., LLC, No. 08cv809 WQJ (POR), 2009 WL 449190, *4 (S.D. Cal. Feb 4, 2009) (finding NLEA did not expressly preempt plaintiff's claim that defendant's beverages were deceptively mislabeled as "all natural" because they contained high fructose corn syrup).

### b.    Implied (Conflict) Preemption

Alternatively, Defendants appear to argue that Plaintiffs' claims are impliedly preempted because a court order requiring Defendants to remove the "all natural" language from their product packaging would "require this Court to legislate state law requirements for bioengineered foods that conflict with federal policy."  (Motion at 6.) This argument fails because the FDA does not have a policy permitting food containing GMOs to be described as "natural," nor has it regulated the term "all natural."  Implied preemption occurs "where it is impossible for a private party to comply with both state and federal requirements, see, e.g., Florida Lime & Avocado Growers, Inc. v. Paul, 373 U.S. 132, 142-43 (1963), or where state law 'stands as an obstacle to the accomplishment

and execution of the full purposes and objectives of Congress.'"  English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990) (quoting Hines v. Davidowitz, 312 U.S. 52, 67 (1941)).

Defendants rely on the informal policy espoused by the FDA in 1991, which provides: "[T]he agency has considered 'natural' to mean that nothing artificial or synthetic (including colors regardless of source) is included in, or has been added to, the product that would not normally be expected to be there."  Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definition of Terms, 56 Fed. Reg. 60421, 60466 (Nov. 27, 1991).  Defendants also cite a 1993 statement from the FDA in which it specifically declined to establish a definition for "natural," and maintained the informal position it espoused in 1991.  Food Labeling: Nutrient Content Claims, General Principles, Petitions, Definition of Terms; Definitions of Nutrient Content Claims for the Fat, Fatty Acid, and Cholesterol Content of Food, 58 Fed. Reg. 2302, 2407 (Jan. 6, 1993).

Thus, with respect to Plaintiffs' "all natural" claims, "the FDA has deferred taking regulatory action. Plaintiff's All Natural Claims do not stand as an obstacle to accomplishing Congress's objectives of uniformity and consistency in regulating . . . labeling because there are no federal requirements regarding the term 'natural' to be given preemptive effect."  Hitt, 2009 WL 449190, *5.  Nor has Defendant established that Plaintiffs' claims, if successful, make compliance with federal law an impossibility. See Lockwood, 597 F. Supp. 2d at 1034.

Furthermore, in Holk v. Snapple Beverage Corp., the Third Circuit Court of Appeals held that this informal FDA policy upon which Defendants rely for preemptive effect "is not entitled to preemptive effect."  575 F.3d 329, 340 (3d Cir. 2009) (emphasis

14

added).  In <u>Holk</u>, the plaintiff sued a beverage maker under, <u>inter alia</u>, a state consumer fraud statute for deceptively advertising its beverages as "All Natural" when they contained high fructose corn syrup (HFCS)—"an ingredient manufactured from processed cornstarch."  <u>Id.</u> at 332.  The defendant argued, as Defendants appear to argue here, that the plaintiff's claim was impliedly preempted because it would impose "additional conditions not contemplated by the federal regime."  <u>Id.</u> at 339.  The plaintiff argued, as Plaintiffs argue here, that the "causes of action do not serve as an obstacle to federal objectives because there 'are no federal requirements in place regarding the term 'natural.'"  <u>Id.</u> at 339-40.  After a lengthy, well-reasoned analysis, the Third Circuit concluded that the FDA's informal policy on the term "natural" was not entitled to preemptive effect and, therefore, that the plaintiff's claims under the consumer fraud statute were not preempted.  <u>Id.</u> at 340-41.  <u>See also</u> <u>Von Koenig v. Snapple Beverage Corp.</u>, 713 F. Supp. 2d 1066, 1076 (E.D. Cal. 2010) (concluding that FDA policy on the term "natural" was not entitled to preemptive effect with regard to "safe harbor" provision in California statute).   Accordingly, Plaintiffs' claims are not impliedly preempted.  <u>Lockwood</u>, 597 F. Supp. 2d at 1034; <u>see also</u> <u>In re Frito-Lay N. Am., Inc. All Natural Litig.</u>, No. 12-MD-2413 (RRM)(RLM), 2013 WL 4647512, at *10 (E.D.N.Y. Aug. 29, 2013) (concluding that FDA's informal policy on "natural" was not conflict preemptive in case challenging that "all natural" labeling was misleading due to use of GMOs).

In sum, the Court concludes that Plaintiffs' GMO-based claims are neither expressly nor impliedly preempted by FDA policy or regulations.[5]

### 2.    FDA regulations governing the identification of common ingredients

Next, Defendants argue that Plaintiffs' GMO-based claims are preempted "because the FDA has implemented comprehensive labeling regulations for food ingredients that directly undercut Plaintiffs' claim that Kashi must identify its ingredients as bioengineered." (Motion at 7.)  Once again, Defendants' argument is premised on a misreading of the SAC.  Plaintiffs do not, as Defendants argue, "suggest that Kashi should have identified ingredients as bioengineered." (Id.)  Rather, the SAC alleges that the "all natural" representation currently on the packaging would, and does, mislead reasonable consumers.   (Response at 6-7 (citing SAC ¶¶ 7-9, 36-39, 46-53).) Accordingly, Defendants' argument with respect to FDA regulations governing identification of common ingredients is misplaced and therefore rejected.

### 3.    Plaintiffs' "end-run" around the NLEA and FDA

Next, Defendants argue that Plaintiffs are attempting an "end-run around the NLEA and FDA regulations . . . by claiming they are merely objecting to the 'all natural label, rather than the alleged use of bioengineered ingredients." (Motion at 8.)

---

[5]    The Court further notes that the two cases Defendants cite in this section of their Motion are inapposite and/or overruled.  (See Motion at 6 (citing Veal v. Citrus World, Inc., No. 12-0801, 2013 WL 120761, at *9 (N.D. Ala. Jan. 8, 2013) and POM Wonderful LLC v. Coca-Cola Co., 679 F.3d 1170 (9th Cir. 2012) (rev'd POM Wonderful LLC v. Coca-Cola Co., __ U.S. __, __ S. Ct. __, No. 12-761, 2014 WL 2608859 (2014))).)  The court in Veal dismissed the plaintiff's complaint for lack of standing for failure to allege a concrete injury, not because Plaintiff's claims were preempted.  2013 WL 120761, at *10.  And the U.S. Supreme Court recently reversed the Ninth Circuit's opinion in Pom Wonderful.  See __ U.S. __, 2014 WL 2608859 (2014).

Essentially, Defendants are just using different terms and relying on different cases to again argue that Plaintiffs' GMO-based claims are expressly preempted. However, their argument is unpersuasive.

First, Defendants rely on <u>In re: PepsiCo, Inc., Bottled Water Marketing & Sales Practices Litigation</u>, 588 F. Supp. 2d 527 (S.D.N.Y. 2008). In that case, the plaintiffs sued the makers of Aquafina water for, <u>inter alia</u>, unfair and deceptive trade practices. <u>Id.</u> at 529. They alleged that the defendant deceptively placed an image of a mountain on bottled water to mislead consumers as to the source of the water, which was actually just purified "tap water." <u>Id.</u> The parties agreed "that although bottled water originating from a community water system generally must be labeled 'from a community water system' or 'from a municipal source,' the applicable standard of identity explicitly exempts from this source disclosure requirement water meeting the definition of purified drinking water." <u>Id.</u> at 534 (citing 21 C.F.R. § 165.110(a)(3)(ii)).[6] Relying on the FDA's final rule interpreting the FDCA's express preemption provision, the court concluded that "the only State requirements that are subject to preemption are those that are affirmatively different from the Federal requirements[.]" <u>Id.</u> at 532 (quoting 60 Fed. Reg. 57076, 57120 (Nov. 13, 1995)).[7] Consequently, it held that

---

[6]    The FDA had earlier explained that purified water was exempt from the source-identification requirement "'because ***consumers purchase this water because of its treatment and subsequent purity rather than because of its source.*'" <u>Id.</u> at 536 (quoting Nonalcoholic Beverages: Repeal of Soda Water Standard of Identity; Amendment of Bottled Water Quality Standard, 54 Fed. Reg. 398, 399 (Jan. 6, 1989)).

[7]    The court further found that the FDA "was not concerned with any misleading potential of graphics on bottles of purified water, based on its conclusion that with respect to purified water, the purification, and not the source, is the reason consumers buy it." <u>Id.</u> at 537.

> Plaintiffs' claims are expressly preempted . . . because: (1) federal law is not silent on the subject of implied labeling misrepresentations regarding the municipal source of bottled water; and (2) given that the *Aquafina* label fits within the exception for purified water and thus complies with the FDCA's requirements, Plaintiff's state law claims by necessity are premised on requirements that are not parallel to those imposed by federal law.

Id. Thus, finding that the plaintiffs' cause of action would impose a labeling requirement explicitly rejected by the FDA, and affirmatively different from the federal requirements, the court found the claims preempted. Id.

In contrast, here, "[u]nlike the federal standard governing bottled water considered in Pepsico, . . . defendants do not have the benefit of an express preemption provision or interpretive guidance by the FDA as to the scope of the regulation's preemptive effect." Chavez v. Blue Sky Natural Beverage Co., 268 F.R.D. 365, 372 (N.D. Cal. 2010) (finding no preemption in consumer class action alleging beverage company misrepresented origin of beverage). Here, no "affirmatively different" regulation applies to Plaintiffs' claims; Pepsico is inapposite.

Second, Defendants rely on Hairston v. South Beach Beverage Co., Inc. No. CV 12-1429-JFW (DTBx), 2012 WL 1893818 (N.D. Cal. 2014). In Hairston, the Plaintiff sued beverage-makers alleging: (1) "that the 'all natural' label is potentially deceptive because Lifewater contains 'deceptively labeled ingredients' that are 'synthetic or created via chemical processing'"; (2) "that Lifewater's labels are potentially misleading because the names of various fruits are used to describe the different flavors of Lifewater even though Lifewater does not contain any actual fruit or fruit juice"; and (3) "that the use of the common vitamin name (e.g., $B_{12}$) on the product labels is misleading because the

vitamins added to Lifewater are synthetic or created via chemical processing." Id. at *1. The court began by finding that the second claim was preempted "because FDA regulations explicitly permit manufacturers 'to use the name and images of a fruit on a product's packaging to describe the characterizing flavor of the product even where the product does not contain any of that fruit, or contains no fruit at all[.]'" Id. at *3 (quoting Dvora v. Gen. Mills, Inc., No. CV 11-1074-GW(PLAx), 2011 WL 1897349, at *4 (C.D. Cal. May 16, 2011) (citing 21 C.F.R. §§ 101.22(i), 101.22(i)(1)(i); 101.22(i)(1)(ii))). Next, the court found that the third claim was preempted because FDA regulations permit the use of common vitamin names on nutritional labeling. Id. (citing 21 C.F.R. §§ 101.9(c)(8)(v), 101.9(k)(4)). Finally, the court concluded that

> Plaintiff cannot avoid preemption of these claims by arguing that his claim relates solely to Defendants' "all natural" representations and that he included his fruit name and vitamin name claims only as support for his "all natural" claim. Plaintiff's argument would effectively allow Plaintiff to avoid preemption of those claims, and would undermine the purpose of the federal labeling standards which includes avoiding a patchwork of different state standards.

Id. Thus, "Hairston did not address whether 'all natural' claims, on their own, are preempted," Larsen v. Trader Joe's Co., 917 F. Supp. 2d 1019, 1024 (N.D. Cal. 2013) (finding "all natural" claims were not preempted by FDCA or FDA regulations). Rather, "Hairston stands for the limited and unremarkable proposition that a plaintiff cannot avoid preemption of one claim by asserting that it supports another claim. . . . The pertinent inquiry is whether Plaintiff's . . . claim, standing on its own, is preempted." Pardini v. Unilever United States, Inc., 961 F. Supp. 2d 1048, 1058 (N.D. Cal. 2013). For the reasons discussed in Section III(A)(1) and (2), supra, and Section III(A)(4), infra,

Plaintiffs' stand-alone challenge to Defendants' "all natural" labeling are not preempted. Accordingly, <u>Hairston</u> is of no help to Defendants.

In sum, the Court rejects Defendants' argument that Plaintiffs cannot challenge the "all natural" characterization of its products.  At this motion to dismiss stage, the Court accepts Plaintiffs' well-pleaded allegations that the "all natural" labeling on Defendants' products is misleading.

### 4.    Plaintiffs' challenge to vitamins and hexane-processed soy

Next, Defendants argue that the FDA permits "natural" foods to contain synthetic ingredients and processing aids as long as they are normally expected in the food. (Motion at 10 (citing 58 Fed. Reg. at 2407).)  In response, Plaintiffs assert: "Not only is this interpretation of FDA policy incorrect, but even if it were correct it would not apply here.  Taking Plaintiffs' allegations in their SAC as true . . . it is indisputable [that] reasonable consumers do not <u>expect</u> fake vitamins and processing aids to be in foods labeled 'All Natural' and/or 'containing nothing artificial.'"  (Response at 13 (citing SAC ¶¶ 36-45).)

The SAC contains the following well-pleaded allegations under the heading "**<u>Genetically Modified Ingredients Are Not 'All Natural'</u>**":

> 36. Defendants label, market, and/or advertise the Products as "ALL NATURAL."  Defendants' claim is misleading, however, because Defendants' Products contain GMOs, ingredients that have been modified through biotechnology and are therefore not all natural.

> 37. GMOs are not expected to be in foods labeled "All Natural." Recently, Americans have expressed a heightened concern about the safety of GMO Products, as evinced by the fact that legislation requiring labeling

20

GMOs have been proposed in more than a dozen states since 2011.[8]  In addition, polls taken by the Pew Center, Consumers Union, Harris Interactive and ABC over the last decade that have consistently found that the vast majority of Americans would like to see genetically modified foods better regulated and labeled.[9]

. . .

40. Furthermore, the FDA has loosely defined the term "natural" as a product that contains no synthetic or artificial ingredients.[10]  According to federal regulations, an ingredient is synthetic if it is:

> [a] substance that is formulated or manufactured by a chemical process or by a process that chemically changes a substance extracted from naturally occurring plant, animal, or mineral sources, except that such term shall not apply to substances created by naturally occurring biological processes." 7 C.F.R. §205.2.

41. Similarly, the USDA's Food Safety and Inspection Service ("FSIS") defines a "natural" product as a product that does not contain any artificial or synthetic ingredient and does not contain any ingredient that is more than "minimally processed," defined as:

> (a) those traditional processes used to make food edible or to preserve it or to make it safe for human consumption, e.g., smoking, roasting, freezing, drying, and fermenting, or (b) those physical processes which do not fundamentally alter the raw product and/or which only separate a whole, intact food into component parts, e.g., grinding meat, separating eggs into albumen and yolk, and pressing fruits to produce juices. Relatively severe processes, e.g., solvent extraction, acid

---

[8]    See   http://www.nytimes.com/2012/05/25/science/dispute-over-labeling-of-genetically-modified-food.html?_r=0 (last visited January 15, 2013).

[9]    Eng, Monica. "Debate rages over labeling biotech foods; Industry resists listing genetically modified ingredients; consumer worries continue." L.A. Times. June 2, 2011. BUSINESS; Business Desk; Part B; p. 4.

[10]    FDA Consumer Health Information, Food Label Helps Consumers Make Healthier Choices, available at www.fda.gov/downloads/ForConsumers/ConsumerUpdates!UCM199361.pdf.

hydrolysis, and chemical bleaching would clearly be considered more than minimal processing. . . .

USDA FSIS, Food Standards and Labeling Policy Book, available at www.fsis.usda.gov/OPPDE/larc/Policies/Labeling_Policy_Book_082005.pdf31.

42. The Kashi companies have since embraced these federal explanations and posted the following definition of "natural" on its website: At Kashi, we define natural as:

> Natural Food is made without artificial ingredients, colors or preservatives and is minimally processed. A natural ingredient is one that is made from a renewable source found in nature. Minimal Processing involves only kitchen chemistry processes that can be done in a family kitchen and does not negatively impact the purity of the natural ingredients.[11]

43. The scientific description of how GMOs are produced refutes any attempt to categorize them as 'minimally processed,' "all-natural" or substantially similar to something naturally occurring.   Contemporary research on GMOs has made clear that genetic engineering is completely different from natural breeding and entails different risks because the genetic engineering and associated tissue culture processes are imprecise and highly mutagenic, leading to unpredictable changes in the DNA, proteins, and biochemical composition of the resulting GMO that can lead to unexpected toxic or allergenic effects and nutritional disturbances:

> [T]he process of inserting a genetically modified gene into the DNA of a plant cell is crude, uncontrolled, and imprecise, and causes mutations – heritable changes – in the plant's DNA blueprint. These mutations can alter the functioning of the natural genes of the plant in unpredictable and potentially harmful ways.
>
> Because of these diverse interactions, and because even the simplest organism is extremely complex, it is impossible to predict the impacts of even a single GM gene on the organism. It is even more impossible to predict the impact of the GMO on its environment – the complexity of living

---

[11]      Kashi Yearbook, www.kashi.com/meet_us/yearbook

systems is too great. In short, unintended, uncontrolled mutations occur during the GM process and complex interactions occur at multiple levels within the organism as a result of the insertion of even a single new gene. For these reasons, a seemingly simple genetic modification can give rise to many unexpected changes in the resulting crop and the foods produced from it. The unintended changes could include alterations in the nutritional content of the food, toxic and allergenic effects, poor crop performance, and generation of characteristics that harm the environment.[12]

44. At a minimum a reasonable consumer would expect a company's representation of 'all-natural' to conform to the company's own published definition, as well as the federal regulation. However, the process of manufacturing a GMO is clearly beyond "minimal processing;" one would certainly not expect a consumer to bioengineer an ingredient in their kitchen.

45. Despite this, Defendants have falsely represented their Products are all natural even though they contain GMOs, namely Corn, Soy, Corn variations, and/or Soy variations.  Corn, Soy, Corn variations, and/or Soy variations, among other ingredients, are known to be derived from GMOs and serve as part of the main ingredients in the Products. However, Defendants' Products contain no warning or disclaimer that the Products contain GMOs in its advertising for the Products (not related to the label).

(SAC ¶¶ 36-45.)  The Court must take all of these well-pleaded allegations as true and draw all reasonable inferences therefrom in the light most favorable to Plaintiffs.  See Weissman v. Nat'l Ass'n of Secs. Dealers, Inc., 500 F.3d 1293, 1295 (11th Cir. 2007). And, assuming without deciding that FDA policy permits synthetic ingredients to be labeled "natural" so long as they are "normally expected in food," the Court agrees with Plaintiffs that the SAC sufficiently alleges that a reasonable consumer would not expect

---

[12]     Michael Antoniou, Claire Robinson, and John Fagan. GMO MYTHS AND TRUTHS: AN EVIDENCE-BASED EXAMINATION OF THE CLAIMS MADE FOR THE SAFETY AND EFFICACY OF GENETICALLY MODIFIED CROPS. Earth Open Source. June 2012 at 11.

Pyridoxine   Hydrochloride,   Alpha-Tocopherol   Acetate,   Hexane-Processed   Soy ingredients and Calcium Pantothenate in their "All Natural"-labeled food.[13]

Accordingly,   the   Court   rejects   Defendant's   argument   that   Plaintiffs'   claims regarding vitamins and hexane-processed soy are preempted.

### B.   Whether Plaintiffs' Claims are Subject to Dismissal Under the Primary Jurisdiction Doctrine.

Defendants   argue   that   even   if   Plaintiffs'   claims   are   not   preempted,   the   Court should dismiss the SAC based on the "primary jurisdiction doctrine."   (Motion at 11.) Specifically, they argue that "the FDA should decide a product labeling issue because it has the requisite expertise and can ensure uniformity in labeling."   (Id. at 12.)

Primary   jurisdiction   "is   a   doctrine   specifically   applicable   to   claims   properly cognizable   in   court   that   contain   some   issue   within   the   special   competence   of   an administrative   agency."   Reiter   v.   Cooper,   507   U.S.   258,   268   (1993);   see   also   United States   v.   W.   Pac.   R.R.,   352   U.S.   59,   64,   (1956)   (stating   same);   Clark   v.   Time   Warner Cable,   523   F.3d   1110,   1114   (9th   Cir.   2008)   (stating   that   "the   doctrine   is   a   'prudential' one,   under   which   a   court   determines   that   an   otherwise   cognizable   claim   implicates technical   and   policy   questions   that   should   be   addressed   in   the   first   instance   by   the   agency with   regulatory   authority   over   the   relevant   industry,   rather   than   the   judicial   branch").   "It requires   the   court   to   enable   a   'referral'   to   the   agency,   staying   further   proceedings   so   as   to give   the   parties   reasonable   opportunity   to   seek   an   administrative   ruling."   Reiter,   507

---

[13]   As   previously   discussed,   the   Court   denies   Defendants'   request   to   take   judicial notice of the USDA letter regarding hexane-processed soy.   (See Section II, supra.)   Because Defendants' preemption argument with respect to hexane-processed soy relies exclusively upon the USDA letter, the Court declines to address it.

U.S. at 268. "Referral of the issue to the administrative agency does not deprive the court of jurisdiction; it has discretion either to retain jurisdiction or, if the parties would not be unfairly disadvantaged, to dismiss the case without prejudice." Id. at 268–69; see also Hansen v. Norfolk & W. Ry., 689 F.2d 707, 714 (7th Cir. 1982) (stating that "[d]ismissal of the complaint may be appropriate when all of the relief that is sought in court can be obtained in an administrative forum or in an easily initiated suit subsequent to the administrative proceedings;" however, "[a] stay of the court action pending administrative determinations . . . is in order when there is reason to believe that a party may be prejudiced by a dismissal" (citing Far E. Conference v. United States, 342 U.S. 570, 576–77 (1952); United States v. Mich. Nat'l Corp., 419 U.S. 1, 5 (1974))).

"'[T]he main justifications for the rule of primary jurisdiction are the expertise of the agency deferred to and the need for a uniform interpretation of a statute or regulation.'" Boyes v. Shell Oil Prods. Co., 199 F.3d 1260, 1265 (11th Cir. 2000) (quoting Cnty. of Suffolk v. Long Island Lighting Co., 907 F.2d 1295, 1310 (2d Cir. 1990)). "There are four factors uniformly present in cases where the doctrine properly is invoked: (1) the need to resolve an issue that (2) has been placed by Congress within the jurisdiction of an administrative body having regulatory authority (3) pursuant to a statute that subjects an industry or activity to a comprehensive regulatory scheme that (4) requires expertise or uniformity in administration." United States v. Gen. Dynamics Corp., 828 F.2d 1356, 1362 (9th Cir. 1987) (citing Ricci v. Chi. Mercantile Exch., 409 U.S. 289 (1973); W. Pac. R.R., 352 U.S. at 59; United States v. Pac. & Atl. Ry. & Navigation Co., 228 U.S. 87 (1913); United States v. Yellow Freight Sys., 762 F.2d 737

(9th Cir. 1985)).  However, the primary jurisdiction doctrine "is not designed to secure expert advice from agencies every time a court is presented with an issue conceivably within the agency's ambit," but instead "is to be used only if a claim requires resolution of an issue of first impression, or of a particularly complicated issue that Congress has committed to a regulatory agency."  Clark, 523 F.3d at 1114.

Here, Defendant argues that all four factors support invoking the primary jurisdiction doctrine in this case.  (Motion at 12.)

> First, the issues of "natural" labeling and GMO ingredients are within the FDA's jurisdiction.  Second, Congress specifically charged the FDA to "protect the public health by ensuring that – foods are . . . properly labeled."  21 U.S.C. § 393(b)(2)(A).  The FDA has used this authority to promulgate a comprehensive regulatory scheme governing food misbranding.  See, e.g., 21 C.F.R. §§ 101.1—101.18, 101.22, 101.30.  Third, the FDA has implemented numerous policies and guidance documents governing the use and labeling of natural and bioengineered foods. . . . For example, the FDA has appointed a Biotechnology Evaluation Team that is responsible for evaluating the regulatory compliance of bioengineered foods.  Fourth, deferring to the FDA would promote uniformity of laws and avoid a patchwork quilt of varying decisions.

(Id.)

Once again, Defendants' argument misses the mark.  Plaintiffs' claims rest on the determination of whether Defendants' "all natural" and "nothing artificial" representations on their products' labeling are misleading and whether customers purchased Defendants' products in reliance upon these representations.  "'[T]his is not a technical area in which the FDA has greater technical expertise than the courts—[as] every day courts decide whether conduct is misleading.'"  Rikos v. Procter & Gamble Co., 782 F. Supp. 2d 522, 530 (S.D. Ohio 2011) (declining to apply the primary

jurisdiction doctrine where the plaintiff's claims rested on a determination of whether a company's advertisements of a food supplement "are likely to deceive a reasonable consumer" under California's consumer fraud statutes) (quoting Lockwood, 597 F. Supp. 2d at 1035 (declining to apply the primary jurisdiction doctrine in false advertising case concerning definition and deceptive use of the term "natural")) (citing Chacanaca v. Quaker Oats Co., 752 F. Supp. 2d 1111, 1124 (N.D. Cal. 2010) (stating that the plaintiffs advanced a "relatively straightforward claim: they assert that defendant has violated FDA regulations and marketed a product that could mislead a reasonable consumer," which "is a question courts are well-equipped to handle")); see also In re Horizon Organic Milk Plus DHA Omega-3 Mktg. and Sales Practice Litig., 955 F. Supp. 2d 1311, 1348-1351 (S.D. Fla. 2013) (declining to apply the primary jurisdiction doctrine in false advertising case involving representation on milk carton that ingredient in the milk promoted brain health).

Nor has the FDA promulgated a comprehensive regulatory scheme regarding assertions of "all natural" or "nothing artificial" on food labeling.  See Lockwood, 597 F. Supp. 2d at 1035; see also In re Frito-Lay, 2013 WL 4647512, at *7.  "[V]arious parties have repeatedly asked the FDA to adopt formal rulemaking to define the word natural and the FDA has declined to do so because it is not a priority and the FDA has limited resources."  Id.  Courts have further noted that "[a]lthough the FDA has addressed the use of the term 'natural' in depicting food and beverage products, its policy with respect to the use of the term 'natural' is unrestrictive.  The FDA follows a policy of not taking enforcement action charging that a product labeled as 'natural' is misbranded, as long as

the product has no 'added color, synthetic substances, and flavors.'" Wright v. Gen. Mills, Inc., Civil No. 08cv1532 L(NLS), 2009 WL 3247148, at *3 (S.D. Cal. Nov. 18, 2010) (quoting 58 Fed. Reg. 2407). "Based on the FDA's consistent determination that the term 'natural' does not need specific definition, state law claims based upon the use of the term 'natural' is not an issue of first impression, does not require technical expertise within the special competence of the FDA, and is not a particularly complicated issue outside the ability of the Court to consider and decide." Id.

In sum, "'[t]his case is far less about science than it is about whether a label is misleading,' and the reasonable-consumer inquiry upon which some of the claims in this case depends is one to which courts are eminently well suited, even well versed." In re Frito-Lay, 2013 WL 4647512, at *8. Accordingly, the Court denies Defendants' motion to dismiss pursuant to the primary jurisdiction doctrine. See id.; see also Krzykwa v. Campbell Soup Co., 946 F. Supp. 2d 1370, 1375 (S.D. Fla. 2013) (declining to dismiss under primary jurisdiction doctrine where plaintiffs alleged that defendant's use of GMOs in their "all natural" products misled consumers); Janney v. Mills, 944 F. Supp 2d 806, 811-815 (N.D. Cal. 2013) (declining to dismiss under the primary jurisdiction doctrine where plaintiffs alleged that foods containing high fructose corn syrup were not "all natural" and providing a detailed analysis of the FDA's position on "natural" food labeling"); Jones v. ConAgra Foods, Inc., 912 F. Supp. 2d 889, 898-99 (N.D. Cal. 2012) ("100% Natural"); Briseno v. ConAgra Foods, Inc., Case No. CV 11-05379 MMM (AGRx), 2011 U.S. Dist. LEXIS 154750, at *28-29 (C.D. Cal. Nov. 23, 2011) (same).

### C.     Whether Plaintiffs' Claims Fail to Provide Particularized Facts Sufficient to Meet the <u>Iqbal</u> Plausibility Standard.

Next, Defendants assert that Plaintiffs have failed to allege sufficient factual content to show that it is more than "conceivable" that Defendants' products actually contain bioengineered or artificial ingredients.  (Motion at 13 (citing <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 683 (2009)).)  They argue that Plaintiffs "fail to provide a single factual allegation that [Defendants'] products . . . actually contain such ingredients," and that although Kashi has "publicly stated that it is <u>possible</u> that <u>some</u> of its products may contain GMO ingredients due to commingling of ingredients in storage and shipment, it has never stated that its products actually contain GMOs . . . ."  (<u>Id.</u>)  Plaintiffs respond by arguing that they have alleged the "who, what, when, where and why" of each allegation, and have satisfied the Rule 8 and, to the extent a claim sounds in fraud, Rule 9(b) pleading standards.  (Response at 18-19.)

Under Federal Rule of Civil Procedure 8(a)(2), a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  This pleading standard does not require "detailed factual allegations," but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation.  <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  <u>Id.</u> (quoting <u>Twombly</u>, 550 U.S. at 570.  "A claim has facial plausibility when the plaintiff pleads factual content that allows

the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id.

Under Rule 9, a party alleging fraud or mistake "must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."  The particularity requirement of Rule 9(b) is satisfied if the complaint alleges "facts as to time, place, and substance of the defendant's alleged fraud, specifically the details of the defendants' allegedly fraudulent acts, when they occurred, and who engaged in them."  Hopper v. Solvay Pharm., Inc., 588 F.3d 1318, 1324 (11th Cir. 2009) (citation and internal quotation marks omitted); see also Ziemba v. Cascade Int'l, Inc., 256 F.3d 1194, 1202 (11th Cir. 2001) (noting the pleading standards are satisfied if alleging precisely what statements were made in what documents, when, where and by whom, the content, the manner in which they misled the plaintiff, and what the defendants obtained as a consequence of the fraud).

Plaintiffs have sufficiently pled their claims.  The SAC alleges (1) which Plaintiffs purchased (2) which specific food items that were manufactured, marketed, advertised, distributed, and sold by Defendants, (3) where the Plaintiffs purchased them and (4) when.  For example, Paragraph 21 provides:

> Plaintiff Garcia has purchased Go Lean Crunch®, and the snack bars Kashi Go Lean® Crunchy! All Natural Protein and Fiber Bars (chocolate peanut butter), and Kashi Go Lean® Roll! All Natural Protein and Fiber Bars (chocolate peanut butter) during the Class period, from a Publix Supermarket located at 2270 SW 27th Avenue, Miami, Florida 33145 as well as the Whole Foods located at 10th and Alton in Miami Beach, Florida, 33139.

(See also ¶¶ 22-23.)  It further alleges that Plaintiffs were induced to buy the products by their "All Natural" labeling, which they "interpreted to mean that the Products do not contain any GMOs and/or artificial and synthetic ingredients."  (Id. ¶ 27.)  "If Plaintiffs had known the Products contained GMOs and/or other synthetic and artificial ingredients and thus were not all-natural, they would not have purchased them."  (Id. ¶ 24.)  Thus, they allege the labeling is "deceptive and misleading."  (Id. ¶ 26.)

The SAC further provides an extensive list of Defendants' products that are labeled as "All Natural" (SAC ¶ 33) and a separate list of the products that are labeled as "Nothing Artificial" (id. ¶ 34).   Under each product, the SAC lists the "GMO Ingredients" and the "Artificial/Synthetic Ingredients" that each product allegedly contains.  To take just two examples (of the 81 provided in the SAC), Paragraph 33(a) alleges that Kashi® 7 Grain Waffles are labeled as "All Natural" but contain:

i.   GMO Ingredients: Soy Lecithin, Expeller Pressed Canola Oil, Yellow Corn Meal;
ii.  Artificial/ Synthetic Ingredients: Hexene-Processed Soy

Paragraph 34(a) alleges that Kashi® Heart to Heart® Honey Oat Waffles are labeled as "Nothing Artificial" but contain:

i.   GMO Ingredients: Degerminated Yellow Corn Meal, Yellow Corn Flour, Expeller Pressed Canola Oil;
ii.  Artificial/ Synthetic Ingredients: Hexene-Processed Soy Ingredients, Pyridoxine Hydrochloride, Alpha Tocopherol Acetate

The SAC does not allege that these products may contain these genetically-modified and synthetic ingredients, it alleges that they do contain them.  (See id. ¶¶ 33-34.)  The SAC further alleges that the labeling on Defendants' products would, and did, mislead a

reasonable consumer.   (See, e.g., id. ¶¶ 44, 82, 92.)   Finally, the SAC alleges that Defendants charged an artificially high price for these products to encourage the perception that its Products "were superior to other, comparable products because the Kashi Products were 'all natural' whereas the others were not."   (Id. ¶ 30.)   "Plaintiffs paid this price premium for the Products because they believed the Products were GMO-free and did not contain artificial and synthetic ingredients (in other words, they believed they are 'All Natural' and contained 'Nothing Artificial')."

To conceive how the SAC could possibly be pled with any more particularity strains the imagination.   The Court therefore concludes that the SAC pleads sufficient factual content to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."   Iqbal, 556 U.S. at 663.   The Court further finds that the SAC alleges precisely what statements were made in what documents, when, where and by whom, the content, the manner in which they misled the plaintiff, and what the defendants obtained as a consequence of the fraud.   See Ziemba, 256 F.3d at 1202. Accordingly, the SAC is sufficiently pled under Rules 8 and 9(b) of the Federal Rules of Civil Procedure.   See In re ConAgra Foods Inc., 908 F. Supp. 2d 1090, 1099-1101 (C.D. Cal. 2012).

### D.     Whether the Individual Causes of Action State Claims

#### 1.     The FDUTPA, UCL, FAL, and CLRA claims (Claims I, VII, VIII, IX, and X)

Next, Defendants allege that Plaintiffs' claims under Florida's Deceptive and Unfair Trade Practices Act (FDUTPA), California's Unfair Competition Law (UCL),

California's False Advertising Law (FAL), and California's Consumers Legal Remedies Act (CLRA) must be dismissed because Plaintiffs fail to articulate why a reasonable consumer would be misled. (Motion at 14.) Plaintiff contends that Defendants' arguments are premature at the motion to dismiss stage where the pleadings control. (Response at 19 (citing Wright v. Emory, 41 So. 3d 290, 292-93 (Fla. Dist. Ct. App. 2010) ("Whether [Defendants'] representations constitute 'deceptive and unfair' conduct is an issue of fact to be resolved by the judge at the conclusion of the trial.")).)

"'A consumer claim for damages under FDUTPA has three elements: (1) a deceptive act or unfair practice; (2) causation; and (3) actual damages.'" City First Mortg. Corp. v. Barton, 988 So. 2d 82, 86 (Fla. Dist. Ct. App. 2008) (quoting Rollins, Inc. v. Butland, 951 So. 2d 860, 869 (Fla. Dist. Ct. App. 2006)); see also Maguire v. S. Homes of Palm Beach, 591 F. Supp. 2d 1263, 1271 (S.D. Fla. 2008). "[D]eception occurs if there is a representation, omission, or practice that is likely to mislead the consumer acting reasonably in the circumstances, to the consumer's detriment." PNR, Inc. v. Beacon Prop. Mgmt., Inc., 842 So. 2d 773, 777 (Fla. 2003) (citations and internal quotation marks omitted); see also Zlotnick v. Premier Sales Grp., Inc., 480 F.3d 1281, 1284 (11th Cir. 2007). "This standard requires a showing of 'probable, not possible, deception' that is 'likely to cause injury to a reasonable relying consumer.'" Zlotnick, 480 F.3d at 1284 (quoting Millenium Commc'ns & Fulfillment, Inc. v. Office of the Att'y Gen., 761 So. 2d 1256, 1263 (Fla. Dist. Ct. App. 2000)).

Similarly, the UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200. The FAL prohibits any "unfair, deceptive,

33

untrue, or misleading advertising." Cal. Bus. & Prof. Code § 17500.  The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices."  Cal. Civ. Code § 1770.  The claims under these California statutes are governed by the "reasonable consumer" test.  Williams v. Gerber Prods. Co., 552 F3d 934, 938 (9th Cir. 2008) (citations omitted).  "Under the reasonable consumer standard, [Plaintiffs] must show that members of the public are likely to be deceived."  Id. (citations and internal quotation marks omitted).

Defendants first argue that Plaintiffs have not shown how Defendants have violated the FDA's policy, which permits foods to be labeled "natural" when "nothing artificial or synthetic (including all color additives regardless of source) has been included in, or has been added to, a food that would not normally be expected in the food."  (Motion at 18 (citing 58 Fed. Reg. 2407 (Jan. 6, 1993)).)  In fact, they contend that reasonable consumers "would expect and want vitamins and low-fat soybeans in their food."  (Id.)  However, the SAC alleges that reasonable consumers do not expect that foods labeled "all natural" will contain synthetic and/or artificial ingredients.  (SAC ¶¶ 27, 30, 40, 44.)  "At the motion to dismiss stage, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff."  Garfield v. NDC Health Corp., 466 F.3d 1255, 1261 (11th Cir. 2006) (citation and internal quotation marks omitted).  Thus, the Court rejects Defendants' claim that reasonable consumers would expect and want synthetic and/or artificial ingredients in food labeled "all natural."

Second, Defendants argue that notwithstanding their compliance with the FDA policy, Plaintiffs "claims fail because they have not offered a plausible definition of 'natural' for <u>packaged</u> foods that by definition undergo some processing and human intervention to be created."   (<u>Id.</u>)   They cite <u>Pelayo v. Nestle USA, Inc.</u> where the complaint alleged that the "All Natural" labeling of pasta was misleading because the products contained unnatural, artificial, or synthetic ingredients.   989 F. Supp. 2d 973, 975-76 (C.D. Cal. 2013).   The Court relied on a report by the Federal Trade Commission in which it purportedly "declined to adopt a definition of 'natural' because 'natural may be used in numerous contexts and may convey different meanings depending on that context.'"   <u>Id.</u> at 979.   The Court dismissed the Complaint because the plaintiff "failed to allege either a plausible objective definition of the term 'All Natural' or her subjective definition of the term 'All Natural' that is shared by the reasonable consumer."   <u>Id.</u> at 979-80.

To begin with, no subsequent case has adopted <u>Pelayo</u>'s position, and two cases have affirmatively rejected it.   <u>See</u> <u>Surzyn v. Diamond Foods, Inc.</u>, Case No: C 14-0136 SBA, 2014 WL 2212216, at *3-4 (N.D. Cal. May 28, 2014); <u>Jou v. Kimberly Clark Corp.</u>, Case No.: C-13-03075 JSC, 2013 WL 6491158, at *8 (N.D. Cal. Dec. 10, 2013). As explained by the Court in <u>Surzyn</u>:

> The <u>Pelayo</u> court's reliance on the FTC's report as a basis to dismiss the action is misplaced.   Though not discussed in the court's ruling, the FTC's report relates to the FTC's Guides for the Use of Environmental Marketing Claims ("Guides"), the purpose of which is to "help marketers make truthful and substantiated environmental claims[.]"   75 Fed. Reg. 63552–01, § I (2010). . . . With regard to the meaning of "natural," the FTC chose not to create a specific section in the Guides to define that term.   <u>Id.</u> §

IV.B.4.  The FTC explained that "definitions for terms such as natural must be based on what consumers understand those terms to mean," but that "no commenters provided consumer perception evidence indicating how consumers understand the term 'natural.'"  Id. § IV.B.4.b.  In the absence of such information, the FTC declined to proffer specific guidance on the meaning of "natural," particularly since consumer perception of the term may vary depending on the context in which it is used.  Id.

Nothing in the FTC's analysis either directly or inferentially supports the Pelayo court's conclusion that it is "implausible" that consumers would be misled or confused by the use of "All Natural" on food product packaging. The FTC simply found that the meaning of "natural" is context-specific, and in the absence of contextualized evidence regarding consumer perceptions, it was inappropriate to provide specific guidance on the meaning of that term.  Thus, rather than justifying the Pelayo court's dismissal of the action at the pleading stage, the FTC's observations support the conclusion that the question of whether consumers were deceived by an "All Natural" designation must be resolved based on consideration of evidence–and not at the pleading stage.

2014 WL 2212216, at *3 (emphasis added).  For the same reasons, this Court rejects Pelayo and Defendants' reliance thereon.  Plaintiffs' claims are not deficient for failure to offer an alternative definition of "all natural."  See id.

Third, Defendants argue that Plaintiffs' GMO-based claims fail because the FDA has found that there is no material difference between food produced through bioengineering and those produced naturally.  (Id. at 19 (citing the FDA's "Guidance for Industry Voluntary Labeling Indicating Whether Foods Have or Have Not Been Developed Using Bioengineering, Draft Guidance" (D.E. 72-5)).)  However, as Plaintiffs point out, Defendants' argument attempts "to make the leap from a purported FDA finding [that] there is no material difference between GMO and traditionally bred food to the conclusion that no reasonable consumer would understand the statement "All Natural" to mean the Products were made from non-GMO ingredients."  (Response at

36

21.)  The SAC sufficiently alleges that a reasonable consumer would expect a product labeled "all natural" to be free of GMOs.  (See SAC ¶¶ 27, 30, 36-45.)  And, at this stage of the proceedings, the Court must accept that allegation as true.   See Garfield, 466 F.3d at 1261.

Finally, Defendants argue that Plaintiffs are attempting to conflate "natural" with "organic," and contend that consumers who do not want foods containing GMOs can avoid them because the "federal government has issued extensive regulations for certified organic foods that do not contain bioengineered ingredients."  (Motion at 19 (citing 7 C.F.R. § 205 et seq.).)   Again, the issue is whether the "all natural" labeling on Defendants products would mislead a reasonable consumer into believing they were buying a product free of GMOs, Pyridoxine Hydrochloride, Alpha-Tocopherol Acetate, Hexane-Processed Soy ingredients and Calcium Pantothenate, not whether buying "organic" is "an easy way to avoid such foods."  (Motion at 19.)

In sum, the SAC sufficiently alleges that the "All Natural" labeling of Defendants' Products could mislead a reasonable consumer to his or her detriment.  See Williams, 552 F.3d at 939 (reversing the dismissal of UCL and false advertising claims, finding that "the statement that Fruit Juice Snacks was made with 'fruit juice and other all natural ingredients' could easily be interpreted by consumers as a claim that all the ingredients in the product were natural, which appears to be false."); accord Rojas v. Gen. Mills, Inc., No. C 12–5099 WHO, 2014 WL 1248017, at *7–8 (N.D. Cal. Mar. 26, 2014) ("100% Natural" and "All Natural" representations on Nature Valley granola bars could mislead a reasonable consumer where the products contained GMOs; Parker v. J.M. Smucker Co.,

37

No. C 13–690 SC, 2013 WL 4516156, at *6 (N.D. Cal. Aug. 23, 2013) (plaintiff's allegations that a reasonable consumer would believe that a product labeled as "all natural" contained no bioengineered or chemically altered ingredients "cannot be resolved as a matter of law"); Vicuna v. Alexia Foods, Inc., No. C 11–6119 PJH, 2012 WL 1497507, at *2 (N.D. Cal. Apr. 27, 2012) (same); Ben & Jerry's, Nos. C 10–4387 PJH, C 10–4937 PJH, 2011 WL 2111796, at *5–6 (N.D. Cal. May 26, 2011) (same). Accordingly, the Court denies Defendants Motion to Dismiss Claims I, VII, VIII, IX, and X for failure to state claims.

## 2.    Negligent Misrepresentation (Claim II)

Next, Defendant argues that Plaintiffs' negligent misrepresentation claim (Claim II)—which alleges, in part, that "[t]hrough advertising not related to the label, Defendants have failed to disclose that the Products contain [GMOs] and other artificial and synthetic ingredients," (SAC ¶ 90)—must be dismissed because the SAC fails to identify the advertising at issue.  (Motion at 19.)  Plaintiffs argue that they have sufficiently alleged that they "reasonably relied on Defendants' 'all natural' and 'nothing artificial' representations" as well as Defendants' strategic branding on its labels and websites." (Response at 23 (quoting SAC ¶ 29).)

"To state a cause of action for negligent misrepresentation in Florida, a plaintiff must allege: '(1) the defendant made a misrepresentation of material fact that he believed to be true but which was in fact false; (2) the defendant was negligent in making the statement because he should have known the representation was false; (3) the defendant intended to induce the plaintiff to rely . . . on the misrepresentation; and (4) injury

resulted to the plaintiff acting in justifiable reliance upon the misrepresentation.'"

McGee v. JP Moragn Chase Bank, NA, 520 F. App'x 829, 831 (11th Cir. 2013) (quoting

Simon v. Celebration Co., 883 So. 2d 826, 832 (Fla. Dist. Ct. App. 2004)).

"The Eleventh Circuit has . . . noted that because actions for negligent

misrepresentation in Florida sound in fraud rather than negligence, the pleading

requirements contained in Federal Rule of Civil Procedure 9(b) apply to such actions."

Recreational Design & Constr., Inc. v. Wiss, Janney, Elstner Assocs., Inc., 820 F. Supp.

2d 1293, 1303 (S.D. Fla. 2011) (citing Souran v. Travelers Ins. Co., 982 F.2d 1497, 1511

(11th Cir. 1993).)  "Rule 9(b) is satisfied if the complaint sets forth '(1) precisely what

statements were made in what documents or oral representations or what omissions were

made, and (2) the time and place of each such statement and the person responsible for

making (or, in the case of omissions, not making) same, and (3) the content of such

statements and the manner in which they misled the plaintiff, and (4) what the defendants

obtained as a consequence of the fraud.'"  Ziemba, 256 F.3d at 1202 (quoting Brooks v.

Blue Cross and Blue Shield of Fla., Inc., 116 F.3d 1364, 1371 (11th Cir. 1997)).

The Court finds that Plaintiffs have stated a claim for negligent misrepresentation

with respect to the "all natural" and "nothing artificial" representations on the product

labeling.  With respect to the first two prongs, construing the inferences drawn from the

SAC's factual allegations in the light most favorable to Plaintiffs, the Court finds that

Claim II alleges that Defendants' made a negligent misrepresentation of material fact

they should have known was false.  (See, e.g., SAC ¶ 89 ("Defendants have negligently

represented that the Products have nothing artificial and are all 'ALL NATURAL,' when

in fact, they are not because it contains GMOs."); <u>id.</u> ¶ 28 ("Defendants' statement that the Products had nothing artificial and were 'All Natural,' was important to Plaintiffs in deciding to purchase and consume the Products because they would not have purchased and consumed the Products had they not been advertised and labeled as 'All Natural' . . . .").)[14]

With respect to the third prong, the SAC sufficiently alleges that Defendants intended to induce the Plaintiffs to rely on the misrepresentation.   (See <u>id.</u> ¶ 91 ("Defendants knew or should have known that these omissions would materially affect Plaintiffs' and Class Members' decisions to purchase the Products."); <u>id.</u> ¶ 82 ("Defendants have deceived reasonable consumers, like Plaintiff and the Class, into believing its Products were something they were not—'All Natural.'").)

With respect to the fourth prong, the SAC sufficiently alleges that injury resulted to the Plaintiffs acting in justifiable reliance upon the misrepresentation.   (See <u>id.</u> ¶ 92 ("Plaintiffs and other reasonable consumers, including the Class members, reasonably relied on Defendants' representations set forth herein, and, in reliance thereon, purchased the Products."); <u>id.</u> ¶ 94 ("Plaintiffs would not have been willing to pay for Defendants' Products if they knew that they contained genetically modified organisms and/or other artificial and synthetic ingredients, such as pyridoxine hydrochloride, alpha-tocopherol acetate, hexane-processed soy ingredients and calcium pantothenate."); <u>id.</u> ¶ 95 ("As a direct and proximate result of these misrepresentations, Plaintiffs and Members of the

---

[14]     Claim II specifically incorporates by reference the allegations set forth in the previous paragraphs.  (SAC ¶ 88.)

Class were induced to purchase and consume Defendants' Products, and have suffered damages to be determined at trial in that, among other things, they have been deprived of the benefit of their bargain in that they bought Products that were not what they were represented to be, and they have spent money on Products that had less value than was reflected in the premium purchase price they paid for the Products.").)   Thus, even assuming that Defendants are correct in that the SAC fails to state a negligent misrepresentation claim with respect to "advertising not related to the label," the SAC sufficiently alleges a negligent misrepresentation claim with respect to the representations made on the label.

### 3.   Warranty Claims

Next, Defendants argue that Plaintiffs' claims for Breach of Implied Warranty of Fitness for Purpose (Claim III) and Breach of Express Warranty (Claim IV) fail because there is no privity.  (Motion at 20.)  Specifically, they argue that Plaintiffs allege that they bought the products from Publix, Whole Foods, and Trader Joe's supermarkets, and argue that Florida law requires privity of contract with the defendant in order to recover on express and implied warranty claims.  (Id. (citing T.W.M. v. Am. Med. Sys., Inc., 886 F. Supp. 842, 844 (N.D. Fla. 1995); Weiss v. Johansen, 898 So. 2d 1009, 1011 (Fla. Dist. Ct. App. 2005)).)  Defendants further argue that the express warranty claim must be dismissed because Plaintiffs failed to allege that Defendants made statements amounting to "an affirmation of fact or promise."  (Id. (citing Fla. Stat. 672.313; Carter v. Hale Stores, Inc. v. Conley, 372 So. 2d 965, 969 (Fla. Dist. Ct. App. 1979).)

### a.     Implied Warranty (Claim III)

"Florida law requires privity of contract to sustain a breach of implied warranty claim."  David v. Am. Suzuki Motor Corp., 629 F. Supp. 2d 1309, 1321 (S.D. Fla. 2009) (containing a comprehensive discussion of the evolution of the privity requirement in implied warranty claims under Florida law); see also Kramer v. Piper Aircraft Corp., 520 So. 2d 37, 39 (1988) (noting that an action for breach of implied warranty exists "where privity of contract is shown.")   Because the SAC does not allege privity of contract between Plaintiffs and Defendants, Claim III must be dismissed.  See Bailey v. Monaco Coach Corp., 168 F. App'x 893, 895 (11th Cir. 2006) (affirming district court's dismissal of implied warranty claim because plaintiff lacked privity with defendant manufacturer); Mesa v. BMW of N. Am., LLC, 904 So. 2d 450, 458 (Fla. Dist. Ct. App. 2005) ("Under Florida law, a plaintiff cannot recover economic losses for breach of implied warranty in the absence of privity.") (citations omitted).

### b.     Express Warranty (Claim IV)

Whether privity is required in a claim for breach of express warranty under Florida law is not as clear cut.  See Smith v. Wm. Wrigley Jr. Co., 663 F. Supp. 2d 1336, 1341-1343 (S.D. Fla. 2009) (characterizing the privity requirement in Florida warranty claims as "a moving target").  Although there is case law supporting Defendants' position that privity is required for express warranty claims, see T.W.M., 886 F. Supp. at 844, several cases involving the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq. ("MMWA") have not required privity for express warranty claims to advance past the motion to dismiss stage.  See, e.g., Rentas v. DaimlerChrysler Corp., 936 So. 2d 747, 751 (Fla. Dist.

Ct. App. 2006).  Furthermore, in <u>David v. American Suzuki Motor Corp.</u>, which involved express and implied warranty claims under both Florida law and the MMWA, Judge Gold dismissed the implied warranty claims for lack of privity but made no mention of privity in discussing the express warranty claims which survived the motion to dismiss.  629 F. Supp. 2d at 1323-24, 1328.

Additionally, in <u>Smith</u>—a case highly analogous to the case at bar—Judge Cohn concluded that the plaintiff's claim for breach of express warranty survived the defendant's motion to dismiss, despite the absence of privity.  663 F Supp. 2d at 1343. <u>Smith</u> centered on Wrigley's claim "that its Eclipse® gum brand is 'scientifically proven to help kill the germs that cause bad breath' as a result of the 'natural ingredient,' Magnolia Bark Extract ('MBE')."  <u>Id.</u> at 1337.  The plaintiff alleged that Wrigley's claim was "false, deceptive and likely to mislead," and sued for, <u>inter alia</u>, breach of express warranty.  <u>Id.</u> at 1337-38.  The defendants moved to dismiss the express warranty claim for failure to establish privity.  <u>Id.</u> at 1341.  Judge Cohn discussed the uncertainty surrounding the privity requirement for breach of express warranty claims under Florida law, distinguished the cases requiring privity in such claims, and concluded that the plaintiff stated a valid express warranty claim.  <u>Id.</u> at 1343.

> The Court need not resolve the issue of whether privity is ever required for express warranty claims under Florida law.  Rather, the Court finds that, given the particular facts of this case, the analysis here is relatively straight-forward.  First, this case is not similar to <u>T.W.M.</u> or <u>Stearman</u>.  In each of those cases, whether it be a doctor installing an implant or a computer salesman, it could be assumed that the end-purchaser might expect the seller or "middle man" to have relevant knowledge, or even expertise, regarding the manufacturer's product.  Here, it defies common sense to argue that purchasers of Eclipse gum presumed that the cashier at the local

> convenience store is familiar with the scientific properties of MBE.
> Second, it is significant that the express warranty the manufacturer
> allegedly breached is contained on the packaging of Eclipse gum. Compl. ¶
> 14. Moreover, the Complaint alleges that Plaintiff relied on the warranty
> when purchasing the gum. Id. ¶ 8. Accordingly, the Court finds that
> Plaintiff states a valid claim for breach of express warranty.

Id. This Court is persuaded by Judge Cohn's analysis in Smith and, for the same reasons, concludes that Plaintiffs claim for breach of express warranty survives despite the absence of privity.

With respect to Defendants' alternative argument, under Florida law, "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise." Fla. Stat. 672.313(1)(a). Construing the SACs allegations in the light most favorable to Plaintiffs, and drawing all reasonable inferences therefrom, the Court finds that the SAC sufficiently states a claim for breach of express warranty under the statutory definition. See Vicuna v. Alexia Foods, Inc., No. C 11-6119 PJH, 2012 WL 1497507, at *2 (N.D. Cal. Apr. 27, 2012) (holding that the plaintiffs adequately stated express warranty claim regarding "all natural" characterization of potato containing allegedly synthetic ingredient under California's parallel "affirmation of fact or promise" standard).

### 4.    Declaratory Judgment (Claim V)

Claim V seeks a declaratory judgment "requiring Defendants to cease using genetically modified organisms in its All Natural products and/or stopping Defendants

from representing its products are All Natural when they are not." (SAC ¶ 115.) The Court finds that Claim V is a claim for injunctive relief, <u>not</u> a declaratory judgment.

A declaratory judgment is "[a] binding adjudication that establishes the rights and other legal relations of the parties without providing for or ordering enforcement." <u>Black's Law Dictionary</u> 971 (10th ed. 2014); <u>see also</u> <u>Broadview Chem. Corp. v. Loctite Corp.</u>, 474 F.2d 1391, 1393 (2d Cir. 1973) ("[A] declaratory judgment is to clarify and settle disputed legal relationships and to relieve uncertainty, insecurity and controversy."). An injunction is "[a] court order commanding or preventing an action." <u>Black's Law Dictionary</u> 904 (10th ed. 2014).

> In a general sense, every order of a court which commands or forbids is an injunction; but in its accepted legal sense, an injunction is a judicial process or mandate operating <u>in personam</u> by which, upon certain established principles of equity, a party is required to do or refrain from doing a particular thing. An injunction has also been defined as a writ framed according to the circumstances of the case, commanding an act which the court regards as essential to justice, or restraining an act which it esteems contrary to equity and good conscience; as a remedial writ which courts issue for the purpose of enforcing their equity jurisdiction; and as a writ issuing by the order and under the seal of a court of equity.

1 Howard C. Joyce, <u>A Treatise on the Law Relating to Injunctions</u> §1, at 2-3 (1909), as quoted in <u>Black's Law Dictionary</u> at 904.

Claim V does not request a binding adjudication regarding the parties' rights and legal relations, but rather requests an order commanding Defendants "to cease using genetically modified organisms in its All Natural products and/or stopping Defendants from representing its products are All Natural . . . ." (SAC ¶ 115.) Such a request is, by definition, one for injunctive relief. However, "to obtain a permanent injunction, a party

must show: (1) that he has prevailed in establishing the violation of the right asserted in his complaint; (2) there is no adequate remedy at law for the violation of this right; and (3) irreparable harm will result if the court does not order injunctive relief." Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1128 (11th Cir. 2005). The Court finds that: (1) a permanent injunction is premature in that Plaintiffs have not prevailed in establishing the violation of the right asserted in the SAC; and (2) an adequate remedy at law exists. An injunction is therefore inappropriate, and Claim V is therefore dismissed.

### 5.    Money Had and Received (Claim VI)

Next, Defendants argue that Plaintiffs' claim for Money Had and Received must be dismissed because "Plaintiffs do not – and cannot – allege that the money they paid for Kashi products was intended to be used for the benefit of the Plaintiffs, as that money was undisputedly provided to Publix, Whole Foods, and Trader Joe's in exchange for Kashi cereal and snack bars." (Motion at 21.) They further argue that the claim may only be pursued to the extent that there is privity between the plaintiff and defendant, which is absent here. (Id.) Plaintiffs argue that the claim survives because the SAC properly alleges that they paid a price premium in exchange for Defendants' products and had they known that the products were not all natural they would not have been deprived of their money. (Response at 25.) They further allege that "Defendants' privity argument fails because the money Plaintiffs paid to retailers in exchange for the Products, in fact, provides significant monetary benefits to Defendants." (Id.)

"Florida law recognizes the general rule that 'an action for money had and received . . . can be maintained where money is paid under a mistake of fact or where

46

money has been obtained through fraud, imposition, extortion or undue advantage.'"[15] Berry v. Budget Rent A Car Sys., Inc., 497 F. Supp. 2d 1361, 1370 (S.D. Fla. 2007) (quoting Cent. Bank & Trust Co. v. Gen. Fin. Corp., 297 F.2d 126, 129 (5th Cir. 1961)). In Florida, a claim for money had and received is treated the same (and requires the same showing) as a claim for unjust enrichment or restitution.  See Kelly v. Palmer, Reifler, & Assocs., P.A., 681 F. Supp. 2d 1356, 1384 (S.D. Fla. 2010); Moore v. Handley, Inc. v. Major Realty Corp., 340 So. 2d 1238, 1239 (Fla. Dist. Ct. App. 1976).  To prevail on the claim, Plaintiffs must show that (1) they conferred a benefit on Defendants; (2) Defendants appreciated such benefit; and (3) acceptance and retention of such benefit by Defendants under the circumstances would be inequitable without paying for it.  Kelly, 681 F. Supp. 2d at 1384; see also Moore Handley, 340 So. 2d at 1239 ("An action for money had and received may, in general, be maintained whenever one has money in his hands belonging to another, which in equity and good conscience, he ought to pay over to that other.") (citation and internal quotation marks omitted).  "There can be no strict rule as to what constitutes unjust enrichment, nor can an exhaustive list be given of elements which must be alleged [sic] in a pleading in order to state a cause of action for restitution. Everything depends on the circumstances of the individual case and whether or not the pleader has alleged facts which show that an injustice would occur if money were not refunded."  Moore Handley, 340 So. 2d at 1239.

---

[15]     Although Claim VI references a California definition for a money had and received claim, it is listed under the "Florida Causes of Action" heading, and the only case to which Plaintiffs' cite in their Response is a Florida case.  (See Response at 25 (citing Sharp v. Bowling, 511 So. 2d 363, 364-65 (Fla. Dist. Ct. App. 1987)).)  Accordingly, the Court will proceed with its analysis of the money had and received claim by looking to Florida law.

Claim VI of the SAC alleges that "Defendants have represented on its label that its Products are 'All Natural' when in fact, they are not, because they contain GMOs, a fact that Defendants fail to disclose . . . ." (SAC ¶ 120.)  It further alleges that Defendants received, accepted, and retained money from the Plaintiffs through the purchase price obtained from sales of the Products to Plaintiffs.  (Id. ¶¶ 122-23.)  It further alleges that "Defendants have profited from their unlawful, unfair, misleading, and deceptive practices and advertising at the expense of Plaintiffs and Class Members, under circumstances in which it would be unjust for Defendants to be permitted to retain the benefit." (Id. ¶ 124.)  The Court finds that Plaintiffs have sufficiently pled the elements of a money had and received cause of action.

With respect to Defendants' argument that the claim fails for lack of privity, the Supreme Court of Florida has stated:

> When the fact is proved that one has money received from another, if the recipient cannot show a legal and equitable ground for retaining it, the law creates the privity and promise necessary to sustain the action for money had and received.  And it is settled that money paid under a mistake of facts may be so recovered, it being considered unconscionable that money so paid should be detained from the payor on his discovery of the mistake and demand for the money's return.

First State Bank of Fort Meade v. Singletary, 169 So. 407, 408 (Fla. 1936) (emphasis added); see also Anchor Sav. Bank v. Berlin, 445 So. 2d 675, 676 (Fla. Dist. Ct. App. 1984); Ferguson v. Cotler, 382 So. 2d 1315, 1316 (Fla. Dist. Ct. App. 1980). Accordingly, the Court rejects Defendants' argument that Claim VI fails for lack of privity and concludes that Plaintiffs have stated a viable claim for money had and received under Florida law.

**E.      Whether Plaintiffs Have Standing for Products They Did Not Purchase**

The SAC alleges that Plaintiffs purchased eight of the eighty-one products listed in the SAC.  (See SAC ¶¶ 21-23.)  Defendants argue that Plaintiffs lack standing to pursue any claims involving Kashi products they did not purchase.  (Motion at 21.)  Plaintiffs argue that "[a] named plaintiff has standing to assert claims for products he did not purchase when those products are sufficiently similar and part of the same product line." (Response at 25 (citing Colucci v. ZonePerfect Nutrition Co., No. 12-2907-SC, 2012 WL 6737800 (N.D. Cal. Dec. 28, 2012); Miller v. Ghirardelli Chocolate Co., 912 F. Supp. 2d 861, 869 (N.D. Cal. 2012)).)  Plaintiffs contend that the non-purchased products are sufficiently similar to confer standing.  (Id. at 25-26.)  In reply, Defendants cite to Toback v. GNC Holdings, Inc., a case from this District in which the Court held that the class representative did not have standing to "raise claims relating to those other products which he did not purchase."  No. 13-80526-CIV, 2013 WL 5206103, at *5 (S.D. Fla. Sept. 13, 2013).

In Toback, a single plaintiff brought a single FDUTPA claim against GNC challenging representations GNC made about its entire "TriFlex" line of products, even though the plaintiff had only purchased one product from the TriFlex line (the TriFlex Vitapak).  Id. at *1.  GNC argued Plaintiff lacked standing to challenge the non-purchased items.  Id. at *4.  The court noted that some courts have dismissed similar claims for lack of standing to challenge the non-purchased products, see id. (citing Pearson v. Target Corp., No. 11-7972, 2012 WL 7761986 (N.D. Ill. Nov. 9, 2012)), while other courts hold that whether a class representative has standing to challenge non-

purchased products is a question more appropriate for the class certification stage, id. (citing Cardenas v. NBTY, Inc., 870 F. Supp. 2d 984, 991-92 (E.D. Cal. 2012), while still other courts have permitted plaintiffs to maintain consumer class actions involving products they did not purchase, id. (citing In re Frito-Lay N. Am., Inc., No. 12-2413, 2013 WL 4647512 (E.D.N.Y. Aug. 29, 2013)).  However, the Court in Toback stated that

> the law in the Eleventh Circuit is clear that at least one named plaintiff must establish Article III standing for each class subclaim.  Prado–Steiman v. Bush, 221 F.3d 1266, 1279–80 (11th Cir. 2000).  In other words, Article III standing of a named plaintiff must be established on a claim-by-claim basis within the Eleventh Circuit, and deferring the standing determination to the class[-]certification stage will yield no different result.

Id.  The court concluded:

> The Article III standing analysis requires a plaintiff to demonstrate that he has suffered an injury-in-fact.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–61, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992).  Because Plaintiff alleges that he purchased the TriFlex Vitapak, but not other TriFlex products, he has failed to plead that he suffered any injury with regard to products other than the TriFlex Vitapak.  See Guerrero v. Target Corp., 889 F. Supp. 2d 1348, 1353–54 (S.D. Fla. 2012) (standing satisfied for FDUTPA claim where plaintiff purchased product forming basis of claim).  Plaintiff therefore cannot establish his Article III standing with respect to any product other than the Vitapak, see Lujan, 504 U.S. at 560–61, and cannot raise claims relating to those other products which he did not purchase, see Prado–Steiman, 221 F.3d at 1279–80.  The claims Plaintiff has standing to bring are therefore limited to those relating to the TriFlex Vitapak.

Id. at *5.

The Court acknowledges that "there is authority going both ways" on this issue. Astiana v. Dreyer's Grand Ice Cream, Inc., Nos. C-11-2910 EMC, C-11-3164 EMC, 2012 WL 2990766, at *11 (N.D. Cal. July 20, 2012), and other courts in other circuits permit class representatives to challenge non-purchased products that are "sufficiently

similar" to the purchased products.[16]  Id. (noting that "the critical inquiry seems to be whether there is sufficient similarity between the products purchased and not purchased"); see also Colucci, 2012 WL 6737800, at *4-5; Miller, 912 F. Supp. 2d at 869 ("The majority of the courts that have carefully analyzed the question hold that a plaintiff may have standing to assert claims for unnamed class members based on products he or she did not purchase so long as the products and alleged misrepresentations are substantially similar."); Koh v. S.C. Johnson & Son, Inc., No. C-09-0927 RMW, 2010 WL 94265 (N.D. Cal. Jan. 6, 2010).

Although the Court finds persuasive arguments supporting both positions, it appears that Toback is the only case from the Eleventh Circuit to directly address the issue.  Relying on the Eleventh Circuit's opinion in Prado–Steiman, 221 F.3d at 1279-80, Toback held that a named plaintiff in a consumer class action lacks standing to challenge a non-purchased product because there is no injury-in-fact as to that product, even if he purchased a substantially similar product.  2013 WL 5206103, at *4-5.  This interpretation is consistent with other pronouncements from the Eleventh Circuit.  See Wooden v. Bd. of Regents of Univ. Sys. of Ga., 247 F.3d 1262, 1288 (11th Cir. 2001) ("[J]ust as a plaintiff cannot pursue an individual claim unless he proves standing, a plaintiff cannot represent a class unless he has standing to raise the claims of the class he seeks to represent."); Griffin v. Dugger, 823 F.2d 1476, 1483 (11th Cir. 1987) ("[The] individual injury requirement is not met by alleging 'that injury has been suffered by

---

[16]     There is actually a split of authority on the issue within the Ninth Circuit alone, as discussed by Miller, 912 F. Supp. 2d at 869 and Dreyer's Grand, 2012 WL 2990766, at *11-12.

other, unidentified members of the class to which [the plaintiff] belong[s] and which [he] purport[s] to represent.' Warth v. Seldin, 422 U.S. 490, 502 (1975) . . . Moreover, it is not enough that a named plaintiff can establish a case or controversy between himself and the defendant by virtue of having standing as to just one of many claims he wishes to assert. Rather, each claim must be analyzed separately, and a claim cannot be asserted on behalf of a class unless at least one named plaintiff has suffered the injury that gives rise to that claim."). Toback's holding is also consistent with U.S. Supreme Court precedent:

> It is not enough that the conduct of which the plaintiff complains will injure someone. The complaining party must also show that he is within the class of persons who will be concretely affected. Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject.

Blum v. Yaretsky, 457 U.S. 991, 999 (1982) (second emphasis added)

The Court agrees with Toback that, in the Eleventh Circuit, a named plaintiff in a consumer class action "cannot raise claims relating to those other products which he did not purchase[.]" 2013 WL 5206103, at *5 (citing Prado-Steiman, 221 F.3d at 1279-80). Therefore, in this case, the claims Plaintiffs' have standing to bring are limited to the following products:

1. Kashi® GOLEAN® Crunch! Cereal;

2. Kashi® GOLEAN® Crunchy! Chocolate Peanut Protein & Fiber Bars;

3. Kashi® GOLEAN® Roll! Chocolate Peanut Protein & Fiber Bars;

4. Kashi® TLC Trail Mix Chewy Granola Bars;

5. Kashi® TLC Honey Almond Flax Chewy Granola Bars;

6. Kashi® TLC Peanut Peanut Butter Chewy Granola Bars;

7. Kashi® TLC Cherry Dark Chocolate Chewy Granola Bars; and

8. Kashi® TLC Pumpkin Spice Flax Crunchy Granola Bars.

(See SAC ¶¶ 21-23.)

**F.      Whether Defendant Kellogg Company Must be Dismissed**

Finally, Defendants argue that Defendant The Kellogg Company ("Kellogg") must be dismissed from this action because the SAC insufficiently alleges that Kashi is the "mere instrumentality" or "alter ego" of Kellogg.  (Motion at 22.)  Plaintiff agrees that a parent corporation cannot be held liable for the actions of its subsidiary unless the subsidiary is deemed to be a mere instrumentality of the parent, but argues that this issue presents a factual question not suitable for resolution at the motion to dismiss stage. (Response at 27-28.)

In Florida, "[a] parent corporation will not be held liable for the actions of its subsidiary unless the subsidiary is deemed to be a mere instrumentality of the parent." Federated Title Insurers, Inc. v. Ward, 538 So. 3d 890, 891 (Fla. Dist. Ct. App. 1989) (citation omitted).

> For a subsidiary to be considered a mere instrumentality of a parent corporation, there must be: (1) control of the parent over the subsidiary "to the degree that it is a mere instrumentality." (2) parent committed fraud or wrongdoing through its subsidiary. (3) unjust loss or injury to a claimant, such as when the subsidiary is insolvent. . . . A mere instrumentality finding is rare.

Id. (citations omitted).  Or, as the Eleventh Circuit has stated: "Florida law allows a party to pierce the corporate veil and hold a parent corporation liable for its subsidiary's actions

if it can demonstrate first, 'that the subsidiary was a 'mere instrumentality' of the parent,' and second, 'that the parent engaged in 'improper conduct' through its organization or use of the subsidiary.'" SEB S.A. v. Sunbeam Corp., 148 F. App'x 774, 800 (quoting Johnson Enters. of Jacksonville, Inc. v. FPL Grp., Inc., 162 F.3d 1290, 1320 (11th Cir. 1998)).

Similarly, "[u]nder California law, a parent corporation may be held liable for the acts of its subsidiary only if that subsidiary is either the alter ego or the agent of the parent." Salkin v. United Servs. Auto. Ass'n, 797 F. Supp. 2d 1062, 1065 (C.D. Cal. 2011) (citations omitted).

> To apply the alter ego doctrine, there must be: (1) "such a unity of interest and ownership between the corporation and its equitable owner that the separate personalities . . . do not in reality exist," and (2) "there must be an inequitable result if the acts in question are treated as those of the corporation alone." . . . Some of the factors a court should consider in determining whether to apply the doctrine are:
>
>> "commingling of funds and other assets of the two entities, the holding out by one entity that it is liable for the debts of the other, identical equitable ownership in the two entities, use of the same offices and employees, and use of one as a mere shell or conduit for the affairs of the other."

Id. (quoting Sonora Diamond Corp. v. Super. Ct., 99 Cal. Rptr. 2d 824 (Cal. Ct. App. 2000)).

The Court concludes that the SAC must be dismissed as to Kellogg because it simply does not allege a "mere instrumentality" or "alter ego" theory of liability. See Molinos Valle del Cibao, C. por A. v. Lama, 633 F.3d 1330, 1351 (11th Cir. 2011) (affirming district court's rejection of agency theory of liability for failure to plead it in

the amended complaint); see also Pegasus Imaging Corp. v. Northrop Grumman Corp.,

No. 08:07-CV-1937-T-27EAJ, 2008 WL 5099691, at *2-3 (M.D. Fla. Nov. 25, 2008)

(dismissing claim against parent company for failure to plead sufficient facts establishing

liability for subsidiary).  In fact, the SAC does not even mention Kellogg beyond noting

that Kashi is a "subsidiary" of Kellogg, and alleging that Kellogg "promoted and

marketed the Products at issue."  (SAC ¶¶ 19-20.)  This falls far short of establishing that

Kashi is a "mere instrumentality" or "alter ego" of Kellogg, as is required to survive

Defendants' Motion.  Accordingly, the Court dismisses the SAC as to Defendant The

Kellogg Company.

## V.      Conclusion

Accordingly, it is **ORDERED AND ADJUDGED** that:

1.      The Parties' Agreed Motion to File Documents Under Seal (D.E. 73), filed

December 4, 2013, is **GRANTED**;

2.      Plaintiffs' Unopposed Motion to Request Judicial Notice in Support of their

Response in Opposition to Defendants' Motion to Dismiss (D.E. 81), filed

December 23, 2013, is **GRANTED**;

3.      The Parties' Agreed Motion to File Documents Under Seal (D.E. 88), filed

January 10, 2014, is **GRANTED**;

4.      Consistent with this Order, Defendants' Motion Requesting Judicial Notice

in Support of their Motion to Dismiss (D.E. 72), filed December 2, 2013, is

**GRANTED IN PART AND DENIED IN PART**;

5.     Consistent with this Order, Defendants' Motion to Dismiss Plaintiffs' Second Amended Complaint (D.E. 74), filed December 4, 2014, is **GRANTED IN PART AND DENIED IN PART**;

6.     The SAC is **DISMISSED with prejudice** as to Defendant The Kellogg Company;

7.     Plaintiffs' claim for Implied Warranty of Fitness for Purpose (Claim III) is **DISMISSED with prejudice**;

8.     Plaintiffs' claim for a Declaratory Judgment (Claim V) is **DISMISSED with prejudice**; and

9.     Consistent with this Order, Plaintiffs' lack standing to assert claims regarding products they did not purchase, and the surviving claims are therefore limited to the eight products the SAC alleges Plaintiffs' purchased.

**DONE AND ORDERED** in Chambers at Miami, Florida this 5th day of September, 2014.

*Joan A. Lenard*

**JOAN A. LENARD**
**UNITED STATES DISTRICT JUDGE**